1  JAMES E. BURNS, JR. (STATE BAR NO. 53250)
   jburns@orrick.com
2  ERICH F. LICHTBLAU (STATE BAR NO. 184450)
   elichtblau@orrick.com
3  EUNICE J. LEE (STATE BAR NO. 233467)
   ejlee@orrick.com
4  SARAH C. MARRIOTT (STATE BAR NO. 241301)
   smarriott@orrick.com
5  TARA M. MCMANIGAL (STATE BAR NO. 252076)
   tmcmanigal@orrick.com
6  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
7  405 Howard Street
   San Francisco, CA  94105-2669
8  Telephone:      415-773-5700
   Facsimile:       415-773-5759
9
   Attorneys for Plaintiff
10 Carlos Castro

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

14

15
   Carlos Castro,                        Case No.  3:98-CV-04877-WHA
16
                  Plaintiff,             **PLAINTIFF'S OPPOSITION TO**
17                                       **DEFENDANTS' MOTIONS TO DISMISS**
          v.                             **AND FOR  SUMMARY JUDGMENT**
18
   Cal Terhune, Director, California Department    Date:  October 8, 2009
19 of Corrections, Bonnie G. Garibay; J.           Time:  8:00 a.m.
   Batchelor; S. C. Wolhwend; A. Scribner; J.      Place:  Courtroom 9, 19th Floor
20 Stokes; M. Yarborough; L. Hood; C. Campbell;    Judge: William Alsup
   A. M. Gonzalez; M. Ayala; E. Derusha, c/o
21 Robert L. Ayers, Warden; J. Martinez            Trial Date: November 2, 2009

22                  Defendants.

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND FOR SUMMARY JUDGMENT
3:98-CV-04877-WHA

1

**TABLE OF CONTENTS**

2

Page

3

I.      INTRODUCTION .................................................................................................. 1

4

II.     MR. CASTRO DISPUTES SOME OF DEFENDANTS' "UNDISPUTED" FACTS ...................................................................................................................... 2

5

III.    MR. CASTRO EXHAUSTED HIS ADMINISTRATIVE REMEDIES, OR ALTERNATIVELY, DEFENDANTS WAIVED THIS AFFIRMATIVE

6       DEFENSE ........................................................................................................... 5

7

IV.     THE NEW VALIDATION DID NOT AND COULD NOT REMEDY DEFENDANTS' FAILURE TO PROVIDE DUE PROCESS IN 1997 ......................... 7

8       A.    The New Validation Did Not Provide Mr. Castro A Meaningful Opportunity To Present His Views To The Critical Decisionmaker Prior To

9             Being Confined To Administrative Segregation In 1997 ...................................... 7

10            B.    The New Validation Was A Sham ....................................................................... 8

V.      THAT MR. CASTRO WAS RETAINED IN ADMINISTRATIVE

11      SEGREGATION AFTER HIS "INACTIVE REVIEW" DOES NOT MOOT HIS DUE PROCESS CLAIM ...................................................................................... 13

12

VI.     THE COURT SHOULD PRECLUDE DEFENDANTS FROM RELYING ON

13      THEIR NEW EVIDENCE BECAUSE DEFENDANTS DID NOT DISCLOSE THESE WITNESSES AND DID NOT PRODUCE THESE DOCUMENTS IN

14      DISCOVERY ..................................................................................................... 13

VII.    EVEN IF A NEW VALIDATION, TWELVE YEARS LATER, COULD MOOT

15      THE CASE, THIS PARTICULAR NEW VALIDATION CREATES TRIABLE ISSUES OF FACT, PREVENTING SUMMARY DISPOSITION, AND

16      PLAINTIFF IS ENTITLED TO CONDUCT DISCOVERY REGARDING THE NEW EVIDENCE BEFORE THE COURT RENDERS ANY DETERMINATION

17      BASED UPON IT ............................................................................................... 14

18      VIII.   EVEN IF MR. CASTRO IS A PRISON GANG ASSOCIATE TODAY (HE IS NOT), THAT DOES NOT MEAN HE WAS A PRISON GANG ASSOCIATE IN

19      1997, AND HE IS ENTITLED TO HAVE HIS RECORD CLEARED FOR PURPOSES OF PAROLE. ................................................................................. 16

20      IX.     EVEN IF THE CASE WERE TECHNICALLY MOOT, THE ISSUE IS CAPABLE OF REPETITION, YET EVADING REVIEW, AND SHOULD

21      THEREFORE NOT BE DISMISSED ................................................................... 16

22      X.      ALL DEFENDANTS NEED TO REMAIN IN THIS CASE TO AFFORD MR. CASTRO A MEANINGFUL REMEDY ............................................................... 18

23      XI.     CONCLUSION ................................................................................................... 19

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Basua v. Solis,*
   2007 U.S. Dist. LEXIS 66068 (ND Cal. Aug. 27, 2007) ................................................... 17

*Brevot v. N.Y. City Dep't of Educ.,*
   2007 U.S. Dist. LEXIS 16109 (S.D. N.Y. Mar. 5, 2007) ................................................. 10

*Cato v. Rushen,*
   824 F.2d 703 (9th Cir. 1987) ........................................................................................... 9

*Claiborne v. Dir. of Corr.,*
   2008 U.S. Dist. LEXIS 63726  (N.D. Cal., Aug. 18, 2008) ............................................. 5

*Hubbart v. Knapp,*
   379 F.3d 773 (9th Cir. 2004) ......................................................................................... 17

*Huffman v. Constr. Protective Servs,*
   541 F.3d 1175 (9th Cir. 2008) ....................................................................................... 14

*In re Lucero L.,*
   22 Cal. 4th 1227 (2000) .................................................................................................... 9

*Jones v. Bock,*
   549 U.S. 199 (2007) ......................................................................................................... 6

*Keithley v. Homestore.com, Inc.,*
   2009 U.S. Dist. LEXIS 2720 (N.D. Cal. Jan. 7, 2009) .................................................. 14

*Lawson v. City of Santa Barbara,*
   310 F.3d 1134 (9th Cir. 2002) ....................................................................................... 18

*Lawson v. City of Santa Barbara,*
   314 F.3d 1070 (9th Cir. 2002) ....................................................................................... 18

*Lawson v. City of Santa Barbara,*
   53 Fed. Appx. 494 (9th Cir. 2002) ................................................................................ 18

*Lewis v. Solis,*
   2005 U.S. Dist. LEXIS 39828 (N.D. Cal. Dec. 8, 2005) ............................................... 17

*Lira v. Herrera,*
   427 F.3d 1164 (9th Cir. 2005) ......................................................................................... 6

*Madrid v. Gomez,*
   889 F. Supp. 1146 (N.D. Cal. 1995) ......................................................................... 2, 15

*Panaro v. City of N. Las Vegas,*
   432 F.3d 949 (9th Cir. 2005) ........................................................................................... 6

*Perez v. Wisconsin Dep't of Corr.,*
   182 F.3d 532 (7th Cir. 1999) ........................................................................................... 6

*Raditch v. U.S.,*
   929 F.2d 478 (9th Cir. 1991) ......................................................................................... 18

*Randolph v. Rodgers,*
   253 F.3d 342 (8th Cir. 2001) ........................................................................................... 6

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Ritza v. Int'l Longshoreman's & Warehousemen's Union*,
   837 F.2d 365 (9th Cir. 1988) ...............................................................................6, 7

*Wyatt v Terhune*,
   315 F.3d 1108 (9th Cir. 2003) ..............................................................................6, 7

## STATUTES

15 C.C.R. 3378(c)(4)............................................................................................3, 13

15 C.C.R. 3378(f).....................................................................................................13

Cal. Code Regs. tit. 15, § 3084.1(a).........................................................................5

Cal. Code Reg., § 3084.2(a) .....................................................................................5

Fed. P. Civ. P. 37(c)(1).............................................................................................14

iii

OHS
West:260725955

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND FOR SUMMARY JUDGMENT
3:98-CV-04877-WHA

# I.     INTRODUCTION

Defendants' motion is an admission that they violated Mr. Castro's due process rights in 1997 and have illegally retained him in solitary confinement for twelve years.  If Defendants truly believed they had not violated Mr. Castro's rights in 1997, there would have been no need for this unprecedented second validation "hearing."  Defendants' attempt to moot this case after almost twelve years of litigation and two trips to the Ninth Circuit, by providing a sham "opportunity" to be heard, is simply one in a long string of bad faith actions intended to maintain their virtual absolute power over Mr. Castro.  Consistent with Defendants' standard practice, their Motions To Dismiss And For Summary Judgment leave out the critical element of due process, that the opportunity to be heard be *meaningful*.  In fact, it was anything but meaningful; it was merely a litigation tactic with a pre-determined outcome designed to do one thing—to prevent this Court from placing limits on Defendants' power.

Defendants filed their motion the same day the Special Services Unit ("SSU") "validated" Mr. Castro.  The Motions To Dismiss And For Summary Judgment were thus drafted before the actions that purportedly mooted the case even took place.  It is patently obvious that Defendants did not actually investigate Mr. Castro's gang status; instead, they merely compiled as much "evidence" as they could that could be deemed to satisfy their own unconstitutionally low standard of proof.  It is noteworthy that, after allegedly being in the gang for *eighteen* years, other than the vague statements of a confidential informant, the CDCR has no evidence that Castro has actually *done* anything for the gang; rather, they merely claim that he "associates" with the gang, and has engaged in innocuous correspondence, not with gang members, but with others who allegedly "associate" with the gang.  Yet, Defendants would keep Castro in solitary confinement for another six years, stripped of any opportunity to obtain parole, bringing his total time in solitary confinement since 1991 to ___*22 years*___, for an "association" that Defendants have failed to prove.

The "evidence" Defendants garnered includes: a statement from a confidential informant that places Mr. Castro in Pelican Bay at a time when he was actually in California State Prison in Los Angeles County (CSP-LAC); two letters from Mr. Castro's 1997 validation that Defendants acknowledge they destroyed and cannot explain how the authorship was purportedly established;

1   and confidential memoranda containing claims that Mr. Castro did things while in solitary

2   confinement that he could not possibly have done.  Given the obvious flaws in the evidence relied

3   upon by the gang investigator, and accepted by the SSU, it is clear that this new "hearing" had a

4   pre-determined outcome that did not give Mr. Castro a meaningful opportunity to be heard.

5       In any event, Defendants cannot moot a twelve-year-old civil rights case by providing a

6   hearing, at least not where the plaintiff contests the validity of the new hearing, as is the case here.

7   Were Defendants permitted to do so, Mr. Castro would never be entitled to his day in court.  Mr.

8   Castro would file suit after suit challenging each new hearing, and, each time his case neared trial,

9   Defendants could simply provide a new "hearing" and again moot the case.  Equity does not

10  permit such an unjust result.

11      Finally, for the first time in twelve years, Defendants raise the ridiculous argument that Mr.

12  Castro somehow failed to exhaust his administrative remedies because, although he specifically

13  challenged on administrative review the fact that he was not given an opportunity to contest the

14  evidence used against him, he failed to specifically request a meeting with the Institutional Gang

15  Investigator ("IGI").  Due process does not require that litigants use magic words to exhaust their

16  administrative remedies.  Mr. Castro administratively appealed the Defendants' failure to give him

17  an opportunity to challenge the evidence and to follow *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D.

18  Cal. 1995).  Nothing more was required.  In any event, Defendants waived this claim by not

19  raising it as an affirmative defense in a timely answer, Rule 12(b) motion, or summary judgment

20  motion in response to Mr. Castro's complaint, and instead waiting twelve years to raise it in this

21  case.

22  **II.     MR. CASTRO DISPUTES SOME OF DEFENDANTS' "UNDISPUTED" FACTS.**

23      Defendants' Statement Of Undisputed Facts includes statements that Mr. Castro disputes.

24  Specifically, Defendants state, "Castro acknowledges that he received an opportunity to be heard

25  [in 1991] by the gang investigator concerning [the June 26, 1991] confidential memorandum."

26  *See* Def.s' Mots. To Dismiss & For S.J., pp. 3-4.  Mr. Castro does not acknowledge that the

27  opportunity was meaningful.  *See* Plaintiff's Motion for Summary Judgment, pp. 14-16.

28  Moreover, he disputes the relevance of this fact given that Mr. Castro's opportunity to be heard

1  had to have been before the 1997 decisionmaker, here IGI Gonzales, who was not involved in Mr.

2  Castro's 1991 validation.  *See* Declaration Of Erich Lichtblau In Support Of Plaintiff's Opposition

3  To Defendants' Motions To Dismiss And For Summary Judgment, (hereinafter "Lichtblau Decl.

4  II"), Ex. E.  Nor is Defendants' claim that Mr. Castro had an opportunity to be heard concerning

5  the June 1991 memorandum during his 1997 validation supported by the evidence to which they

6  cite. *Compare* Def.s' Mots. To Dismiss & For S.J., p. 5 *with* Declaration Of J. Pieren In Support

7  Of Defendants' Motions To Dismiss And For Summary Judgment (hereinafter "Pieren Decl."), ¶

8  16, Compl. Ex. D, p. 1.

9       Mr. Castro also disputes Defendants' statement, "Castro was warned that he would be

10  ***validated again*** upon discovery of one more piece of evidence showing his prison-gang ties," as

11  misstating the evidence.  Def.s' Mots. To Dismiss & For S.J., p. 4 (emphases added).  The

12  memorandum Defendants cite to support this statement actually states, "'S' status is being

13  DELETED, however, if additional information becomes available reflecting his participation in

14  any gang activity, the ***validation process will be initiated***."  *See* Declaration Of Kenneth Roost In

15  Support Of Motions To Dismiss And For Summary Judgment (hereinafter "Roost Decl."), Ex. B,

16  p. CF 0068 (emphases added).  In order to validate Mr. Castro, Defendants would still need three

17  pieces of evidence that the IGI deemed reliable.  *See* 15 C.C.R. 3378(c)(4).  Additionally,

18  Defendants fail to provide any evidence that the memorandum to which they cite was

19  communicated to Mr. Castro.

20       Further, Mr. Castro disputes the statement, "A fourth piece of evidence dated March 11,

21  1997 was rejected in 1997, but was later approved in 2003 upon an internal audit of Castro's

22  validation package" to the extent it references an internal audit of his validation package.  *See*

23  Def.s' Mots. To Dismiss & For S.J., p. 4.  Defendants fail to provide any evidence supporting that

24  there was an internal audit of Mr. Castro's validation package.

25       Mr. Castro also disputes Defendants' statement, "If there is no evidence of recent gang

26  activity, the IGI Unit will issue a validation update to the Office of Correctional Safety,

27  recommending that it classify the inmate as inactive." *Id.*, p. 4.  Defendants do not require "gang

28  activity;" rather, mere possession of cards wishing an inmate "Happy Birthday," are deemed

3

1  sufficient to deny inactive status. *See* Declaration Of Carlos Castro In Support Of Opposition To

2  Defendants' Motions To Dismiss And For Summary Judgment (hereinafter "Castro Decl."), Ex.

3  C, p. 5. Moreover, if Defendants lack evidence of actual gang activity, they will manufacture and

4  plant such evidence in inmates' cells. *Id.,* ¶ 25.

5       Additionally, Mr. Castro disputes that the drawings in his possession "exhibited prison

6  gang affiliation." *Compare* Def.s' Mots. To Dismiss & For S.J., p. 5, line 4, *with* Declaration Of

7  Erich Lichtblau In Support Of Motion For Summary Judgment And Motion For Leave To File

8  Motion For Reconsideration (hereinafter "Lichtblau Decl. I"), Ex. A., pp. 4-5.

9       Mr. Castro disputes Defendants' claim that he was "furnished with all evidence supporting

10  the new validation proceeding." *See* Def.s' Mots. To Dismiss & For S.J., p. 5. It is apparent from

11  the face of the CDC 1030 forms that Defendants failed to disclose as much information as could

12  be disclosed to Mr. Castro without revealing the identify of the confidential informants. *See*

13  Castro Decl., Ex. C. For example, Defendants do not say what weapon Mr. Castro was allegedly

14  holding for the gang, or what "activities" he was allegedly conducting. *See id.* Neither of these

15  pieces of information would have revealed the identity of the confidential informants.

16       Mr. Castro disputes Defendants' claim that both IGI Gonzales and Assistant IGI Ayala

17  sent the 1997 gang validation package to the SSU. *See* Def.s' Mots. To Dismiss & For S.J., p. 8.

18  The evidence shows that Mr. Gonzales alone sent the validation package to the SSU. *See*

19  Lichtblau Decl. I, Ex. DD, p. 1 ("On 4/12/07 a gang validation package regarding subject was

20  received from Institution Gang Investigator GONZALES at LAC.")

21       Mr. Castro disputes that he received a proper validation proceeding in August 2009. *See*

22  Def.s' Mots. To Dismiss & For S.J., pp. 5, 8. Mr. Castro disputes that Mr. Pieren has knowledge

23  to testify about his "new" validation in 2009. *See* Pieren Decl., ¶¶ 14-19. The documents in the

24  new validation package demonstrate that other people, such as D. Short, primarily conducted the

25  "new" validation. *Id.*, Ex. C, pp. 1-24. Many of the source items relied upon in the new

26  validation should have been disclosed to Mr. Castro in his 812(a) as part of his annual review, but

27  he never saw these documents until they were disclosed in the new validation package. *See* Castro

28  Decl., ¶ 26.

III.    **MR. CASTRO EXHAUSTED HIS ADMINISTRATIVE REMEDIES, OR ALTERNATIVELY, DEFENDANTS WAIVED THIS AFFIRMATIVE DEFENSE.**

In his first level administrative appeal, Mr. Castro stated:

> Other that the CDC 114-D [which disclosed only that "On 02/26/97, Security Squad Officers received information indicating that [I was] possibly an active member of the 'EME' Prison Gang"], I was not supplied with any other information.  Thus, I was denied an opportunity to dispute the allegations made against me.  I could not present witnesses or documentary evidence that could dispute the allegations made against me.  Other than the conclusory statement on the 114-D, I still have not received any documents or other information that would allow me to marshal the facts and present a defense against the allegations.

*See* Roost Decl., Ex. B, pp. 14, 17, 19.

Defendants take the preposterous position that this appeal was somehow inadequate to exhaust Mr. Castro's administrative remedies because Mr. Castro did not specifically request a meeting with the IGI.  Compliance with prison grievance procedures is all that is required by the Prison Litigation Reform Act of 1995 ("PLRA") to "properly exhaust" administrative remedies. *See Claiborne v. Dir. of Corr.*, 2008 U.S. Dist. LEXIS 63726 , at *3-5 (N.D. Cal., Aug. 18, 2008) (citing *Jones v. Bock*, 549 U.S. 199 (2007)).  The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Id.* In California, the regulations permit an administrative appeal to be filed as to "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  As to content, the regulations only instruct the prisoner to "describe the problem and action requested . . . ." *Id.* at § 3084.2(a).  As evidenced above, Mr. Castro sufficiently descried the problem and action requested.  That Defendants would now, twelve years later, argue for the first time that Mr. Castro has to file a new administrative grievance and then re-start this litigation from square one is truly shocking.  No reasonable reading of Mr. Castro's administrative appeal could lead one to conclude that he did not exhaust his administrative remedies.

In any event, Defendants waived this affirmative defense by failing to raise it in response

1   to Mr. Castro's complaint in the form of a timely Rule 12(b) motion or motion for summary

2   judgment, back in 1999.[1]  *See Lira v. Herrera*, 427 F.3d 1164,1171 (9th Cir. 2005) ("[Section]

3   1997e(a) establishes an affirmative defense, waived if the defendant does not raise it."); *Wyatt v*

4   *Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) (holding that nonexhaustion under § 1997e(a) is an

5   affirmative defense that "should be treated as a matter of abatement and brought in an

6   'unenumerated Rule 12(b) motion rather than a motion for summary judgment'. . . . [D]efendants

7   have the burden of raising and proving the absence of exhaustion."); *see also Jones*, 549 U.S. at

8   216 ("[F]ailure to exhaust is an affirmative defense under the [PLRA], and inmates are not

9   required to specially plead or demonstrate exhaustion in their complaints."); *Randolph v. Rodgers*,

10  253 F.3d 342, 348 n.11 (8th Cir. 2001) (finding defense of nonexhaustion under PLRA, not raised

11  in district court, waived on appeal); *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir.

12  1999)("Defendants may waive or forfeit reliance on  § 1997e(a), just as they may waive or forfeit

13  the benefit of a statute of limitations. When they assert their rights—as the defendants in this case

14  did—then the judge must address the subject immediately.  Otherwise the benefit is likely to be

15  lost, as it was here, for administrative and judicial claims went forward simultaneously and at the

16  end of the judicial proceeding the judge disdained § 1997e(a). *The statute can function properly*

17  *only if the judge resolves disputes about its application before turning to any other issue in the*

18  *suit*.")(emphasis added); *but see Panaro v. City of N. Las Vegas,* 432 F.3d 949, 952 (9th Cir. 2005)

19  (finding "defendant may raise an affirmative defense at the summary judgment stage as long as the

20  plaintiff does not suffer prejudice," where such defense was unavailable when defendants

21  responded to complaint).

22      Defendants' reliance on *Wyatt* and *Ritza v. Int'l Longshoreman's & Warehousemen's*

23  *Union*, 837 F.2d 365, 368-69 (9th Cir. 1988), to support their argument that it is now proper to file

24  a motion to dismiss as a "nonenumerated" Rule 12(b) motion, is misplaced.  Neither of these cases

25  address a "nonenumerated" Rule 12(b) motion in the context of the present situation.  In *Ritza*,

26

---

[1] Notably, Defendants have never filed an answer in this case.  Nor did they file a motion to
27  dismiss until September 3, 2009.  Moreover, Defendants failed to raise the affirmative defense of
exhaustion in either of their two Motions for Summary Judgment filed on April 5, 1999 and
28  October 3, 2005.

1   appellants, whose applications as longshoremen were rejected by appellees, sought damages and

2   injunctive relief based on a claim that the process by which registrants were selected was tainted

3   by nepotism and a failure to adhere to the contractual procedures. *Ritza*, 837 F.2d at 368-69.  The

4   appellate court upheld the trial court's finding that appellants had not exhausted the grievance

5   procedures that were required by the collective bargaining agreement, and affirmed the dismissal

6   of the action for failure to exhaust contractual remedies. *See id.*  In *Ritza* the Ninth Circuit

7   discussed "nonenumerated" Rule 12(b) motions in the context of taking into account pre-answer

8   evidence outside of the pleadings. *See id*.  In *Wyatt*, the Ninth Circuit reversed an order

9   dismissing an inmate's claim for failure to exhaust administrative remedies as required by the

10  PLRA, because the evidence of non-exhaustion was the warden's burden to prove, and the proof

11  rendered was insufficient.  315 F.3d at 1119-20.  Moreover, in *Wyatt* the Ninth Circuit merely

12  stated, "[W]e have held that the failure to exhaust nonjudicial remedies that are not jurisdictional

13  should be treated as a matter in abatement, which is subject to an unenumerated Rule 12(b) motion

14  rather than a motion for summary judgment." *Id.* at 1119-20.  Neither of these cases support

15  Defendants' proposition that a 12(b) motion is appropriate after twelve years of litigation.  Mr.

16  Castro would be extremely prejudiced were the Court to accept Defendants' defense now.

17  **IV.   THE NEW VALIDATION DID NOT AND COULD NOT REMEDY**
    **DEFENDANTS' FAILURE TO PROVIDE DUE PROCESS IN 1997.**
18
        **A.   The New Validation Did Not Provide Mr. Castro A Meaningful Opportunity**
19           **To Present His Views To The Critical Decisionmaker Prior To Being**
             **Confined To Administrative Segregation In 1997.**
20

21      The issue in this case is whether Mr. Castro had a meaningful opportunity to present his

22  views to the critical decisionmaker before being confined to administrative segregation on April

23  24, 1997.  As demonstrated in Plaintiff's Motion for Summary Judgment, the critical

24  decisionmaker was IGI Gonzales.  That Mr. Castro may have been given an opportunity (not a

25  meaningful one) to meet with a different person, Sergeant Pieren, twelve years later, does not and

26  cannot substitute for a meaningful meeting with IGI Gonzales in April of 1997, prior to IGI

27  Gonzales's decision to confine Mr. Castro to administrative segregation.

28      Moreover, the new validation in August 2009 did not provide Mr. Castro a meaningful

1    opportunity to respond to the three source items used in 1997.  It did not address the June 26, 1991

2    confidential memorandum at all, and thus did not and could not have provided Mr. Castro a

3    meaningful opportunity to present his views on that "source item."  Further, given that (1) the

4    Hernandez letter and Bracamonte card have been destroyed (*see* Lichtblau Decl. I, Ex. D), (2) the

5    validation folder has been destroyed (*id*., Ex. C), (3) there is no record of how the authorship of

6    the Hernandez letter and Bracamonte card were established (*id*., Exs. NN, R.T. 74:4-75:18, 78:4-9,

7    79:23-80:5, 82:5-83:10 and 86:23-87:2, and OO, R.T. 45:21-46:4, 47:9-53:4), and (4) neither IGI

8    Gonzales nor Assistant IGI Ayala, and certainly not Sergeant Pieren, know how the authorship of

9    the letter and card were established.  Whatever opportunity Sergeant Pieren afforded Castro to

10   present his views on these source items was not and could not have been meaningful.

11              **B.      The New Validation Was A Sham.**

12              The new validation was obviously a sham.  SSU validated Mr. Castro as a Mexican Mafia

13   associate on September 3, 2009.  *See* Declaration Of S. Kissel In Support Of Defendants' Motion

14   For Summary Judgment ("Kissel Decl."), Ex. A.  That same day, Defendants filed a well-

15   researched, fourteen-page Motions To Dismiss And For Summary Judgment, with substantial

16   supporting documentation, based on the new validation.  *See* Defendants' Motions To Dismiss

17   And For Summary Judgment.  The timing clearly shows that Defendants drafted the motion *before*

18   SSU made its decision.  This fact indicates that Defendants were coordinating with the Pelican

19   Bay gang investigators and the SSU to revalidate Mr. Castro purely as a litigation tactic, and they

20   did not conduct an unbiased investigation or provide Mr. Castro a meaningful opportunity to be

21   heard.

22              Even if this pretext was not apparent, the "evidence" Defendants use to newly validate Mr.

23   Castro proves beyond a doubt that they did nothing to actually investigate Mr. Castro's alleged

24   gang association, but merely compiled anything they could find, despite patent unreliability.  For

25   example:

26              New Source Item No. 9 (February 7, 1997 Confidential Memorandum):  This confidential

27   memorandum, allegedly drafted on February 7, 1997, purports to describe where Mr. Castro was

28   **two months in the future** on April 23, 1997.  *See* Pieren Decl., Ex. C, p. 13.  On top of that, the

1   informant apparently said that Mr. Castro was housed in Pelican Bay on April 23, 1997. *Id.* In

2   fact, the undisputed evidence shows that Mr. Castro was housed in CSP-LAC on February 7, 1997

3   and April 23, 1997. *See, e.g.,* Def.s' Mots. To Dismiss & For S.J., p. 4, ¶¶ 3-4. Yet, despite these

4   manifest inconsistencies, both the IGI and SSU found this source item to be reliable evidence of

5   Mr. Castro's gang association. Clearly neither the Pelican Bay gang investigators nor SSU did

6   *anything* to investigate or corroborate the information upon which they relied. It is thus equally

7   clear that they had already made up their minds, and had no intention of listening to Mr. Castro

8   with an even partially open mind.

9       New Source Items Nos. 10-12 (1997 Validation Source Items): The new validation also

10   accepts three pieces of evidence allegedly collected by Assistant IGI Ayala in 1997 as valid source

11   items. *See* Pieren Decl., Ex. C, pp. 14-24. Yet, the originals have been destroyed, as has the 1997

12   validation folder, and neither IGI Gonzales nor IGI Ayala can explain how the claimed

13   connections to a gang associate were made, or identify any gang-related content in the

14   correspondence. *See* Lichtblau Decl. I, Exs. NN, R.T. 74:4-75:18, 78:4-9, 79:23-80:5, 82:5-83:10

15   and 86:23-87:2, and OO, R.T. 45:21-46:4, 47:9-53:4. It is clear that Sergeant Pieren thus did

16   nothing more than assume that what is written on the twelve-year-old CDC 128-B forms is true.

17   Uncorroborated hearsay, however, does not meet the minimum constitutional standard for reliable

18   evidence. *See Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987) ("While we remain faithful to

19   the Supreme Court's admonition that we should not reweigh evidence or judge the credibility of

20   witnesses, the only evidence in this case implicating Cato is an inmate's statement that was related

21   to prison officials through a confidential informant who had no first hand knowledge of any

22   relevant statements or actions by Cato. Furthermore, the polygraph test of the inmate who made

23   the statement was inconclusive. This is not enough evidence to meet the *Hill* [some evidence]

24   standard."); *In re Lucero L.*, 22 Cal. 4th 1227, 1244-45 (2000) ("Except in those instances where

25   reliability of hearsay is established, hearsay evidence alone 'is insufficient to satisfy the

26   requirement of due process of law.'"). Sergeant Pieren, knowing nothing about these documents,

27   cannot have afforded Mr. Castro a meaningful opportunity to be heard; rather, he merely assumed

28   the truth of the hearsay 128-B forms, and assumed Mr. Castro was lying.

1     New Source Item No. 7 (March 4, 2004 Confidential Memo):  This memo asserts that Mr.

2   Castro did something physically impossible.  According to the memo, Mr. Castro, while in solitary

3   confinement, was directed to "hold a weapon for the gang."  *See* Pieren Decl., Ex. C, p. 11.  What

4   weapon?  How could Mr. Castro, while in solitary confinement, possibly have obtained this

5   weapon and then supplied the weapon to the gang?  How was the weapon never found by the

6   guards during their regular cell searches?  And how could Mr. Castro have received such orders

7   from a man he has never met and who was not housed in his pod?  *See* Castro Decl., ¶ 19.  The

8   answer is that he could not have done so, and this information is patently unreliable.  Yet, the

9   Pelican Bay IGI and SSU simply assumed it was reliable.  They clearly did not afford Mr. Castro a

10  meaningful opportunity to present his views, as there is nothing that he could have said to change

11  their inalterably closed minds.

12     None of the remaining evidence has any stronger indicia of reliability.  Moreover, the

13  confidential memoranda describe events that purportedly took place ten and twelve years ago.  *See*

14  Pieren Decl, Ex. C, pp. 1-24.  Yet only now, for the first time, Defendants disclose this

15  information to Mr. Castro.  It is patently unreasonable to withhold information from an accused

16  for ten and twelve years and then use it charge him with misconduct.  Indeed, this is the very

17  reason we have statutes of limitations for most crimes, because the passage of time renders it

18  difficult, if not impossible, to prove one's innocence.  *See Brevot v. N.Y. City Dep't of Educ.*, 2007

19  U.S. Dist. LEXIS 16109 (S.D. N.Y. Mar. 5, 2007) (citing *Del. State College v. Ricks*, 449 U.S.

20  250 (1980).  Yet Defendants would have this Court validate twelve years in solitary confinement

21  with no trial, and an additional six years until Mr. Castro's next "inactive" review, based on

22  uncorroborated, vague, ten and twelve-year old hearsay allegations.[2]

23     The Court should see this new "hearing" for what it is, the latest installment in Defendants'

24  eighteen year pattern of abuse and misconduct which includes, but is not limited to the following:

25

26

_____

27  [2] Though some of the CDC 1030 confidential information disclosure forms have a box checked
    indicating that the information was corroborated, the check-mark is itself nothing but

28  uncorroborated hearsay, as well as conclusory.  The underlying claim against Mr. Castro is in
    essence uncorroborated double hearsay.

| | |
|---|---|
| October 30, 1991: | After Mr. Castro was found not guilty of a stabbing attack based on uncontroverted testimony of prison staff that she could "categorically attest" that Mr. Castro did not participate in the attack, the CDCR used the exact same, proven false "evidence" (a confidential informant memorandum) to validate Mr. Castro as a prison gang associate, dooming him to an even worse punishment than he would have received had he actually done the stabbing. *See* Lichtblau Decl. I, Exs. G and H.  The CDCR thus used the lower due process standards of "administrative segregation" as an end-run around the higher standards required for disciplinary action, all the while enforcing a harsher punishment. |
| April 24, 1997: | After Mr. Castro was released from the SHU, due to the dismissal of a separate rules violation charge and the removal of the associated evidence from his file, Defendants again validated him as a prison gang associate, still using the same, proven false confidential memorandum. *See* Lichtblau Decl. I, Ex. DD, O, P, Q and R; Roost Decl., Ex. B, p. 7-9; *see also* Plaintiff's Motion for Summary Judgment, pp. 4, 7-9. |
| June 15, 1999: | Defendants abused the discovery process and took advantage of a *pro se* litigant by refusing to produce the non-confidential "source items" based on the false claim that they were actually confidential. *See* Lichtblau Decl. I, Ex. UU. |
| 2005-2006: | Defendants misrepresented to this Court and to the Ninth Circuit that Assistant IGI Ayala was the "critical decisionmaker," despite his own admission that he had no decision-making authority.  *See* Lichtblau Decl. II, Ex. D, p. 12 ("The undisputed evidence confirms that the 'critical decisionmaker' in Castro's case was Ayala.  Ayala removed Castro from the prison's general population and into |

11

| | | |
|---|---|---|
| 1 | | temporary administrative segregation because his gang status was |
| 2 | | unclear.  Ayala investigated Castro for gang association and |
| 3 | | searched his cell.  Ayala also prepared and co-signed Castro's gang- |
| 4 | | validation package with Gonzales."); Lichtblau Decl. I, Exs. NN, |
| 5 | | R.T. 29:19-30:9;  OO, R.T. 59:23-60:2. |
| 6 | 2004-2009: | Defendants destroyed all of the critical evidence in this case, |
| 7 | | including the actual evidence allegedly found in Mr. Castro's cell, |
| 8 | | the "validation folder," and the Administrative Segregation |
| 9 | | Isolation Log Book.  *See* Lichtblau Decl. I, Exs. C and D. |
| 10 | 2009: | In retaliation against Mr. Castro's lawsuit, Defendants terminated |
| 11 | | his mother's visitation rights.  *See* Castro Decl., ¶ 2. |
| 12 | April 27, 2009: | To intimate Mr. Castro, during a court-sponsored mediation, |
| 13 | | Defendants ransacked his cell and planted evidence.  Castro Decl., |
| 14 | | ¶¶ 4, 11. |
| 15 | May, 2009: | Defendants destroyed Mr. Castro's television.  Castro Decl., ¶¶ 6- |
| 16 | | 7. |
| 17 | August 2099: | Defendants have started to intercept and read correspondence |
| 18 | | between Mr. Castro and his legal counsel.  *See* Lichtblau Decl. II, |
| 19 | | ¶¶ 1-6. |

The Pelican Bay investigator behind the new validation is the same man who told another
inmate, after the inmate's validation had been rejected by SSU, that he would "get him, even if he
had to lie to do so."  *See* Castro Decl., ¶ 25.  This entire saga is exemplary of the old adage:
absolute power corrupts absolutely.  Defendants have virtually absolute power over Mr. Castro
and similarly situated inmates; and they will do anything to maintain that power, including lying
to federal courts.  The new validation was a transparent effort to prevent Mr. Castro from being
vindicated by a federal court, thereby taking away some of Defendants' power and demonstrating
to other inmates that Defendants' power in fact has limits.

12

**V.      THAT MR. CASTRO WAS RETAINED IN ADMINISTRATIVE SEGREGATION AFTER HIS "INACTIVE REVIEW" DOES NOT MOOT HIS DUE PROCESS CLAIM.**

Defendants also argue that this case is somehow moot because Defendants chose to retain Mr. Castro in administrative segregation at his six-year "inactive review." *See* Def.s' Mots. To Dismiss & For S.J., p. 10. An inmate can be retained in administrative segregation during the inactive review if a single "source item" is identified. *See* 15 C.C.R. 3378(f). An initial validation, however, requires three source items. *See* 15 C.C.R. 3378(c)(4). But for the 1997 validation, the drawings found in 2006 would not and could not have resulted in Mr. Castro's retention in administrative segregation. Mr. Castro's possession of these drawings thus does not moot his case.[3]

Moreover, the existence of the drawings does not change the fact that, from 1997 through 2006, Mr. Castro was wrongly retained in administrative segregation. He continues to have a strong and legitimate interest in clearing his record for purposes of obtaining parole.

Finally, Mr. Castro disputes that these drawings evidence gang association, and thus disputes his alleged possession of the drawings warranted his continued retention in administrative segregation. Daniel Vasquez, one of the founders of the Prison Gang Task Force and former Warden of San Quentin and Soledad State Prisons, offered his expert opinion that these drawings do not constitute evidence of prison gang association. *See* Lichtblau Decl. II, Ex. A, pp. 4-5.

**VI.     THE COURT SHOULD PRECLUDE DEFENDANTS FROM RELYING ON THEIR NEW EVIDENCE BECAUSE DEFENDANTS DID NOT DISCLOSE THESE WITNESSES AND DID NOT PRODUCE THESE DOCUMENTS IN DISCOVERY.**

All but one piece of the new evidence upon which Defendants now rely existed at the time

---

[3] Defendants also suggest that one new source item was enough because, when Mr. Castro's 1991 validation was deleted in 1995, Mr. Castro was "warned that he would be validated again upon discovery of one more piece of evidence showing his prison-gang ties." Def.s' Mots. To Dismiss & For S.J., p. 4, ¶ 2. This is both false and irrelevant. First, the document referenced (Roost Decl., Ex. B, p. CF 0068) is an internal memorandum; there is no evidence it was shown to Mr. Castro, and thus no evidence that he was "warned" of anything. Second, the memo does not state that he would be validated if new evidence arose, but that a new investigation would be opened. Any such investigation would still require three pieces of evidence. Moreover, the 1991 evidence still included two demonstrably false confidential statements regarding Mr. Castro. *See* Plaintiff's Motion for Summary Judgment, pp. 7-8.

1   Defendants served their Rule 26 initial disclosures on March 27, 2009.  *Compare* Kissel Decl., Ex.

2   A *and* Pieren Decl., Ex. C *with* Lichtblau Decl. II, Ex. B.  However, Defendants did not identify

3   any of the confidential informants, nor any of the guards who took the informants' statements

4   and/or who knew the informants as persons having relevant knowledge.  *See* Lichtblau Decl. II,

5   Ex. B.  Defendants cannot not rely upon this evidence against Mr. Castro.  Fed. R. Civ. P. 37(c);

6   *Hoffman v. Constr. Protective Servs.*, 541 F.3d 1175, 1179-80 (9th Cir. 2008); *see also Keithley v.*

7   *Homestore.com, Inc.*, 2009 U.S. Dist. LEXIS 2720, at *4-24 (N.D. Cal.  Jan. 7, 2009).

8          Moreover, Mr. Castro served discovery requesting production of all evidence of his

9   purported gang association, on multiple occasions.  *See* Lichtblau Decl. II, A, B, and Lichtblau

10  Decl. I, UU.  In response, Defendants did not produce the letter allegedly received from Raul

11  Mendoza (new source item No. 10 at Pieren Decl., Exs. B, p. 2 and C, pp. 18-20), nor did

12  Defendants provide CDC 1030 disclosure forms, or otherwise provide the non-confidential portion

13  of the newly identified confidential evidence.  *See* Lichtblau Decl. II, ¶ 7.  Defendants also

14  objected to discovery calling for post-1997 gang investigation training materials on the ground

15  that they are irrelevant, and successfully defeated a motion to compel these documents.  *See*

16  Lichtblau Decl. II, Ex. C, Responses Nos. 8-9.  Defendants, having denied discovery regarding

17  post-1997 matters, cannot now be heard to rely upon post-1997 matters to support their case.  *See*

18  Fed. R. Civ. P. 37 (c)(1); *see also Keithley, Inc.*, 2009 U.S. Dist. LEXIS 2720, at *4-23 .

19  **VII.   EVEN IF A NEW VALIDATION, TWELVE YEARS LATER, COULD MOOT
         THE CASE, THIS PARTICULAR NEW VALIDATION CREATES TRIABLE
20       ISSUES OF FACT, PREVENTING SUMMARY DISPOSITION, AND PLAINTIFF
         IS ENTITLED TO CONDUCT DISCOVERY REGARDING THE NEW
21       EVIDENCE BEFORE THE COURT RENDERS ANY DETERMINATION BASED
         UPON IT.**

22

23         While there is no dispute that Defendants recently attempted to provide Mr. Castro an

24  opportunity to be heard, there still remains a factual dispute as to whether that opportunity was

25  meaningful.  Defendants are thus not entitled to summary judgment or summary dismissal based

26  on their new evidence.

27         Moreover, should the Court decide to entertain Defendants' new evidence at trial, it must

28  first grant Plaintiff an opportunity to conduct discovery.  Before Defendants filed their motion, the

1   only issues in this case concerned Plaintiff's 1997 validation. Defendants objected to any

2   discovery that went past this time period, and the Court upheld their objections.

3       Discovery is particularly important with regard to all of the new "confidential" evidence.

4   The Court in *Madrid* noted the obvious, serious flaws in reliance on confidential prison

5   informants:  the "clear incentive to fabricate or exaggerate information" attendant in debriefings –

6   whereby inmates seek to gain release from the SHU by divulging information regarding gang

7   membership or activity – that significantly heightens the risk that false information will be relied

8   upon.  889 F. Supp. at 1274.

9       This has proven true in Mr. Castro's case.  Each time Mr. Castro was provided any

10  opportunity to challenge a confidential informant, Mr. Castro has prevailed, and the confidential

11  information has been proven to be false.[4]  Now the CDCR would use additional confidential

12  informant testimony, most of which is unreliable on its face, to justify twelve years of solitary

13  confinement and to add on an additional six.  Before this Court can allow this, Mr. Castro must be

14  afforded a meaningful opportunity to conduct discovery.  How many confidential informants are

15  there?  Are they all the same person?  Are they all the same person who gave false information in

16  1991?  Do they have personal grudges against Mr. Castro?  Do they even know Mr. Castro?  If so,

17  how?  What did the CDCR promise the informants in exchange for statements against Mr. Castro?

18  Is it even possible for Mr. Castro to have done what they say he did (those that say he did

19  anything, that is)?  What weapon was he purportedly holding for the gang?  How could he have

20  obtained it?  How could the guards not have found it?  What activity was he supposedly carrying

21  out for the gang?  These are among the most basic questions that must be answered before Mr.

22  Castro can lose another six years of his life.  In fact, the CDCR's entire practice of offering

23  benefits to inmates to provide confidential statements against other inmates, and then punishing

24  the inmate against whom information was provided, without affording that inmate any opportunity

25  to confront his accuser, needs to be investigated before this type of evidence can be used to justify

26  _____

27  [4] Specifically, the 1989 stabbing charge, brought based on confidential informant testimony, was thrown out in 1995 (*See* Lichtblau Decl. I, Exs. O, Q), and Mr. Castro was found not guilty of the November 2, 1990 stabbing charge, brought based on confidential informant testimony, because it

28  was proven false by the testimony of prison staff (*id.*, Ex. G.).

1    eighteen years of solitary confinement and the accompanying loss of any opportunity to obtain

2    release from prison on parole.

3    **VIII.   EVEN IF MR. CASTRO IS A PRISON GANG ASSOCIATE TODAY (HE IS NOT),
          THAT DOES NOT MEAN HE WAS A PRISON GANG ASSOCIATE IN 1997,
4          AND HE IS ENTITLED TO HAVE HIS RECORD CLEARED FOR PURPOSES
          OF PAROLE.**
5

6            Mr. Castro's classification as a prison gang associate and consequential retention in the

7    SHU for the past twelve years has had a serious adverse impact on Mr. Castro's chances of

8    obtaining parole.  *See* Declaration of Daniel Vasquez In Support Of Plaintiff's Opposition To

9    Defendants' Motions To Dismiss And For Summary Judgment (hereinafter "Vasquez Decl."), ¶ 2.

10   Even if the new evidence proves that Mr. Castro associates with a prison gang today (it does not),

11   it does not prove he was properly validated as a prison gang associate in 1997.[5]  If Mr. Castro

12   prevails in this litigation, he can clear his prison record for the past twelve years.  Doing so will

13   enhance Mr. Castro's chances of obtaining parole in the future.  *Id.*  There is thus still a live case

14   and controversy and the case is not moot.

15   **IX.    EVEN IF THE CASE WERE TECHNICALLY MOOT, THE ISSUE IS CAPABLE
          OF REPETITION, YET EVADING REVIEW, AND SHOULD THEREFORE NOT
16         BE DISMISSED.**

17           As thoroughly discussed, Defendants cannot moot a twelve-year-old civil rights case by

18   providing a hearing, at least not where the plaintiff contests the validity of the new hearing, as is

19   the case here.  Yet, even if the case were technically moot, the issue is capable of repetition, yet

20   evading review, and should therefore not be dismissed.  This well-established exception to

21   mootness applies when, "(1) the challenged action [is] in its duration too short to be fully litigated

22   prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same

23   complaining party [will] be subject to the same action again."  *See Hubbart v. Knapp*, 379 F.3d

24   773, 777-78 (9th Cir. 2004) (finding inmate's habeas corpus petition claiming commitment under

25   _____

26   [5] By claiming that Mr. Castro "received relief through a new validation proceeding in August
     2009" (*id.*, p. 8), and that he received a "postdeprivation remedy" (*id.*, p. 9), Defendants concede
27   that Mr. Castro did not receive due process in his gang validation in 1997 and thus was not
     legitimately classified as an EME associate at that time.  Accordingly, Mr. Castro's gang associate
28   status should have been deleted from his file for the time period between the 1997 validation until
     his 2009 validation.  Yet, Defendants failed to correct the error on his record.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND FOR SUMMARY JUDGMENT
3:98-CV-04877-WHA

1   California's Sexually Violent Predator Act violated due process was not moot because his claims

2   satisfied the "'capable of repetition' component of this analysis because he has already been

3   subject to a second SVPA commitment proceeding, which he argues was just as unconstitutional

4   as the first" and "'evade[d] review' because a two-term commitment under the SVPA is 'too short

5   to be *fully litigated* prior to . . . [its] expiration.'").  A claim evades review if "the underlying

6   action is almost certain to run its course before either this court or the Supreme Court can give the

7   case full consideration." *Id.* at 778 (citations omitted).

8           The Court should view this case the way it has viewed parole hearings in the context of

9   habeas corpus petitions.  In *Basua* the Northern District found that an inmate's petition for a writ

10  of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the decision by the Board of Prison

11  Terms denying him parole in 2003, was not moot even though the parole denial at issue was

12  superseded by a subsequent unsuitability decision in 2004.  *See Basua v. Solis*, 2007 U.S. Dist.

13  LEXIS 66068, at *10 (ND Cal. Aug. 27, 2007).  In reaching this conclusion, the court held the

14  claim was "capable of repetition" because it was reasonable to expect the inmate would be subject

15  to parole suitability hearings in the future, and it "evaded review" because "to date, all of [the]

16  parole denials have been for one year" and "the time between parole suitability hearings is not

17  adequate for full litigation of the claim before it expires due to the occurrence of the next parole

18  suitability hearing." *Id.*, at *10-12; *see also Lewis v. Solis*, 2005 U.S. Dist. LEXIS 39828, at *8

19  n.2 (N.D. Cal. Dec. 8, 2005) (finding that parole suitability hearings fall under the capable of

20  repetition, yet evading review exception).  Similarly, here Mr. Castro has been subject to and will

21  continue to be subject to, gang validation hearings since his 1997 hearing, that occur on at least an

22  annual  basis.[6]  Were Defendants permitted to moot a twelve-year-old civil rights case by

23  providing a new hearing on the eve of trial, Mr. Castro would file suit after suit challenging each

24  new hearing, and, each time his case neared trial, Defendants could simply provide a new

25  "hearing" and again moot the case.  Equity does not permit such an unjust result.

26          The cases Defendants cite must be distinguished from the present case.  *Raditch* addressed

---

[6] Reviews of validated inmates' gang status can occur even more frequently, as evidenced by the "new validation" Defendants initiated *sua sponte*, right in time for their summary judgment motion.

1  due process in the context of a *property* interest; the appellant sought relief for the termination of

2  his disability benefits without notice.  *See Raditch v. U.S.*, 929 F.2d 478, 480-81 (9th Cir. 1991).

3  Here, Mr. Castro's personal freedom from solitary confinement in the SHU, not merely his

4  property, is at stake; thus, a post deprivation remedy is inadequate to remedy the due process

5  violation at issue.  Defendants also cite *Lawson v. City of Santa Barbara*, for the proposition that

6  an intervening event can "render a claim moot and vindicate the plaintiff's due process rights."

7  *See* Def.s' Mots. To Dismiss & For S.J., p. 9.  In *Lawson*, a political action group sued a city and

8  its officials for refusing to issue parade and park permits even though they conducted their planned

9  rally and march and the court dismissed the complaint as moot but allowed appellant to amend the

10  complaint with respect to future parades.  *Lawson v. City of Santa Barbara*, 310 F.3d 1134 (9th

11  Cir. 2002).  However, this opinion was withdrawn by the Ninth Circuit on December 27, 2002,

12  and a memorandum of disposition was filed in its stead.  *See Lawson v. City of Santa Barbara*,

13  314 F.3d 1070 (9th Cir. 2002).  The unpublished memorandum of disposition states that Lawson's

14  challenge "isn't moot, because it is 'capable of repetition yet evading review.'"  *See Lawson v.*

15  *City of Santa Barbara*, 53 Fed. Appx. 494 (9th Cir. 2002).  Thus, this case actually supports Mr.

16  Castro's position that his 1997 due process claim is not moot, but rather is capable of repetition,

17  yet evading review.

18       For all these reasons, it is evident that Mr. Castro's 1997 due process violation is capable

19  of repetition, yet evading review, and the court should reject Defendants' argument that it is moot.

20  **X.      ALL DEFENDANTS NEED TO REMAIN IN THIS CASE TO AFFORD MR.**

21  **           CASTRO A MEANINGFUL REMEDY.**

22       Defendants argue that all the defendants, other than Ayala, and Gonzales, should be

23  dismissed.  *See* Def.s' Mots. To Dismiss & For S.J., p. 3  The defendants are being sued in their

24  official, not individual, capacities.  While it is true that defendant Gonzales was the "critical

25  decisionmaker," once he made the decision to validate Mr. Castro, the remaining defendants took

26  actions to keep him in the SHU, and to tarnish his prison record.  To obtain meaningful relief, Mr.

27  Castro will need to have his prison classification status restored, and have his prison record

28  cleared, including restoration of all appropriate good time credits.  The institutional gang

1  investigators do not have the necessary authority to grant this relief.  The offices held by the

2  remaining defendants have that authority.  Accordingly, all defendants appropriately remain in the

3  case.

4  **XI.    CONCLUSION**

5          The notion that after twelve years of litigation, now that the tides have turned, Defendants

6  can moot the case by providing new opportunity to be heard by a man who knows nothing about

7  the facts, does nothing to investigate the facts, and could not even investigate the facts if he

8  wanted to (because Defendants destroyed the evidence), is absurd.  The Court should deny

9  Defendants motions.

10  Dated:   September 17, 2009                    Respectfully submitted,

11

12                                               **ORRICK, HERRINGTON & SUTCLIFFE LLP**

13

14                                               _____/s/_____
                                                ERICH F. LICHTBLAU

15                                               Attorneys for Plaintiff

16                                               JAMES E. BURNS, JR.
                                                ERICH F. LICHTBLAU

17                                               EUNICE J. LEE
                                                SARAH C. MARRIOTT

18                                               TARA M. MCMANIGAL

19

20

21

22

23

24

25

26

27

28

OHS West:260725955.4                            19              PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO
                                                               DISMISS AND FOR SUMMARY JUDGMENT
                                                               3:98-CV-04877-WHA