1  JAMES E. BURNS, JR. (STATE BAR NO. 53250)
   jburns@orrick.com
2  ERICH F. LICHTBLAU (STATE BAR NO. 184450)
   elichtblau@orrick.com
3  EUNICE J. LEE (STATE BAR NO. 233467)
   ejlee@orrick.com
4  SARAH C. MARRIOTT (STATE BAR NO. 241301)
   smarriott@orrick.com
5  TARA M. MCMANIGAL (STATE BAR NO. 252076)
   tmcmanigal@orrick.com
6  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
7  405 Howard Street
   San Francisco, CA  94105-2669
8  Telephone:      415-773-5700
   Facsimile:       415-773-5759
9
   Attorneys for Plaintiff
10 Carlos Castro

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15
   Carlos Castro,                          Case No.  3:98-CV-04877-WHA
16
                  Plaintiff,               **APPENDIX OF UNPUBLISHED**
17                                         **AUTHORITY IN SUPPORT OF**
             v.                            **PLAINTIFF'S OPPOSITION TO**
18                                         **DEFENDANTS' MOTIONS TO DISMISS**
   Cal Terhune, Director, California Department  **AND FOR  SUMMARY JUDGMENT**
19 of Corrections, Bonnie G. Garibay; J.
   Batchelor; S. C. Wolhwend; A. Scribner; J.    Date:  October 8, 2009
20 Stokes; M. Yarborough; L. Hood; C. Campbell;  Time:  8:00 a.m.
   A. M. Gonzalez; M. Ayala; E. Derusha, c/o     Place:  Courtroom 9, 19th Floor
21 Robert L. Ayers, Warden; J. Martinez          Judge: William Alsup

22                  Defendants.              Trial Date: November 2, 2009

23

24

25

26

27

28

1    Plaintiff Carlos Castro hereby submits copies of the unpublished authorities cited in

2  support of his Opposition to Defendants' Motions to Dismiss and For Summary Judgment

| **UNPUBLISHED AUTHORITIES** | **TAB NO.** |
|---|---|
| *Basua v. Solis*, <br> 2007 U.S. Dist. LEXIS 66068 (N.D. Cal. Aug. 27, 2007) | 1 |
| *Brevot v. N.Y. City Dep't of Educ.*, <br> 2007 U.S. Dist. LEXIS 16109 (S.D. N.Y. Mar. 5, 2007) | 2 |
| *Claiborne v. Dir. of Corr.*, <br> 2008 U.S. Dist. LEXIS 63726  (N.D. Cal., Aug. 18, 2008) | 3 |
| *Keithley v. Homestore.com, Inc.*, <br> 2009 U.S. Dist. LEXIS 2720 (N.D. Cal. Jan. 7, 2009) | 4 |
| *Lewis v. Solis*, <br> 2005 U.S. Dist. LEXIS 39828 (N.D. Cal. Dec. 8, 2005) | 5 |

Dated:   September 17, 2009          Respectfully submitted,


**ORRICK, HERRINGTON & SUTCLIFFE LLP**


                                                          /s/
                                              ERICH F. LICHTBLAU
                                              Attorneys for Plaintiff

                                       JAMES E. BURNS, JR.
                                       ERICH F. LICHTBLAU
                                       EUNICE J. LEE
                                       SARAH C. MARRIOTT
                                       TARA M. MCMANIGAL

# TAB 1

LEXSEE

**MARTIN BASUA, Petitioner, v. J. SOLIS, Warden, Respondent.**

**No. C 04-2846 MMC (PR)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 66068**

**August 27, 2007, Decided**
**August 27, 2007, Filed**

**SUBSEQUENT HISTORY:**   As Amended September 19, 2007

**CORE TERMS:** parole, prisoner's, prison, suitability, robbery, sentence, plea agreement, liberty interest, parole date, federal claim, commitment offenses, evidence to support, habeas corpus, petitioner's claim, life sentence, violence, cocaine, challenging, vocational, suitable, inmate's, kidnap, self-help, federal law, habeas petition, unreasonable risk, base terms, unsuitability, discretionary, unexhausted

**COUNSEL:**  [*1] Martin Basua, Petitioner, Pro se, Soledad, CA.

For J. Solis, Warden, Respondent: Denise Alayne Yates, LEAD ATTORNEY, Office of the Attorney General, San Francisco, CA.

**JUDGES:** MAXINE M. CHESNEY, United States District Judge.

**OPINION BY:** MAXINE M. CHESNEY

**OPINION**

**AMENDED ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

On July 14, 2004, petitioner Martin Basua, a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the decision by the Board of Prison Terms ("Board") denying him parole in 2003. On September 27, 2004, the Court ordered respondent Warden Solis to show cause why the petition should not be granted based on petitioner's cognizable claims for relief. Respondent filed an answer accompanied by a memorandum and exhibits, and petitioner filed a traverse. After being granted leave to do so by the Court, respondent filed a supplemental answer, and petitioner filed a supplemental traverse. Having read and considered the parties' respective submissions, the Court rules as follows.

**BACKGROUND**

On October 19, 1992, the Superior Court of California, County of Los Angeles, ("Superior Court") sentenced petitioner to a term of seven years to [*2] life in prison upon acceptance of petitioner's plea of guilty to the charge of kidnaping for robbery. (See Answer Ex. 1.) Petitioner also pled guilty to charges of grand theft of a vehicle, three counts of first degree residential robbery, six counts of second degree robbery, and multiple enhancements for the use of a firearm. (See Answer Ex. 2.) The sentences on the robbery charges were ordered to run concurrently with the indeterminate life sentence on the kidnapping charge, and the sentence on the grand theft charge was stayed. (See id.)

The events giving rise to the charges were summarized in the probation report prepared for the Superior Court for sentencing purposes. (See Answer Ex. 6 at 3-6.) The Board relied on the summary at petitioner's 2003 parole suitability hearing to establish the facts of petitioner's commitment offenses, (see Answer Ex. 3 at 10-11), and petitioner raised no objection thereto. The Court includes the summary here:

2007 U.S. Dist. LEXIS 66068, *2
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

On 10/30/91, at about 5:45 p.m., Basua and an unidentified suspect robbed a woman and her two sons in front of their subterranean garage at 849 Gramercy Place. The victims said that both Basua and the unidentified suspect were armed with handguns [*3] and robbed them of their personal property and money. They ordered the victims into the garage and they complied, as the victims walked into the garage they heard the robbers yelling "Give me your money." The victims suspected they were robbing someone else, and headed to the manager's apartment when the attendant said she witnessed the robbery and had called the police. Another victim identified as Mr. Cho stated as soon as he parked, Basua and the unknown suspect ran up to the driver's side of the vehicle, opened the door, and demanded money. Mr. Cho said he didn't have any money as they pointed a gun at him. They searched his pockets, took his watch and demanded his car, and Cho refused. The suspects all of a sudden ran from the location when they realized that the police were watching them. After a brief foot pursuit, the suspects were taken into custody. Los Angeles Police Department officers then pulled out every subterranean garage armed robbery they had on file and conducted photo showings with the victims, as a result 11 counts of robbery were charged. Basua's sentence was reduced as a result of a plea bargain.

(See Answer Ex. 5 at 1.)

Prior to 2003, the Board had, on three [*4] occasions, found petitioner unsuitable for parole. (See Answer Ex. 4.) At issue in the instant petition is petitioner's fourth parole suitability hearing, in 2003, at which the Board again found petitioner unsuitable for parole. (See id.)

On February 21, 2003, the Board determined petitioner was "not suitable for parole and [ ] would pose an unreasonable risk of danger to society, if released from prison at this time." (See Answer Ex. 3 at 67:18-19.) The

Board's first consideration was the nature of the commitment offenses. The Board found:

> The string of robberies that [petitioner] was committed to prison for, were carried out in an especially cruel manner, a manner which demonstrates a callous disregard for human suffering. Some of [petitioner's] victims included women and children. The motive for this crime was very trivial. Basically, it was greed. [Petitioner] needed money to subsidize [his] drug habit, [his] addiction to cocaine.

(See id. at 67:24-68:6.) The Board explained its conclusions were drawn from the facts of the crime, wherein petitioner and his partner, both active gang members and both addicted to cocaine, formulated a plan to subsidize their drug habit by robbing innocent [*5] people. (See id. at 68:8-13.) In order to accomplish the robberies, they armed themselves with weapons -- sometimes BB guns, sometimes pellet guns, and sometimes real guns with real bullets. (See id. at 68:15-16.) They went on a crime spree, terrorizing the Korea Town section of Los Angeles. (See id. at 16-19.)

The Board also noted petitioner's unstable social history, including his history of involvement in the street gang lifestyle, substance abuse problems, escalating pattern of criminal conduct, and previous contacts with the criminal justice system. (See id. at 68:20-69:3.) The Board noted, as well, that the District Attorney opposed petitioner's release on parole. (See id. at 70:11-13.)

The Board further found petitioner had not sufficiently participated in self-help programming. (See id. at 69:8-11.) The Board relied upon a November 10, 1998, Psychological Evaluation prepared by Steven J. Terrini, Ph.D., a prison staff psychologist, which found that, relative to the average citizen in the community, petitioner had a violence potential below average, but should petitioner begin to use crack cocaine again, his violence potential would be considered much higher than average. (See [*6] id. at 69:11-25.) Acknowledging petitioner's enrollment in a substance abuse program since his last parole consideration hearing, the Board concluded "this prisoner needs to continue his participation in self-help programming . . . ." (See id. at 70:16-17.)

Case3:98-cv-04877-WHA    Document133-1    Filed09/17/09    Page6 of 43

2007 U.S. Dist. LEXIS 66068, *6
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

The Board acknowledged petitioner had taken steps towards establishing viable parole plans for his return to Mexico (to which he would be deported upon his release), (see id. at 70:5-10), and lauded him for his exemplary, disciplinary-free record in prison, (see id. at 69:4-8, 70:20-23). The Board further commended petitioner for completing vocational programs and obtaining his high school equivalency degree. (See id. at 70:23-71:2.) The Board told petitioner: "You're doing . . . all the things that need to be done to some day convince a Panel that you're suitable for parole and we urge you to stay on that path." (See id. 71:3-6.) The Board concluded, however, that those positive aspects of petitioner's behavior "do not outweigh the factors of unsuitability." (See id. at 71:6-8.) The Board denied petitioner parole for one year.

Petitioner filed a petition for a writ of a habeas corpus in the Superior Court, challenging the Board's [*7] decision. The Superior Court denied the petition on January 7, 2004, finding there was some evidence to support the Board's decision. (See Answer Ex. 9.) Petitioner subsequently filed a petition for a writ of habeas corpus in the California Court of Appeal, which denied the petition on March 4, 2004, finding the Board had not abused its discretion by relying substantially on the nature of the commitment offense to deny parole. (See Answer Ex. 8.) Petitioner thereafter filed a petition for review in the California Supreme Court, which petition was denied without comment on May 19, 2004. (See Answer Ex. 10.) Petitioner next filed the instant petition, in which he claims the Board violated his federal constitutional rights by denying him parole (1) without sufficient evidence to support its decision that his release would pose an unreasonable risk to public safety; (2) in breach of his plea agreement, by recharacterizing his offenses as more serious than those to which he pled guilty and by considering the offenses for which he had received concurrent and stayed sentences; and (3) by considering his individual suitability for parole, rather than setting a uniform parole date based solely [*8] on his commitment offense.

## DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a habeas petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." See 28 U.S.C. § 2254(d). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

A decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless [*9] arrives at a result different from [Supreme Court] precedent." See Lockyer v. Andrade, 538 U.S. 63, 73, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). An "unreasonable application" of federal law occurs "if the state court identifies the correct governing legal principle from the [Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." See id. at 75. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." Id. "The state court's application of clearly established law must be objectively unreasonable." Id. An "unreasonable determination of the facts" occurs where "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record" or "that the state court's fact-finding process was adequate." See Taylor v. Maddox, 366 F.3d 992, 1000 (2004).

In determining whether to grant a petition, a federal court must analyze the state court's "last reasoned decision." Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the "last reasoned decision" is the California Court of Appeal's order [*10] of March 4, 2004. (See Answer Ex. 8.)

### B. Mootness

Respondent asserts the instant petition is moot because the 2003 parole denial at issue has been superceded by a subsequent unsuitability decision in 2004.

Case3:98-cv-04877-WHA   Document133-1   Filed09/17/09   Page7 of 43

2007 U.S. Dist. LEXIS 66068, *10
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

The mootness doctrine derives from the requirement of Article III, §2, of the United States Constitution that there exist a case or controversy through all stages of federal judicial proceedings. The effect of such requirement is that the party who has filed suit "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Lewis v. Continental Bank Corp., 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990). "This case-or-controversy requirement subsists through all stages" of the federal judicial proceedings. See id. One exception to the mootness doctrine, however, is where a claim is "capable of repetition yet evading review." See Wiggins v. Rushen, 760 F.2d 1009, 1011 (9th Cir. 1985). "A claim evades review if the underlying action is almost certain to run its course before either [the Ninth Circuit] or the Supreme Court can give the case full consideration.'" Hubbart v. Knapp, 379 F.3d 773, 778 (9th Cir. 2004), cert. [*11] denied, 543 U.S. 1071, 125 S. Ct. 913, 160 L. Ed. 2d 807 (2005) (citation omitted). In Hubbart, the Ninth Circuit found a habeas petition challenging a two-year commitment under California's Sexually Violent Predator's Act evaded review because the duration of the commitment was too short to allow the commitment to be fully litigated prior to its expiration. Id. at 777.

Under the reasoning of Hubbart, petitioner's claim that his parole suitability hearing was in violation of due process is capable of repetition yet evading review. See Jones v. Solis, 2006 U.S. Dist. LEXIS 21161, 2006 WL 927699, at *3 (N.D. Cal. Apr. 10, 2006); Hudson v. Kane, 2005 U.S. Dist. LEXIS 45591, 2005 WL 2035590, at *4 (N.D. Cal. Aug. 23, 2005). His claim is "capable of repetition" because it is reasonable to expect he will be subject to parole suitability hearings in the future. Indeed, he already has had at least one subsequent parole suitability hearing, at which he again was found unsuitable for parole. (See Answer at 21.) Also, petitioner's claim "evades review" [*12] because, to date, all of his parole denials have been for one year; the time between parole suitability hearings is not adequate for full litigation of the claim before it expires due to the occurrence of the next parole suitability hearing.

Because petitioner's claim is capable of repetition yet evading review, the Court finds the instant petition is not moot.

**C. Exhaustion**

Respondent argues petitioner's third claim, that the Board violated due process by considering petitioner's individual suitability for parole, rather than setting a uniform parole date based solely on the commitment offense, is unexhausted because petitioner raised it for the first time in his petition for review to the California Supreme Court.

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b)-(c). The exhaustion-of-state-remedies doctrine [*13] reflects a policy of federal-state comity to give the state "the initial 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (quoting Wilwording v. Swenson, 404 U.S. 249, 250, 92 S. Ct. 407, 30 L. Ed. 2d 418 (1971)). The exhaustion requirement is satisfied only if the federal claim has been "fairly presented" to the state courts. See id.; Peterson v. Lampert, 319 F.3d 1153, 1155-56 (9th Cir. 2003) (en banc). A federal district court must dismiss a federal habeas petition containing any claim as to which state remedies have not been exhausted. See Rhines v. Weber, 544 U.S. 269, 273, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005).

As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts in the manner required by the state courts, thereby affording the state courts a meaningful opportunity to consider allegations of legal error. Casey v. Moore, 386 F.3d 896, 915-16 (9th Cir. 2004), cert. denied, 545 U.S. 1146, 125 S. Ct. 2975, 162 L. Ed. 2d 899 (2005). In Castille v. Peoples, 489 U.S. 346, 351, 109 S. Ct. 1056, 103 L. Ed. 2d 380 (1989), the United States Supreme Court held that a claim was not fairly presented where it was raised for the first time on discretionary [*14] review to the state's highest court and denied without comment. In so holding, the Supreme Court stated: "[W]here the [federal] claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor, . . . [r]aising the claim in such a fashion does not . . .

Case3:98-cv-04877-WHA   Document133-1   Filed09/17/09   Page8 of 43

2007 U.S. Dist. LEXIS 66068, *14
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

constitute fair presentation." Id. The Ninth Circuit has interpreted Castille to stand for the proposition that a petitioner does not fairly present a federal claim to the state courts if he seeks review of the claim for the first time on discretionary appeal. See Casey, 386 F.3d at 917-18 (holding petitioner did not exhaust federal claims where they were raised for first and only time in discretionary petition for review to Washington State Supreme Court).

The procedural posture of petitioner's third claim in the instant petition is indistinguishable from that of the petitioner's claims in Casey. The language of Rule 8.500 of the California Rules of Court makes clear that a petition for review to the California Supreme Court is a discretionary appeal: "As a policy matter, on petition for review the Supreme Court normally will [*15] not consider an issue that the petitioner failed to timely raise in the Court of Appeal." See Cal. R. Ct. 8.500(c)(1). Here, petitioner raised his third claim only in his petition for review to the California Supreme Court, and that court denied the petition without comment. Accordingly, this Court finds petitioner did not fairly present his third claim for review to the state courts.

Although the claim is unexhausted, respondent urges the Court to deny the petition on the merits under 28 U.S.C. § 2254(b)(2), which provides: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." A court may deny a petition containing an unexhausted claim on the merits "when it is perfectly clear that the applicant does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005). For the reasons discussed below, the Court finds petitioner's third claim does not raise a colorable federal claim. Accordingly, the Court will not dismiss the petition for failure to exhaust.

### D. Subject Matter Jurisdiction

Respondent asserts the instant petition [*16] should be dismissed for lack of subject matter jurisdiction, because petitioner has no constitutionally protected liberty interest in parole.

While there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1, 7, 99 S.

Ct. 2100, 60 L. Ed. 2d 668 (1979), a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when, or unless, certain designated findings are made, and thereby give rise to a constitutionally protected liberty interest. See Board of Pardons v. Allen, 482 U.S. 369, 376-78, 107 S. Ct. 2415, 96 L. Ed. 2d 303 (1987) (finding Montana parole statute creates due process liberty interest in release on parole); Greenholtz, 442 U.S. at 11-12 (finding Nebraska parole statute creates due process liberty interest in release on parole). In such a case, a prisoner gains a legitimate expectation in parole that cannot be denied without adequate procedural due process protections. See Allen, 482 U.S. at 373-81; Greenholtz, 442 U.S. at 11-16. In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit held that, under the clearly [*17] established framework of Greenholtz and Allen, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." See id. at 902.

Relying on the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), respondent argues the Ninth Circuit improperly applied Greenholtz and Allen to find a protected liberty interest in McQuillion. Respondent's argument is without merit. In Sandin, the Supreme Court criticized the "mandatory language" methodology used in Greenholtz and Allen, and held that, while states may under certain circumstances create liberty interests that are protected by the Due Process Clause, "these interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. In McQuillion, the Ninth Circuit squarely addressed, and rejected, the contention that Sandin applies to parole regulations. See McQuillion, 306 F.3d at 902-04. In particular, the Ninth Circuit held: "It is clear from the [Supreme] Court's framing of the problem in Sandin . . . that Sandin's holding [*18] was limited to internal prison disciplinary regulations." Id. at 904; see also Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1127 n.3 (9th Cir. 2006) ("Despite the government's argument that [Sandin] eliminated the 'mandatory language' approach of Greenholtz and Allen, the Supreme Court did not so hold and this court has consistently rejected this argument.").

Respondent further argues the California Supreme Court's decision in In re Dannenberg, 34 Cal. 4th 1061,

Page 5

Case3:98-cv-04877-WHA    Document133-1    Filed09/17/09    Page9 of 43

2007 U.S. Dist. LEXIS 66068, *18
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005), established that California's parole regulations do not create a protected liberty interest. The Ninth Circuit rejected this argument in Sass, finding Dannenberg addressed only "the narrow question whether the Board must engage in a comparative proportionality analysis in setting parole dates before determining an inmate's individual suitability for parole." 461 F.3d at 1128. Consequently, the Ninth Circuit concluded, "Dannenberg does not explicitly or implicitly hold that there is no constitutionally protected liberty interest in parole," id., and "California inmates continue to have a liberty interest in parole after [Dannenberg],"id. at 1125.

Accordingly, petitioner was entitled to the protections of due process [*19] at his parole suitability hearing, and the Court has subject matter jurisdiction over the petition.

**E. Petitioner's Claims**

**1. Denial of Due Process**

Petitioner contends the Board violated his right to due process by denying him parole, because the Board's decision was not supported by some evidence.

According to "clearly-established" federal law, a parole board's decision must be supported by "some evidence" to satisfy due process. See id. at 1128-29. "[The] some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. 445, 457, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.'" Id. at 1128 (quoting Hill, 472 U.S. at 455-56.) "Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the Board. See id. (quoting Hill, 472 U.S. at 455-56.)

When assessing whether a state parole board's suitability determination [*20] was supported by "some evidence," the Court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. Irons v. Carey, --- F.3d ---, 505 F.3d 846, 2007 U.S. App. LEXIS 16787, 2007 WL 2027359, at *3 (9th Cir. July 13, 2007). In

California, the criteria for determining whether a life prisoner who has not been convicted of murder, such as petitioner, is suitable for parole are set forth at title 15, § 2280, et seq., of the California Code of Regulations. The opening paragraph of § 2281(a) states: "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2281(a). Circumstances "tending to indicate unsuitability" for parole include whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2281(c). This factor includes consideration of the number of victims; whether "[t]he offense was carried out in a dispassionate and calculated manner"; whether the victim was "abused, defiled or mutilated during or after the offense"; whether [*21] "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering"; and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. See id.

Circumstances tending to support a finding of suitability for parole include: no juvenile record; a stable social history; signs of remorse; the crime was committed as a result of significant stress in the prisoner's life; a lack of criminal history; a reduced possibility of recidivism due to the prisoner's present age; the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. See id. § 2281(d).

The Board's 2003 denial of parole was based in part on findings petitioner posed an unreasonable risk of danger to society, see [*22] id. § 2281(a), because "the string of robberies that [petitioner was] committed to prison for, were carried out in an especially cruel manner, a manner which demonstrates a callous disregard for human suffering." (See Answer Ex. 3 at 67:24-68:2.) Based on evidence petitioner and his crime partner, both gang members, robbed multiple individuals at gunpoint to support their cocaine addiction, and that petitioner had

Case3:98-cv-04877-WHA   Document133-1   Filed09/17/09   Page10 of 43

2007 U.S. Dist. LEXIS 66068, *22
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

not considered the effect of his actions on the victims when he committed the robberies, the Board had "some evidence" to support these findings. (See id. at 13:24-18:7.) Further, because petitioner conceded his sole motivation for committing multiple armed robberies was to obtain money to subsidize his drug habit, (see id. at 15:23-16:26), the Board had "some evidence" to support its finding that the motive for the crime was very trivial in relation to the offense. (See id. at 68:3-4.)

The Board also considered petitioner's previous record of violence, see Cal. Code Regs. tit. 15, § 2281(c), and based its denial of parole in part on findings that petitioner had an unstable social history and prior criminal record. (See Answer Ex. 3 at 68:20-69:2.) Based on evidence of petitioner's [*23] history as a gang member, his use and abuse of drugs (in particular, cocaine), and an escalating pattern of criminal conduct that included a conviction for receiving stolen property and numerous arrests for property-related crimes, there was "some evidence" to support the Board's findings. (See id. at 22:1-24:23.)

The Board further determined petitioner needed to participate in additional self-help programs before he could be found suitable for parole. (See id. at 69:8-11, 70:14-20.) Of particular concern to the Board was petitioner's continued need for insight into his drug addiction, and his ability to avoid a relapse upon his release. (See id. at 69:18-70:20.) The Board relied upon a psychological evaluation by prison psychologist Steven Terrini, which, the Board conceded, estimated petitioner's violence potential to be below average relative to the average citizen in the community. The Board expressed great concern, however, about the report's conclusion that, if petitioner were to begin using crack cocaine again upon his release, his violence potential would be considered much higher than average. (See id. at 69:11-25.) Based on evidence petitioner believed his drug use was "behind" [*24] him now, (see id. at 46:1-11), he had not sought out self-help programs he could attend in Mexico upon his release, (see id. at 37:8-38:12), and he had stopped going to self-help programs in prison until the Board, at his 2002 parole suitability hearing, directed him to start attending again, (see id. at 43:9-44:10), there was "some evidence" to support the Board's finding that petitioner's drug addiction still posed a barrier to parole.

Petitioner contends the Board's continued reliance on his prior conduct and the nature of the commitment offense violates due process. The Ninth Circuit, however, has held that a denial of parole based on an unchanging factor, such as the gravity of the offense, may constitute "some evidence" to justify a denial of parole. See Irons, 2007 U.S. App. LEXIS 16787, 2007 WL 2027359, at *5 (holding Board's sole reliance on commitment offense in denying parole comported with due process); Sass, 461 F.3d at 1129 (holding Board's reliance "on the gravity of [petitioner's] convicted offenses in combination with his prior offenses . . . amount[ed] to some evidence to support the Board's determination"); Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003) ("[T]he parole board's sole supportable [*25] reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.") Although the Ninth Circuit, in Biggs, stated that "[a] continued reliance in the future on an unchanging factor . . . runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation," see Biggs, 334 F.3d at 917, this exception has never been applied by the Ninth Circuit.

Lastly, other circumstances presented in the instant action are not materially distinguishable from those found not to warrant the granting of a habeas petition in Irons, Sass, and Biggs. Here, while in prison, petitioner has acquired a high school equivalency degree, been free of disciplinary charges, received no counseling chronos in the last four years, completed a mill and cabinet vocational program, continued in a computer vocational program for the last three years, and participated in a substance abuse program for the last three months. (See Answer Ex. 3 at 40:5-45:5.) Similarly, the petitioner in Irons was "extremely industrious" in prison, maintained "average to exceptional [*26] job performance in every position he ha[d] occupied," and "received certificates of completion in several vocational training programs." See Irons, 2007 U.S. App. LEXIS 16787, 2007 WL 2027359, at *2. Likewise, in Sass, the petitioner displayed "exemplary conduct in prison," had "detailed plans" for his release, received vocational training and certificates, and "had taken college classes, for which he received all A's except for one B minus." See Sass, 461 F.3d at 1136 n.16 (Reinhardt, dissenting). Lastly, the petitioner in Biggs was a "model inmate," received praise from his supervisors for his "skills and efforts," received certification from the FAA in two aviation programs, and earned an A.A. degree as well as a Bachelor's degree and Masters in Business Administration. See Biggs, 334 F.3d

Case3:98-cv-04877-WHA   Document133-1   Filed09/17/09   Page11 of 43

2007 U.S. Dist. LEXIS 66068, *26
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

at 912. The Ninth Circuit nonetheless found the petitioners' accomplishments in Irons, Sass, and Biggs insufficient to require a grant of parole. See Irons, 2007 U.S. App. LEXIS 16787, 2007 WL 2027359, at *5; Sass, 461 F.3d at 1129; Biggs, 334 F.3d at 916.

In sum, the Board had "some evidence" to support its decision to deny petitioner parole in 2002. See Sass, 461 F.3d at 1129.

**2. Breach of Plea Agreement**

Petitioner next argues the Board's denial of [*27] parole breached the terms of his plea agreement, because the Board characterized his commitment offense as more serious than the charge to which he pled guilty, and considered the offenses underlying his concurrent and stayed sentences when making its determination. Specifically, petitioner contends that, although he pled guilty to multiple counts, under the terms of the plea agreement he would be punished only for the kidnap for robbery charge, and the punishments for all of the other charges would be stayed or run concurrently. (See Petition at 15-16.) Petitioner maintains he understood, at the time he entered his plea, that the plea agreement would contractually estop the Board from either considering the other offenses or punishing him for them, in return for his serving a prison term for the single offense of kidnap for robbery. (See id. at 16.)

"[D]ue process rights conferred by the federal constitution allow [a defendant] to enforce the terms of the plea agreement." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003). Plea agreements are construed using the ordinary rules of contract interpretation. See id. at 1159. "[W]hen a plea rests in any significant degree on a promise [*28] or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971); see also Brown, 337 F.3d at 1159 (holding prosecutor's promise petitioner would be released on parole after serving half of minimum sentence discipline-free was binding).

Assuming all of petitioner's allegations are true, he has failed to state a claim for relief because he has not shown that the terms of his plea agreement prohibited the Board from considering all of the charged offenses. Notably, he has not presented any evidence of his plea agreement, and the abstracts of judgment do not support

his purported subjective belief at the time he entered his plea. (See Answer Exs. 1, 2.) Further, at the time petitioner entered his plea, the Board was obligated, under California's parole regulations, to consider all of the offenses with which petitioner was charged when determining his parole suitability. See Cal. Code Regs. tit. 15, § 2281(b). Finally, petitioner received the benefit of his plea agreement because he was ordered to serve a life sentence only on the charge of kidnap for robbery; determinate [*29] sentences for all of the robbery charges were ordered to run concurrently with the life sentence. (See Answer Ex. 2.) If the sentences on the other charges had been ordered to run consecutively to the life sentence, petitioner's total life term would have been greater, see Cal. Code Regs. tit. 15, § 2289, and his minimum eligible parole date would have been later, because he would have been required to serve the determinate sentences before he could begin serving his life sentence. (See Answer App. C at 2.)

Based on this record, the Board's consideration of all of petitioner's charged offenses did not breach the plea agreement entered into between petitioner and the District Attorney's Office.

**3. Failure to Set Uniform Parole Date**

Petitioner claims the Board violated his right to due process by considering his individual suitability for parole, rather than setting a uniform parole date based solely on the offense of kidnap for robbery.

California's parole regulations contain a matrix of suggested base terms prisoners with life sentences should serve before they are released on parole. See Cal. Code Regs. tit. 15, § 2282. The base term is to be set solely on the basis of the gravity of [*30] the "base offense," which is defined as "the most serious of all life offenses for which the prisoner has been committed to prison." See id. § 2282(a). If, as in petitioner's case, the base offense is kidnap for robbery, and the victim was unharmed or received only minor injury, the matrix base term ranges from a low of eight, ten, or twelve years, to a high of eleven, thirteen, or fifteen years, depending on the facts of the crime. See id. § 2282(c).

In In re Dannenberg, 34 Cal. 4th at 1070-71, the California Supreme Court held that an inmate's base term can be set only after he has been found suitable for parole, because the statutory scheme places individual suitability for parole above a prisoner's expectancy in an

2007 U.S. Dist. LEXIS 66068, *30
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

early setting of a fixed date designed to ensure term uniformity. Specifically, the California Supreme Court found:

> While subdivision (a) of [California Penal Code] section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies *"unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime [*31] and/or criminal history raises *"public safety"* concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger.*

Id. at 1070 (emphasis, brackets, and parentheses in original). Consequently, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." Id. at 1071.

This Court is bound by a state court's interpretation of state law. Bradshaw v. Richey, 546 U.S. 74, 126 S. Ct. 602, 604, 163 L. Ed. 2d 407 (2005); Hicks v. Feiock, 485 U.S. 624, 629, 108 S. Ct. 1423, 99 L. Ed. 2d 721 (1988). Accordingly, petitioner's claim, that California's parole regulations required the Board to set a uniform parole date for him, does not state a colorable federal claim for relief.

**4.. Summary**

For the reasons set forth above, the California Court of Appeal's decision rejecting petitioner's first two claims and upholding the Board's 2003 denial of parole was not "contrary to" or an [*32] "unreasonable application of" clearly established federal law, or "an unreasonable determination of the facts in light of the evidence presented" in the state court proceedings. See 28 U.S.C. § 2254(d). Further, petitioner's third claim, which was raised only in a petition for review to the California Supreme Court and is unexhausted, fails to state a colorable federal claim for relief. Accordingly, the petition for a writ of a habeas corpus will be denied.

**CONCLUSION**

For the reasons set forth above, the petition for a writ of a habeas corpus is hereby DENIED.

The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

DATED: August 27, 2007

MAXINE M. CHESNEY

United States District Judge

# TAB 2

LEXSEE

**MARCIA BREVOT, Plaintiff, -v- NEW YORK CITY DEPARTMENT OF EDUCATION, et al., Defendants**

**04 Civ. 7959 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 16109**

**March 5, 2007, Decided**
**March 6, 2007, Filed**

**SUBSEQUENT HISTORY:** Affirmed by Brevot v. N.Y. City Dep't of Educ., 2008 U.S. App. LEXIS 23353 (2d Cir. N.Y., Oct. 29, 2008)

**CORE TERMS:** ineligible, statute of limitations, stigmatizing, stigma-plus, deprivation, summary judgment, defamation, deprived, supplemental jurisdiction, liberty interest, continuing violation, name-clearing, defamatory, new cause of action, school district, quotation marks omitted, time-barred, genuine, process of law, state law claim, state law, injunctive relief, nonmoving party's, federal district, dissemination, placement, partial, accrued, ongoing, stigma

**COUNSEL:** [*1] Jeffrey E. Fogel, Center for Constitutional Rights, New York, NY, and Beth Haroules, New York Civil Liberties Union, New York, NY, for plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, by Blanche Jayne Greenfield, Assistant Corporation Counsel, for defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff Marcia Brevot, a former employee of the New York City Department of Education (the "Department"), seeks injunctive relief and damages pursuant to 42 U.S.C. § 1983 for defendants' alleged violation of her due process rights as provided by the Fourteenth Amendment of the United States Constitution. She also asks this Court to exercise supplemental jurisdiction over her claim under Article 78 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. §§ 7801-7806, that defendants have behaved in an arbitrary and capricious manner. [1] Defendants -- the Department, two employees of the Department (including the Chancellor), and two employees of the New York City Office of the Special Commissioner of Investigation for the [*2] New York City School District -- move for summary judgment on both of plaintiff's claims, arguing, *inter alia*, that plaintiff's due process claim is time-barred and that her Article 78 claim may be maintained only in state court. Plaintiff cross-moves for partial summary judgment granting injunctive relief under her due process claim. For the following reasons, the defendants' motion will be granted in its entirety, and plaintiff's motion will be denied.

1 Plaintiff's complaint also included a state law claim for tortious interference with contract. (Compl. PP 37-40.) However, plaintiff has abandoned that claim. (P. Opp'n Mem. 16 n.11.)

**BACKGROUND**

The essential facts are mostly undisputed. Dr. Marcia Brevot retired from the New York City School System in 1995 after 27 years of employment, during which time

2007 U.S. Dist. LEXIS 16109, *2
96 Cal. Rptr. 2d 56, ***78; 2000 Cal. LEXIS 4293

she held various positions ranging from guidance counselor to principal. (Pl. Decl. P 2.) After her retirement, plaintiff was asked by the Department to serve as Acting Principal of the Eastern [*3] District Academy and as Director of the Grand Street Campus. (Compl. P 16.) Plaintiff was given a one-year contract for this position in July 1996. (Pl. Dep. 46.) Upon expiration of the contract term in June 1997, her contract was not renewed. (Id.)

In June 1998, Edward Stancik, the Special Commissioner of Investigation for the New York City School District ("SCI") [2] issued a report ("the Stancik Report" or "the Report") -- titled "How to Succeed Without Really Trying: The Alternative to Education at Eastern District Senior Academy" -- accusing plaintiff of "extreme[ly] incompeten[t]" performance at the Eastern District Academy. (Pl. Exh. C; Compl. P 1.) The Report accused plaintiff of "relax[ing] the curriculum and restructur[ing] the system of awarding credits in a manner that made it easier for students" to graduate. (Pl. Exh. D at 2.) SCI also issued a press release summarizing the charges of the Report. (Pl. Exh. B.) [3] The Report was provided to the State Education Department and remains publicly available on the SCI website. (Def. Exh. H at 34; Answer P 17.)

> 2 SCI is charged with investigating "alleged acts of corruption and other criminal activity, conflicts of interest, unethical conduct and other misconduct within the school district of the City of New York." (Def. Exh. W § 1.)

[*4]

> 3 According to plaintiff, the charges made in the Stancik Report were widely publicized in the media. (Pl. Dep. 73, 75.) Defendants do not dispute that the press release was issued to major media outlets (Def. Exh. I), or that plaintiff held a press conference concerning the Report which was broadcast "[e]verywhere." (Pl. Dep. 74-75.)

On July 6, 1998, as a result of the Stancik Report, plaintiff was informed by letter that she had been placed on the Department's Ineligible/Inquiry List ("the Ineligible List"), which disqualifies individuals from future employment with the Department. (Pl. Decl. Exh. A; Pl. Dep. 81.) The July 6 letter also advised plaintiff that she could schedule an "informal conference" to discuss the matter. (Pl. Decl. Exh. A.) However, the conference never took place, [4] and an employee of the

Office of Appeals and Review for the Department advised plaintiff that she "[could] no longer work for the Board of Education" as a result of her placement on the Ineligible List. (Pl. Dep. 71; Heaney Dep. 13.)

> 4 Plaintiff claims that either she or her attorney attempted to schedule a conference, but was told that she could not receive one because she was technically a consultant and not an official employee of the Department. (Pl. Dep. 70-71.) However, plaintiff "ha[s] nothing in writing" to substantiate this claim. (Id. 71.) Plaintiff does not dispute that she never filed an Article 78 proceeding in New York State Supreme Court, or took any other legal action, to challenge the findings of the Stancik Report or to seek a name-clearing hearing. (Def. Mem. 16.)

[*5] In September 2003, after a period of employment in Florida, plaintiff was hired by New Visions for Public Schools as a consultant to the New Century High School Initiative project in Region 9. (Pl. Decl. Exh. C.) Plaintiff was recommended for the position by Michael LaForgia, Region 9 Local Instructional Superintendent. (LaForgia Dep. 61-62.) New Visions is a non-profit organization that, in part, acts as a conduit for grants from the Carnegie, Gates, and Soros Foundations to the Department. (Pl. Exh. E.) Plaintiff was hired as an independent contractor "[t]o work closely with [Region 9] under their general direction, [and] to organize teams to create new schools in Region 9." (Pl. Decl. Exh. C; Wechsler Dep. 29.) Plaintiff's contract with New Visions was for a one year period beginning September 10, 2003, and ending August 30, 2004. (Pl. Decl. Exh. C.)

In December 2003, SCI received information from a confidential source, alleging that plaintiff, "who was the subject of an SCI investigation in 1997 . . . and was placed on the Ineligible List as a result, is now employed" by New Visions. [5] (Def. Exh. L.) SCI investigator Marie E. Zolfo was assigned to investigate the matter. [*6] (Def. Exh. M.) Zolfo interviewed a number of people during the course of her investigation, including an employee of the Hillsboro County School District in Florida, where plaintiff had worked as a guidance counselor from July 2001 until July 2003. [6] (Pl. Exh. L.) Zolfo concluded that plaintiff was on the Ineligible List and was employed by New Visions, despite her awareness that she was ineligible for employment with

the Department. (Def. Exh. O.)

    5  By this time, Stancik had been succeeded as the Special Commissioner of Investigation by defendant Richard J. Condon.

    6  Zolfo also interviewed, *inter alia*, New Visions Senior Program Officer Norman Wechsler, Deputy Superintendent of Region 9 Roy Moskowitz, Deputy Director of the Human Resources Division of the Department Lawrence Becker, LaForgia, and plaintiff herself. (Def. Exh. N.)

By letter of April 22, 2004, SCI Deputy Commissioner Regina Loughran advised the Chancellor of the Department, Joel I. Klein, that "[a]n investigation conducted by [*7] this office has substantiated that Marcia Brevot" was employed by New Visions "even though she is on the Department of Education . . . ineligible list as a result of misconduct." (Def. Exh. P.) The April 22 letter summarized the allegations of the Stancik Report and related information about plaintiff's employment by the Hillsboro School District in Florida. (Id. 1-2) The April 22 letter was also copied to DOE legal personnel, the Commissioner of the New York City Department of Investigation, and the Commissioner of the New York State Department of Education. [7] (Id.) As a result of its investigation, SCI recommended "that the continuation of Marcia Brevot['s] . . . contract . . . be reviewed in light of the information provided" in the April 22 letter. (Id.)

    7  SCI was required by Mayoral Executive Order to provide a copy of the April 22 letter to the Commissioner of Investigation, Chancellor, and Board of Education. (Def. Exh. W at 3-4.)

The April 22 letter was forwarded to Peter Heaney, Superintendent [*8] of Region 9, who "react[ed] to it immediately, because a report from SCI is rather serious." (Heaney Dep. 68.) As a result of the letter and its summary of the Stancik Report, Heaney determined that plaintiff should no longer serve in Region 9. (Id. 61-67.) On June 3, 2004, Heaney emailed LaForgia, advising him to "notify [plaintiff] and New Visions that [the Department] wish[es] to discontinue the use of her services effective today." (Pl. Exh. O.) Heaney also called Robert Hughes, President of New Visions, and requested that plaintiff's consultancy be discontinued. (Heaney Dep. 62.) On June 14, 2004, before the completion of her contract, plaintiff was terminated from

her position with New Visions. (Pl. Exh. E.)

On October 8, 2004, plaintiff filed the complaint that initiated this action. On April 19, 2006, following completion of discovery, defendants moved for summary judgment; plaintiff cross-moved for partial summary judgment on her injunctive relief claim on May 22, 2006. Both motions were fully submitted as of June 19, 2006.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, [*9] and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may only determine if there is a genuine issue to be tried, and is not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-255.

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. Mere conclusory allegations will not suffice. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). A [*10] genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. Anderson, 477 U.S. at 248.

### II. Statute of Limitations

Plaintiff argues that defendants have deprived her of due process of law by failing to provide her with a name-clearing hearing to challenge the findings of the Stancik Report and of SCI's subsequent investigation. (Pl. Mem. 18.) Defendants argue that plaintiff's due process claim accrued in 1998, and therefore is time-barred by the three-year statute of limitations on § 1983 claims. Because the Court agrees that plaintiff's due process

claim is time-barred, defendants' motion for summary judgment on plaintiff's due process claim will be granted, and plaintiff's cross-motion for partial summary judgment on that claim will be denied.

Plaintiff claims that defendants' failure to provide her with a name-clearing hearing to challenge the stigmatizing allegations of the Stancik Report and subsequent SCI investigation constitutes a violation of the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. XIV ("No State shall . . . deprive any person of life, liberty, [*11] or property, without due process of law."). "The Due Process Clause requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest." Patterson v. City of Utica, 370 F.3d 322, 329 (2d Cir. 2004). Thus, to establish that defendants violated the Due Process Clause, plaintiff must establish that defendants' conduct deprived her of a constitutionally protected liberty.

An individual is not deprived of liberty as a result of defamation by the government alone; a liberty interest is implicated only when the defamation is coupled with an "alter[ation]" or "extinguish[ment]" of a "right or status." Paul v. Davis, 424 U.S. 693, 711, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976). Thus, a "serious additional harm, such as loss of employment, as a result of the defamatory remarks by a government official" must be established before defamation may be deemed a constitutional deprivation. Komlosi v. N.Y. State Office of Mental Retardation and Developmental Disabilities, 64 F.3d 810, 817 (2d Cir. 1995). The legal standard has been referred to as the "stigma-plus" [*12] test: a liberty interest is implicated by public defamation coupled with the termination or loss of some legal right or status. See, e.g., Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989) ("[D]efamation . . . is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee.").

To satisfy the stigma-plus test, plaintiff must allege: (1) the utterance of a defamatory statement about her that "is injurious to her reputation, that is capable of being proved false, and that . . . she claims is false," and (2) "some tangible and material state-imposed burden . . . in addition to the stigmatizing statement." Doe v. Dep't of Pub. Safety ex rel. Lee, 271 F.3d 38, 47 (2d Cir. 2001), rev'd on other grounds, Conn. Dep't of Pub. Safety v.

Doe, 538 U.S. 1, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003); see also Paul, 424 U.S. at 701-702. The defamatory statement need not actually "create" an injury to plaintiff's reputation to be actionable; instead, the mere "threat[]" of such injury is sufficient to satisfy the first prong of the stigma-plus test. Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005). [*13] See, e.g., Brandt v. Bd. of Coop. Educ. Servs., 820 F.2d 41, 43 (2d Cir. 1987) (requiring the defamatory remarks to be of the type "'that *might* seriously damage [her] standing and associations in [her] community' or that *might* impose 'on [her] a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities'"), quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 573, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) (emphasis added).

If plaintiff satisfies the stigma-plus test, she has been deprived of a liberty interest, and the Fourteenth Amendment prohibits such a deprivation without due process of law, ordinarily in the form of notice and an opportunity to be heard. Failure to provide such a hearing is a violation of plaintiff's right to due process. See Roth, 408 U.S. at 573 ("[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.") (citation and internal quotation marks omitted). Where due process has been denied, the appropriate remedy is a post-deprivation [*14] name-clearing hearing. Patterson, 370 F.3d at 328.

Plaintiff need not convince this Court that the allegations in the Stancik Report or SCI's subsequent investigation were actually false in order to establish a violation of her due process rights. Brandt, 820 F.2d at 43-44 (noting that the goal of a name-clearing hearing is to determine the falsity of the allegations). Thus, plaintiff argues only that defendants' failure to provide her with a hearing violated her right to due process because she has satisfied the stigma-plus test. (See generally Pl. Mem. 12-18.) [8] Defendants argue that plaintiff has failed to establish a due process violation because, *inter alia*, she has failed to show that defendants were "personal[ly] involved in the alleged constitutional deprivation," or that she was "deprived of rights pursuant to a municipal policy or custom." (Def. Mem. 8, 11.) However, these issues need not be reached, because plaintiff's due process claim is time-barred.

[8] Plaintiff argues that this Court should order a

name-clearing hearing immediately, and that only if she is successful in establishing the falsity of the charges in the Report would she be entitled to return to this Court to attempt to prove that she sustained compensable damages.

[*15] Plaintiff's due process claim is asserted against defendants pursuant to 42 U.S.C. § 1983. 9 "[Section] 1983 provides a remedy for the deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 924, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982) (citing 42 U.S.C. § 1983). Claims under § 1983 accrue at the time that plaintiff knows, or has reason to know, of the injury that is the basis of her action. Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 332 (2d Cir. 1997) ("Under federal law, which governs when claims brought under § 1983 . . . accrue, the statute of limitations begins to run once the plaintiff knows of the injury on which the claim is based."), citing Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994). The limitations period on § 1983 claims in New York is three years. See Owens v. Okure, 488 U.S. 235, 251, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989) (applying New York's three-year statute [*16] of limitations governing general personal injury actions to § 1983 claims). See, e.g., Jaghory, 131 F.3d at 332 (same).

9 The complaint does not specifically base plaintiff's due process claim under § 1983. However, defendants treat plaintiff's Fourteenth Amendment claim as arising under § 1983 (Def. Mem. 14), and plaintiff does not argue otherwise. (See also Compl. P 9 ("The New York City Department of Education is a person within the meaning of 42 U.S.C. § 1983.").) Plaintiff's due process claim is properly construed as arising under § 1983. See Pauk v. Bd. of Trustees of City Univ. of N.Y., 654 F.2d 856, 865 (2d Cir. 1981) ("[W]hen § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available."); Turpin v. Mailet, 591 F.2d 426, 427 (2d Cir. 1979) (rejecting cause of action against municipality grounded directly on Constitution because of availability of § 1983).

The Stancik Report [*17] and the Department's press release were issued in 1998. (Def. Exhs. H, I.)

Plaintiff was placed on the Ineligible List in 1998. (Exh. J.) Plaintiff does not dispute that she was aware of all of these events at the time they occurred. Therefore, any claim based on these events accrued in 1998, more than three years prior to plaintiff's initiation of the present action. Because there is a three-year statute of limitations on § 1983 claims, plaintiff cannot base her § 1983 claim on these events.

Plaintiff argues, however, that "the continued publication and republication of the allegations of the Stancik Report and the additional allegations made in the course of the 2004 investigation along with her loss of employment gave rise to a new cause of action in 2004." (Pl. Opp'n Mem. 3.) Thus, plaintiff argues that her § 1983 claim was timely brought because her cause of action continues to accrue on an ongoing basis as long as the Stancik Report remains publicly available. Alternatively, plaintiff argues that her claim was timely brought because a new cause of action arose in 2004 as a result of defendants' dissemination of the Report during the course of SCI's investigation. Plaintiff [*18] argues that this dissemination resulted in the termination of her employment with New Visions, thereby giving rise to a distinct, discrete harm in 2004. Both arguments fail.

Plaintiff's first argument is analogous to the "continuing violation doctrine," applied most often in discrimination cases. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998); Lucenti v. Potter, 432 F. Supp. 2d 347, 358-59 (S.D.N.Y. 2006). Application of the continuing violation doctrine "delays the point at which the statute of limitations begins to run . . . until the last discriminatory act in furtherance of" defendant's "continuous practice and policy of discrimination" occurs. Jaghory, 131 F.3d at 331, quoting Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994). Although the continuing violation doctrine is considered most often in the context of discrimination cases, courts also have considered its application to other types of claims. See, e.g., id. at 332 (considering the continuing violation doctrine in a § 1983 case).

The continuing violation doctrine balances the burden imposed on plaintiffs by statutes of [*19] limitations against the reality that unlawful conduct does not always occur on discrete, specific occasions. The goal of statutes of limitations is to provide a "shelter" that protects defendants from being haled into court on "claims that have been allowed to slumber until evidence

has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." In re Becker, 407 F.3d 89, 97 (2d Cir. 2005), quoting Rothensies v. Elec. Storage Battery Co., 329 U.S. 296, 301, 67 S. Ct. 271, 91 L. Ed. 296, 1947-1 C.B. 109 (1946). The continuing violation doctrine is premised on the theory that a defendant who is accused of engaging in an "ongoing . . . polic[y] or practice[]" of unlawful conduct does not require the "shelter" of the statute because such a claim is not "stale." See Quinn, 159 F.3d at 766 (citations and internal quotation marks omitted). See, e.g., Del. State Coll. v. Ricks, 449 U.S. 250, 256-57, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) [*20] ("The limitations periods . . . protect [defendants] from the burden of defending claims arising from . . . decisions *that are long past*.") (emphasis supplied). Thus, plaintiff argues that the "ongoing" public availability of the Stancik Report on the Department's website is a continued violation of her liberty interest, and so defendants should not be afforded the "shelter" provided by the statute of limitations.

Plaintiff's argument misunderstands the nature of the due process claim. The constitutional claim is that plaintiff was entitled to a hearing before the Department deprived her of liberty by taking adverse action against her while making allegations potentially damaging her deputation. That deprivation occurred in 1998, with the issuance of the Stancik Report accompanied by plaintiff's consignment to the Ineligible List. Plaintiff claims that she was entitled to a hearing before such harmful action was taken.

Plaintiff's claim was thus complete in 1998. Satisfaction of the stigma-plus test is not contingent on the *actual* consequences of the stigmatizing allegations, but on their *potential* consequences: To satisfy the stigma-plus test, plaintiff must establish [*21] that the government publicized information "that *might* seriously damage [her] standing . . . in [her] community," or that *might* impose "on [her] a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities." Roth, 408 U.S. at 573 (1972) (emphasis added). Thus, had plaintiff brought her claim in 1998, when she was placed on the Ineligible List (satisfying the "plus" element of the test), as a result of the allegedly defamatory and publicly-circulated

assertions in the Stancik Report (satisfying the "stigma" element), her claim would have been ripe for adjudication even if she had not yet suffered any actual loss of employment as a result of the Report. Being barred from future employment by the Department of Education "extingush[ed]" a "right or status" within the meaning of Paul v. Davis. Assuming arguendo that the allegations of the Report were potentially stigmatizing, the stigma-plus test would have been satisfied. [10] Thus, plaintiff's claim that she should have been accorded a hearing before this action was taken, and her equitable entitlement to a name-clearing hearing, accrued in 1998. [*22] Whether or not the continued publication of the Report constituted an ongoing defamation is immaterial, for such defamation is not in itself a deprivation of liberty. [11] The deprivation, and any attendant right to a hearing, occurred at the particular point in time, in 1998, when the defamation was accompanied by a concrete adverse governmental action.

10 Levine v. Morgenthau, No. 95 Civ. 8529, 1996 U.S. Dist. LEXIS 9872, 1996 WL 396119 (S.D.N.Y. 1996), is instructive. Levine was arrested in June 1991, but the charges were dropped in July. Id. 1996 U.S. Dist. LEXIS 9872, [WL] at *1. In December 1995, plaintiff brought a § 1983 action challenging a section of the New York Criminal Procedure Law that allows sealed records from criminal actions terminated in favor of the accused to be released to certain organizations and certain people, including to the prospective employer of a police officer. Id. Plaintiff alleged that the statute deprived her of the right to "due process of law before a deprivation of a liberty interest." Id. 1996 U.S. Dist. LEXIS 9872, [WL] at *2. Thus, the Levine court analyzed the merits of plaintiff's claim under the Paul v. Davis stigma-plus test. Id. 1996 U.S. Dist. LEXIS 9872, [WL] at *5.

However, before discussing the merits of plaintiff's claim, the court considered defendant's argument that plaintiff's § 1983 claim was time-barred. Defendant argued that, because plaintiff brought her suit more than three years after her 1991 arrest, her § 1983 claim was barred by the three-year statute of limitations. Id. 1996 U.S. Dist. LEXIS 9872, [WL] at *3-4. The court found that, although "[a]t first blush, one could argue that" plaintiff's failure to allege actual

dissemination to employers "indicates that plaintiff's challenge to the constitutionality . . . of the statute is not ripe, . . . [i]t was sufficient that plaintiff alleged that she intended to apply for positions which would trigger the dissemination." Id. 1996 U.S. Dist. LEXIS 9872, [WL] at 3. The court held that "applying for employment [was] not necessary to make" plaintiff's stigma-plus claim ripe for adjudication. Id. 1996 U.S. Dist. LEXIS 9872, [WL] at *4.

[*23]

11   Plaintiff attempts to take a bite from both sides of the apple by first rejecting defendants' argument that New York's single publication rule should not apply to her claim because the claim sounds in due process rather than defamation (Pl. Opp'n Mem. 3-4), while simultaneously arguing that her claim is exempt from the statute of limitations because it falls within an exception to the single publication rule. (Id. 5.) As defendant correctly states, "the constitutional right to liberty is neither defined nor constrained by state defamation law." (Id. 4.) Indeed, the stigma-plus tests rests on the premise that defamation which is actionable under state law, standing alone, is "[in]sufficient to invoke the guarantees of procedural due process." Paul, 424 U.S. at 706.

Plaintiff's second argument does not fare any better. Plaintiff argues that defendants violated her liberty interest again by disseminating the Report in 2004, thereby causing her to lose her job with New Visions. According to plaintiff, the fact that the 2004 investigation exposed a "new audience" to [*24] the stigmatizing allegations of the Report "is critical" to her claim. (Pl. Opp'n Mem. 6.) But if every exposure of stigmatizing allegations to a "new audience" gave rise to a new cause of action, then a plaintiff would have a cognizable claim every time such exposure resulted in a new harm, no matter how long ago the information was actually publicized. This would effectively exempt every stigma-plus case from the statute of limitations imposed on § 1983 claims. Such an effect would undermine the purpose of statutes of limitations, to protect parties from being forced to defend against claims arising from "decisions that are long past." Ricks, 449 U.S. at 257.

Plaintiff's argument would entail the absurd consequence that she is entitled to a hearing before SCI may circulate the Report it prepared in 1998 to any

Department of Education official, or remind any such official that she is on the Ineligible List. If plaintiff was deprived of due process, that deprivation occurred when she was deprived of eligibility for employment in a defamatory manner without a hearing. A new hearing is not required whenever the consequences of the original state action are felt.

[*25]   The Department's placement of plaintiff on the Ineligible List, which stripped plaintiff of a "legal right or status," and SCI's publication of the Stancik Report, which provided the potential for stigmatization, both occurred in 1998. Plaintiff knew about the Report and her placement on the Ineligible List in 1998. Moreover, plaintiff's unsuccessful attempt to schedule a conference to address the Report in 1998 shows that plaintiff knew at that time that the defendants' conduct could have a stigmatizing effect and negatively impact her future employment possibilities. [12] It is irrelevant that her attempt to meet with the Department in 1998 was unsuccessful; even if the Department violated her due process rights by denying her an opportunity to clear her name in 1998, her cause of action arose *at that time*, and not six years later when she once again faced the consequences of being on the Ineligible List.

12   This is not a case in which the potentially stigmatizing information laid dormant for years, and plaintiff, though aware of the publication of the information, was unaware that it would ever have a stigmatizing effect on her life. Instead, according to plaintiff, she actually suffered the stigmatizing effects of the Report in 1998, which she claims "damaged [her] standing . . . in [her] community." Roth, 408 U.S. at 573. (See Pl. Dep. 72 ("I was the old lady on the corner looking like an evil person.").) Thus, the potential for stigma was apparent to plaintiff from the very beginning.

[*26]   The decision to terminate plaintiff's employment in 2004 was not a new action based on defamatory allegations made in 2004; it was simply a recognition of her ineligibility for employment. Thus, the SCI investigation in 2004, and the resulting denial of employment, did not constitute a "continuing violation" or "renewed violation" of plaintiff's liberty interest. The events in 2004 were merely the consequence of events that occurred, fully and completely, in 1998. Plaintiff does not contend that the reason for her removal from employment was false; she was fired because she was on

Case3:98-cv-04877-WHA   Document133-1   Filed09/17/09   Page21 of 43

2007 U.S. Dist. LEXIS 16109, *26
96 Cal. Rptr. 2d 56, ***78; 2000 Cal. LEXIS 4293

the Ineligible List. Regardless of the truth of the findings that led to her placement on the list, she *was* on the list, and Department officials determined that this precluded her for indirect as well as direct employment. Therefore, plaintiff's § 1983 claim accrued in 1998 and is barred by the three-year statute of limitations.

If the 2004 investigation involved new stigmatizing allegations that were not contained in the Stancik Report, plaintiff could perhaps argue that the investigation created a new cause of action, separate and apart from the 1998 events. However, the 2004 SCI investigation [*27] did not involve any new stigmatizing information not already included in the Stancik Report, and thus can not, in and of itself, give rise to a new cause of action. 13 (See Def. Exh. P at 1-2.) The investigation focused on the relationship between New Visions and the Department, and the implications of the Stancik Report on plaintiff's employment by New Visions. (Id. 2-4; Def. Exh. S (directing the dismissal of plaintiff based on the discovery of the Stancik Report).) Nothing was disclosed in 2004 that was not disclosed to the general public, to plaintiff's full knowledge, in 1998.

13   The only new information uncovered by the 2004 SCI investigation is the statement in SCI's April 22, 2004 letter to Chancellor Klein that plaintiff had failed to inform her Florida employer about the Stancik Report. (Def. Exh. P.) Plaintiff claims that this statement "suggests that [she] had lied to" her Florida employer. (Pl. Decl. P 17.) Regardless of whether it is reasonable to read such an inference into the statement, plaintiff does not assert that the statement in the 2004 letter was false, only that it could be misconstrued. (Id. P 18.) In addition, plaintiff's assertion that the statement was misleading is belied by her own admission that the Florida employer actually might not have known about the Stancik Report due to a misunderstanding in her job application. (Id.) The stigma-plus test requires plaintiff to allege that the stigmatizing charges were false. Brandt, 820 F.2d at 43-44, citing Codd v. Velger, 429 U.S. 624, 627, 97 S. Ct. 882, 51 L. Ed. 2d 92 (1977).

[*28] The Court is mindful that application of the statute of limitations to plaintiff's § 1983 claim "may very well . . . foreclose[] any remedy for what might have been an actionable injury." BellSouth Telecomms., Inc. v.

W.R. Grace & Co., 77 F.3d 603, 616 (2d Cir. 1996) (citation and internal quotation marks omitted). Unfortunately, such a "harsh" result is sometimes "unavoidable . . . . Where a plaintiff has failed to comply with [the statutory] requirement, a court may not entertain the suit." Id. (citation and internal quotation marks omitted).

III. Supplemental Jurisdiction

Finally, plaintiff claims that, by "acting to provoke New Visions to write its June 9, 2004 letter terminating [plaintiff's] contract" (Compl. P 41), defendants violated § 7803(3) of the New York Civil Practice Law and Rules. Section 7803(3), a part of Article 78 of the N.Y. C.P.L.R., provides for injunctive relief where a "body or officer" of New York State behaves in an "arbitrary and capricious manner." N.Y. C.P.L.R. § 7803(3).

Because plaintiff's Article 78 claim is based on state law, the claim may be maintained only through exercise of [*29] the Court's supplemental jurisdiction. 28 U.S.C. § 1367. Dismissal of plaintiff's state law claim is appropriate because she has no surviving federal claims. See E&L Consulting, Ltd. v. Doman Indus. Ltp., 472 F.3d 23, 33 (2d Cir. 2006) (affirming district court's "proper" dismissal of plaintiff's remaining state claims following dismissal of plaintiff's federal claims); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he state law claims should be dismissed so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present.").

Dismissal is particularly appropriate here, because Article 78 proceedings present unique issues of state law. Assuming an Article 78 claim could ever be properly adjudicated in a federal district court, 14 the Court clearly has discretion under 28 U.S.C. § 1367(c) to decline to hear such a claim. Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 309 (2d Cir. 2004). A court may decline to exercise supplemental jurisdiction for "compelling reasons." 28 U.S.C. § 1367(c) [*30] , (c)(4). "The very nature of an Article 78 proceeding presents such compelling reasons." Morningside Supermarket Corp. v. N.Y. State Dep't of Health, 432 F. Supp. 2d 334, 346 (S.D.N.Y. 2006).

14   Three district courts in this Circuit have recently concluded that Article 78 claims brought in federal court "must be dismissed for lack of

subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims." Blatch ex rel. Clay v. Hernandez, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005); see also Beckwith v. Erie County Water Auth., 413 F. Supp. 2d 214, 226 (W.D.N.Y. 2006); Cartagena v. City of New York, 257 F. Supp. 2d 708, 710 (S.D.N.Y. 2003). However, for the purposes of this case, the Court assumes without deciding that there are circumstances under which a federal district court may hear Article 78 claims. See, e.g., Cartagena v. City of New York, 345 F. Supp. 2d 414, 426 (S.D.N.Y. 2004) (accepting supplemental jurisdiction after defendants withdrew their jurisdictional objection and "unequivocally agreed, in the unusual circumstances of th[e] case, to the submission of the Article 78 claim" to the federal court, but not denying the propriety of the court's earlier ruling).

[*31] "An Article 78 proceeding is a novel and special creation of state law, and differs markedly from the typical civil action brought in [federal district court] in a number of ways." Lucchese v. Carboni, 22 F. Supp. 2d 256, 258 (S.D.N.Y. 1998). As a "purely state procedural remedy," Camacho v. Brandon, 56 F. Supp. 2d 370, 380 (S.D.N.Y. 1999), an Article 78 proceeding is "designed to accommodate to the state court system." Herrmann v. Brooklyn Law Sch., 432 F. Supp. 236, 240 (E.D.N.Y. 1976). When a federal district court exercises supplemental jurisdiction over Article 78 claims, the court "usurp[s] the statutory authority bestowed upon the New York state courts." Adler v. Pataki, 204 F. Supp. 2d

384, 396 (N.D.N.Y. 2002) (citation and internal quotation marks omitted). Thus, "federal courts are loath to exercise jurisdiction over Article 78 claims." Birmingham v. Ogden, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999). See also Morningside Supermarket, 432 F. Supp. 2d at 346-47 (locating "[o]nly two cases" in which a federal court accepted supplemental jurisdiction over an Article 78 claim). [*32]

These are compelling reasons to decline supplemental jurisdiction over plaintiff's Article 78 claim. Not only does plaintiff not make a convincing argument otherwise - she does not even brief the issue beyond the conclusory statement that the Court should "invoke its supplemental jurisdiction to hear claims arising under state law." (Compl P 5.) Therefore, plaintiff's Article 78 claim is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. Plaintiff's cross-motion for partial summary judgment is denied.

SO ORDERED.

Dated: New York, New York

March 5, 2007

GERARD E. LYNCH

United States District Judge

# TAB 3

LEXSEE

**DENNIS GERALD CLAIBORNE, Plaintiff, vs. DIRECTOR OF CORRECTIONS;
LINDA L. RIANDA, Chief, Inmate Appeals Branch; MEDICAL APPEALS
COORDINATOR, Salinas Valley State Prison; HEALTH CARE MANAGER,
Salinas Valley State Prison; A.A. LAMARQUE, Warden, SVSP; Medical Appeals
Coordinator DEBRA RUISI; Health Care Managers THOR and LEE; Supervisors,
Medical Supplies, ABBY HAVENS and MR. HAGGER, Defendants.**

**No. C 03-2598 WHA (PR)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2008 U.S. Dist. LEXIS 63726**

**August 18, 2008, Decided
August 20, 2008, Filed**

**PRIOR HISTORY:** Claiborne v. Dir. of Corr., 2007
U.S. Dist. LEXIS 55499 (N.D. Cal., July 22, 2007)

**CORE TERMS:** grievance, prison's, exhaustion,
exhausted, prisoner, knee brace, administrative remedies,
administrative appeals, appointment of counsel,
grievance procedures, failure to exhaust, exhaustion
requirement, exhaust, inmate, forma pauperis, citation
omitted, unenumerated, correctional, departmental,
prescribed, housed, unnumbered, log

**COUNSEL:** [*1] Dennis Gerald Claiborne, Plaintiff,
Pro se, Susanville, CA.

For Deborah Ruisi, Medical Appeals Coordinator, Daniel
Thor, Health Care Manager, Charles Lee, Health Care
Manager, Hagger, Supervisor, Medical Supplies,
Defendants: Charles J. Antonen, LEAD ATTORNEY,
California Department of Justice, Office of the Attorney
General, San Francisco, CA.

**JUDGES:** WILLIAM ALSUP, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** WILLIAM ALSUP

**OPINION**

**ORDER GRANTING DEFENDANTS' MOTION TO**

**DISMISS FOR FAILURE TO EXHAUST**

This is a civil rights case filed pro se by a state
prisoner. Plaintiff contends that defendants were
deliberately indifferent to a serious medical need in not
providing him with a metal knee brace prescribed by an
outside doctor.

Although leave to proceed in forma pauperis ("IFP")
was granted initially, it was revoked because plaintiff had
suffered at least nine previous dismissals of cases that
were determined to be frivolous, malicious, or to fail to
state a claim upon which relief could be granted. *See* 28
U.S.C. § 1915(g). When plaintiff failed to pay the fee the
case was dismissed. Plaintiff appealed. The Ninth Circuit
concluded that plaintiff's allegation that he had not
received the kind of knee brace that had been prescribed
[*2] amounted to an assertion that he was "under
imminent danger of serious physical injury," *see* 28
U.S.C. § 1915(g), an exception to the three-strike rule,
and remanded. Service of the amended complaint was
ordered in the initial review order.

Defendants Lee, Hager, Thor and Ruisi have filed an
unenumerated motion to dismiss for failure to exhaust
administrative remedies. Plaintiff has opposed the motion
to dismiss and has filed a motion for appointment of
counsel. For the reasons discussed below, the motion for
counsel is denied and the motion to dismiss is granted.

# DISCUSSION

## I. MOTION FOR APPOINTMENT OF COUNSEL

There is no constitutional right to counsel in a civil case. *Lassiter v. Dep't of Social Services, 452 U.S. 18, 25, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)*. Section 1915 of the United States Codes confers on a district court only the power to "request" that counsel represent a litigant who is proceeding in forma pauperis. *28 U.S.C. § 1915(e)(1)*. This does not give the courts the power to make "coercive appointments of counsel." *Mallard v. United States Dist. Court, 490 U.S. 296, 310, 109 S. Ct. 1814, 104 L. Ed. 2d 318 (1989)*. In short, the Court has only the power to ask pro bono counsel to represent plaintiff, not the power to "appoint" counsel.

At [*3] this stage of the case the issue is whether plaintiff has exhausted, and he has done a good job of presenting his factual arguments -- that is, he need only point out to the Court the facts that he believes show exhaustion, which he has done. The motion will be denied.

## II. MOTION TO DISMISS

Federal law provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Although once within the discretion of the district court, exhaustion in prisoner cases covered by § 1997e(a) is now mandatory. *Porter v Nussle, 534 U.S. 516, 524, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)*. All available remedies must now be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Id.* (citation omitted).

The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Woodford v. Ngo, 548 U.S. 81, 126 S. Ct. 2378, 2382, 165 L. Ed. 2d 368 (2006)*. "The text of 42 U.S.C. § 1997e(a) strongly suggests that the PLRA uses [*4] the term 'exhausted' to mean what the term means in administrative law, where exhaustion means proper exhaustion." *Id. at 2387*. Therefore, the PLRA exhaustion requirement requires proper exhaustion. *Id.* "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id. at 2386* (footnote omitted). Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 922-23, 166 L. Ed. 2d 798 (2007)*.

The State of California provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare." Cal. Code Regs. tit. 15, § 3084.1(a). It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers. *See id.* § 3084.1(e). In order to exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal resolution, (2) formal written appeal on a [*5] CDC 602 inmate appeal form, (3) second level appeal to the institution head or designee, and (4) third level appeal to the Director of the California Department of Corrections. *See id.* § 3084.5; *Barry v. Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997)*. A final decision at the director's level satisfied the exhaustion requirement under § 1997e(a). *Id. at 1237-38*.

Nonexhaustion under § 1997e(a) is an affirmative defense. *Wyatt v Terhune, 315 F.3d 1108, 1119 (9th Cir 2003)*. It should be treated as a matter of abatement and brought in an "unenumerated Rule 12(b) motion rather than [in] a motion for summary judgment." *Id.* (citations omitted). In deciding a motion to dismiss for failure to exhaust administrative remedies under § 1997e(a), the court may look beyond the pleadings and decide disputed issues of fact. *Id. at 1119-20*. If the court concludes that the prisoner has not exhausted California's prison administrative process, the proper remedy is dismissal without prejudice. *Id. at 1120*.

Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 922-23, 166 L. Ed. 2d 798 (2007)*. The level of detail necessary in a grievance to comply [*6] with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Id. at 923*. In California, the regulations permit an administrative appeal to be filed as to "any departmental decision,

action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a)." As to content, the regulations only instruct the prisoner to "describe the problem and action requested . . . ." *Id.* at § 3084.2(a).

In his petition, petitioner specified the log number of the administrative appeal by which he claimed to have exhausted his administrative remedies, LAC 01-1130 (Pet. at 2). He also contends in his opposition that his exhaustion of the claims was by way of that administrative appeal (Opp. at 2). LAC 01-1130 was filed at Lancaster State Prison, long before plaintiff was housed at Salinas Valley State Prison, where the events giving rise to this suit occurred, so obviously it could not and did not describe those facts (Pet., (unnumbered) Exh. 1 at (unnumbered) 6). The grievance did mention a knee brace, though that [*7] was far from the main point of the grievance, but the claim presented in the complaint here has to do with events at Salinas Valley State Prison, not events at Lancaster.

It is true that the United States Supreme Court has held that the level of detail necessary in a grievance to comply with the grievance procedures is determined by the requirements of the prison's grievance system, not the PLRA, and that exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievance. *Jones*, 127 S. Ct. at 923. The holding in this order, however, is not that plaintiff's grievance was insufficient because he failed to name the people who are the defendants in this case, something which is not required by the California grievance system, but rather that it was insufficient because it did not describe "the problem," which is a requirement of the California system. That is, "the problem" that gave rise to this suit is the Salinas Valley State Prison authorities' failure to provide plaintiff with the sort of knee brace he allegedly required -- and that is a "problem" that could not have been exhausted before plaintiff was even housed at Salinas Valley State Prison. [*8] The Lancaster grievance therefore exhausted a different claim than the one involved in this lawsuit.

Defendants also mention another grievance, log number SVSP B 02-03159 (Mot. to Dismiss at 4-5). This one was filed at Salinas Valley State Prison, and in it plaintiff did ask for the kind of knee brace he contends is required (Decl. Variz, Exh. B). Defendants have, however, established that plaintiff did not pursue it to the second formal level or to the final, Director's, level (*id.* at P 6; Decl. Grannis at P 2). That is, he did not complete exhaustion.

Plaintiff complains about defendants' references to this grievance, asserting that he did not rely on it in the complaint and that it cannot be considered in light of the Ninth Circuit's remand (Opp. at 2-3). He apparently misunderstands the defendants' references to this grievance, which were essentially anticipatory -- defendants were saying that if plaintiff should contend that he exhausted by way of SVSP B 02-03159, that contention would be wrong because he did not appeal to the final level. Since plaintiff does not rely on this grievance, and because it is clear that if he did such reliance would be futile, it need not be considered [*9] further.

The motion to dismiss will be granted.

## CONCLUSION

Plaintiff's motion for appointment of counsel (document number 55 on the docket) is **DENIED.** The motion to dismiss by defendants Lee, Hager, Thor and Ruisi (document number 51 on the docket) is **GRANTED.** The claim against the only other defendant, Havens, is **DISMISSED** for failure to obtain service. *See* Fed. R.Civ.P. 4(m). The case is **DISMISSED** without prejudice. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: August 18, 2008.

/s/ William Alsup

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

# TAB 4

LEXSEE

**KEVIN L. KEITHLEY, et al., Plaintiffs, v. HOMESTORE.COM, INC., et al, Defendants.**

**No. C-03-04447 SI (EDL)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2009 U.S. Dist. LEXIS 2720**

**January 7, 2009, Decided**
**January 7, 2009, Filed**

**SUBSEQUENT HISTORY:** Sanctions allowed by, in part, Sanctions disallowed by, in part Keithley v. Homestore.com, Inc., 2009 U.S. Dist. LEXIS 30187 (N.D. Cal., Mar. 27, 2009)

**PRIOR HISTORY:** Keithley v. Homestore.com, Inc., 2008 U.S. Dist. LEXIS 92822 (N.D. Cal., Nov. 6, 2008)

**COUNSEL:** [*1] For Kevin L. Keithley, Plaintiff: Scott Richard Mosko, LEAD ATTORNEY, Robert Francis McCauley, Finnegan, Henderson, Farabow, Garrett & Stanford Research Park, Palo Alto, CA.

For Tren Technology Holdings LLC, Plaintiff: Scott Richard Mosko, LEAD ATTORNEY, Finnegan, Henderson, Farabow, Garrett & Stanford Research Park, Palo Alto, CA; Scott Richard Mosko, Finnegan, Henderson, Farabow, Garrett & Stanford Research Park, Palo Alto, CA.

For The Home Store.Com, Inc., Defendants: Douglas R. Wilner, Jitendra Malik, PRO HAC VICE, Bruce J. Rose, Jud Graves, Alston & Bird LLP, Atlanta, GA; Jennifer L. Shoda, Snyder Miller & Orton, San Francisco, CA; Luther Kent Orton, Snyder Miller & Orton LLP, San Francisco, CA; S. Benjamin Pleune, Bank of America Plaza, Charlotte, NC.

For National Association of Home Builders of the United States, Defendant: Douglas R. Wilner, Jitendra Malik, PRO HAC VICE, Alston & Bird LLP, Atlanta, GA; Jennifer L. Shoda, Snyder Miller & Orton, San Francisco, CA; Luther Kent Orton, Snyder Miller & Orton LLP, San Francisco, CA; S. Benjamin Pleune, Bank of America Plaza, Charlotte, NC.

For National Association of Home Builders of the United States, National Association of Realtors, [*2] The Home Store.Com, Inc., Counter-claimants: Jennifer L. Shoda, Snyder Miller & Orton, San Francisco, CA; S. Benjamin Pleune, Attorney at Law, Charlotte, NC.

Kevin L. Keithley, Counter-defendant, Pro se, Menlo Park, CA.

For Kevin L. Keithley, Counter-defendant: Scott Richard Mosko, LEAD ATTORNEY, Finnegan, Henderson, Farabow, Garrett & Stanford Research Park, Palo Alto, CA.

**JUDGES:** ELIZABETH D. LAPORTE, United States Magistrate Judge.

**OPINION BY:** ELIZABETH D. LAPORTE

**OPINION**

**ORDER AWARDING SANCTIONS**

On November 6, 2008, following a hearing on October 17, 2008, the Court granted in part Defendants' Motion for Sanctions, stating that it would award monetary sanctions consisting of additional fees and costs incurred by Defendants as a result of Plaintiffs' late production of documents and loss of documents, and declining to recommend an adverse inference jury instruction, or terminating or evidentiary sanctions. The

Court ordered briefing regarding Defendants' reasonable fees and costs attributable to the sanctionable conduct. On October 31, 2008, Defendants filed a Statement of Incurred Costs. On November 5, 2008, the Court granted Defendants leave to lodge supporting documentation and billing records in camera. Plaintiffs [*3] filed an opposition to Defendants' Statement of Incurred Costs on November 10, 2008, and Defendants filed a reply on November 12, 2008. On November 19, 2008, Judge Illston granted Defendants' Motion for Summary Judgment as to Noninfringement and Invalidity based on Indefiniteness.

In the November 6, 2008 order, the Court awarded sanctions pursuant to Federal Rule of Civil Procedure 37. Specifically, the Court held that sanctions are warranted under Rule 37(a)(5)(C) for the instances in which Defendants' motions to compel were granted in part, and under Rule 37(c)(1) for the instances in which Plaintiffs' failure to timely produce documents constituted a failure to supplement prior discovery responses as required by Rule 26(e). See Fed. R. Civ. P. 37(a)(5)(C) ("If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."); Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on [*4] a motion, at a hearing or at a trial, unless the failure was substantially justified or harmless. In addition to or instead of this sanction, the court, on motion and after giving opportunity to be heard: (a) may order payment of the reasonable expenses, including attorney's fees, caused by the failure, . . . ."). Defendants seek a total of $ 391,903.51 in sanctions based on two categories: (1) costs Defendants incurred in securing production of the late produced materials; and (2) costs Defendants incurred in examining and trying to make use of the late produced materials in the limited time available. Within these two categories, there are seven subcategories of fees and costs sought by Defendants. For the reasons stated below, the Court awards $ 205,507.53 plus the costs for lodging as described below in monetary sanctions based on Plaintiffs' conduct as described in the November 6, 2008 Order.

**1. Costs incurred in securing production of late produced materials**

**A. $ 11,204.78**

Defendants seek $ 11,204.78 for fees and costs relating to "investigating references by Plaintiffs in record to documents not yet produced, propounding [hard drive] request and associated meet and confers solely [*5] for purposes of getting Plaintiffs to comply with their discovery obligations. . . ." See Defs.' Statement of Incurred Costs at 2-3. Defendants explain that because prior to February 28, 2008, Plaintiffs had only produced approximately 2,000 pages of documents, and because Defendants then observed that Plaintiffs had documents in their possession during depositions that had not previously been produced by Plaintiffs, Defendants served the request seeking documents from Plaintiff's hard drive on February 28, 2008. That request stated:

> All desktops, laptops, hard drives, USB devices, servers, storage devices, or any other device capable of storing computer files or accessing the internet owned, possessed or in the custody of (1) Plaintiff Kevin Keithley in his corporate or personal capacity; (2) Plaintiff Tren Technologies Holdings, LLC; or (3) any officer of Tren Technologies Holdings, LLC, specifically, Mr. Ronald Keithley in his corporate or personal capacity.

Declaration of Jitendra Malik in Support of Defs.' Mot. to Compel (docket no. 567) Ex. 9 at 2.

Production in response to this request constituted the first time that Plaintiffs made an adequately thorough search for electronic [*6] information. See Nov. 6, 2008 Order at 4. There is no dispute that the bulk of Plaintiffs' document production in this case took place after the hard drive request was served. Defendants argue that the expenses relating to service of that request would not have been incurred had Plaintiffs produced the documents in a timely manner.

Defendants did not file a motion to compel seeking these documents. However, Defendants note that at least some of the relevant late produced documents would have been responsive to discovery requests served earlier in the case: No. 5: "All documents constituting or relating to all patentability, validity or enforceability analyses and opinions concerning the '025 patent, or the alleged inventions discussed therein;" No. 12: "All documents

relating to any alleged infringement of the '025 patent or alleged copying or use of any design or method or process asserted to fall within the scope of the '025 patent;" or No. 13: "All documents relating to Defendants." See Defs.' Mot. for Sanctions at 2, n. 3. Documents produced in response to the hard drive request, which broadly sought computer hardware and storage devices in the custody of Kevin Keithley, Ron Keithley [*7] or Tren Technologies (see Defs.' Mot. for Sanctions at 4), were likely responsive to one or more of the earlier discovery requests. Plaintiffs had an obligation to supplement their earlier discovery responses with any information of which they became aware. See Fed. R. Civ. P. 26(e). The failure to do so is sanctionable under Rule 37(c)(1), unless the failure was substantially justified or harmless. The Court has already found that the late production contained at least some relevant documents, and that the late production caused some prejudice. See Nov. 6, 2008 Order at 4. Further, there has been no showing of substantial justification for failing to search Plaintiffs' hard drives and to produce documents prior to service of the hard drive request.

Defendants would not have had to incur most of these fees and costs had Plaintiffs produced all documents in response to Defendants' earlier requests for production in a timely manner. However, Defendants would have had to incur fees and costs to review these documents even if they had been produced earlier, and may well have had to serve the hard drive request if Plaintiffs failed to produce documents. Accordingly, pursuant to Rule 37(c)(1), [*8] the Court awards 75% of the amount sought, or $ 8,403.59, for reasonable expenses incurred relating to service of the hard drive request.

## B. $ 3,131.40

Defendants seek $ 3,131.40 in fees and costs related to "correspondence, meet and confers, and time spent reviewing the garage documents at Plaintiffs' counsel's offices." Defendants state that in response to Plaintiffs' refusal to produce the documents from Plaintiffs' garage, Defendants did not file a motion to compel, but instead served a Request to Permit Entry Upon Land for Inspection, seeking leave to examine the documents at Plaintiffs' garage. Plaintiffs agreed to produce the documents for inspection at Plaintiffs' counsel's office on April 28, 2008. Defendants argue that Plaintiffs then secretly added the documents to Plaintiffs' other

document production a few weeks later, so Defendants incurred costs for reviewing the documents twice. Plaintiffs argue that Defendants sought copies of the garage documents, so the documents were openly included in a later production. The Court has already found that these documents had little if any relevance to this case, and that therefore Defendants did not show prejudice resulting from their [*9] late production. See Nov. 6, 2008 Order at 5-6. Accordingly, Defendants are not entitled to expenses pursuant to Rule 37(c)(1) because the failure to timely produce was harmless.

## C. $ 51,964.31

Defendants seek $ 51,964.31 in fees and costs relating to "the cost of the meet and confers, the cost to file the moving and reply papers and argue at the hearing" relating to Defendants' May 6, 2008 motion to compel documents improperly withheld as privileged. In that motion to compel, Defendants sought documents relating to communications between Plaintiffs and Joe Novosel, Don Levy, Scott Essex and Maureen Keithley, Kevin Keithley's wife, that Plaintiffs had withheld as protected by the attorney-client privilege and the marital privileges. On July 2, 2008, the Court granted in part Defendants' motion to compel, ordering production of communications with Don Levy on the ground that Plaintiffs had failed to show that the documents were protected by the attorney-client privilege. The Court denied production of communications with Scott Essex after reviewing the documents in camera and finding that the documents were irrelevant, and with Maureen Keithley on the ground that the communications were [*10] protected by a marital privilege. The Court also ordered Defendants to choose ten sample documents of communications with Joe Novosel for Plaintiffs to lodge in camera, and ordered Plaintiffs to file Mr. Novosel's declaration regarding his relationship with Plaintiffs, so that the Court could determine whether the Novosel communications were privileged. On August 4, 2008, after reviewing the sample Novosel documents in camera, the Court found that one of the ten documents was not privileged and must be produced to Defendants, but that the remainder of the documents were either privileged or irrelevant.

When a motion to compel is granted in part and denied in part, the Court may apportion expenses. See Fed. R. Civ. P. 37(a)(5)(C). Here, even though Defendants became aware of the documents pertaining to

these third parties only through Plaintiffs' late production, the late production and the timing of the service of the privilege log containing these documents had little bearing on the need for Defendants to bring the motion to compel. No matter when the documents were produced, Plaintiffs would likely have submitted a privilege log and Defendants would have had to move to compel. Even [*11] though Defendants would not have been as rushed in doing so had the issue arisen earlier, the Court is not convinced that the fees and costs associated with this motion to compel were incurred because of the late production. Defendants seem to recognize that the delay in production did not cause these expenses: "Defendants are entitled to these costs because it was an additional expense they would not have had to bear had Plaintiffs been forthright and offered their reasons [for the privilege] in good faith." See Defs.' Reply in Support of Statement of Incurred Costs at 5. Accordingly, the Court does not apportion any of these fees and costs as sanctions.

**D. $ 45,574.80**

Defendants seek $ 45,574.80 in fees and costs relating to the "cost of identifying the missing documents, the meet and confers, the cost to file the moving and reply papers and argue at the hearing" relating to Defendants' June 20, 2008 Motion to Compel Production of Plaintiffs' Hard Drive and Electronic Media. In that motion to compel, Defendants sought further responses to interrogatories seeking facts relating to infringement, as well as further production in response to the hard drive request. [1] On August 11, 2008, [*12] the Court ordered Plaintiffs, inter alia, to certify that all documents responsive to the hard drive request had been produced, to produce a privilege log, and to provide a declaration from an information technology expert regarding the search done for documents on Plaintiffs' hard drive and other electronic media.

> 1   The amount of fees and costs sought in the motion for sanctions does not include time spent on the interrogatory issue.

Plaintiffs concede, as they must, that production from the hard drive in March and April 2008 was belated, but argue that the delayed search did not prejudice Defendants and that the late production did not cause Defendants to file their motion to compel. However, Plaintiffs' production of documents from their hard drive was not only late, thereby necessitating the hard drive

request in the first place, but was also partially deficient, thereby causing Defendants to file the motion to compel. Specifically, there is no dispute that documents were missing from Plaintiffs' production in response to the hard drive request and that Plaintiffs did not substantively address the issue of the missing documents until *after* Defendants filed their motion to compel [*13] on June 20, 2008. Not until the time of their opposition to the motion did Plaintiffs provide a chart detailing the status of the missing documents and state that non-privileged documents would be produced, despite four earlier letters from Defendants prior to the filing of the motion to compel seeking Plaintiffs' explanation as to the missing documents, and Plaintiffs' counsel's statement at Kevin Keithley's May 9, 2008 deposition that he was reviewing documents for production. Even if, as Plaintiffs argue, Defendants filed their motion to compel without consulting Plaintiffs while the parties were on a discovery hiatus, Plaintiffs' deficient production and failure to timely respond to Defendants' letters would not be completely excused on that basis, particularly because the discovery hiatus was imposed after Defendants' letters. See Declaration of Jitendra Malik in Support of Defs.' Mot. to Compel (docket no. 567) at P 6; Ex. 1-4 (letters dated April 14, 2008, April 30, 2008, May 1, 2008 and May 2, 2008); Pls.' Opp. to Defs.' Mot. to Compel (docket no. 611) at 11 (stating that the parties agreed to the discovery hiatus on May 13, 2008). On the other hand, Defendants' letters, which [*14] apparently required extensive review of documents by Plaintiffs, were sent over a short period, and the parties had agreed to a discovery hiatus around that time. Plaintiffs were not entirely unreasonable in deciding to cease their review and production efforts in response to Defendants' letters for a time.

Because Defendants' motion to compel was not granted in full, the Court may apportion expenses pursuant to Rule 37(a)(5)(C). Based on the facts described above, the Court apportions 50%, or $ 22,787.40, of the expenses to Plaintiffs as a sanction.

**E. $ 41,203.55**

Defendants seek $ 41,203.55 in fees and costs relating to the "cost of identifying missing PatentBridge documents, securing the declaration of Mark Holmes (CEO, PatentBridge) to refute Plaintiffs' claim that Holmes was operating as Mr. Keithley's counsel, the meet and confers, the cost to file the moving and reply

papers and argue at the hearing" on Defendants' July 18, 2008 Motion to Compel. Defendants state that in reviewing Plaintiffs' late produced documents, they found correspondence between PatentBridge and Kevin Keithley, and that those documents had not been listed on Plaintiffs' privilege log. Defendants obtained documents [*15] through a subpoena from PatentBridge and then filed a motion to compel these documents from Plaintiff. In that motion to compel, Defendants sought production of documents relating to PatentBridge on the grounds that Plaintiffs improperly asserted the attorney-client privilege with respect to those documents. On September 16, 2008, the Court granted in part Defendants' motion to compel with respect to the PatentBridge documents, holding that Plaintiffs waived the attorney-client privilege with respect to those documents, but that the waiver only applied to the documents that had already been produced.

Because Defendants' motion to compel was not granted in full, the Court may apportion expenses pursuant to Rule 37(a)(5)(C). Here, Plaintiffs focus on the asserted lack of prejudice to Defendants resulting from the handling of the PatentBridge documents because upon learning of Mr. Holmes, Defendants were able to subpoena him before the original discovery cutoff, and were able to get his declaration to support their reply. More importantly, Plaintiffs note that Defendants received many documents they ordinarily might not have as a result of the Court's ruling on waiver.

Defendants respond [*16] that even though they were able to obtain documents and Mr. Holmes' declaration, they were precluded from engaging in further follow up with Mr. Holmes without sacrificing time that would have been better spent preparing for trial. Defendants should be compensated for the harm due to lack of time to conduct adequate discovery, but they have not justified recovery of fees and costs for the entire course of conduct leading up to the motion to compel. Rather, Defendants are only entitled to the fees and costs incurred for the re-depositions of Kevin Keithley and Sheldon Parker which resulted from the late production of the PatentBridge documents. This amount is addressed below in section 2.A. Otherwise, Defendants' request for costs under this category is denied.

**F. $ 144,122.51**

2

2   This amount was revised upward in the

November 13, 2008 summary of Defendants' billing records. See Summary of Billing Records at 21, n. 2.

Defendants seek $ 144,122.51 for fees and costs relating to "analysis of the Albagli certification, the meet and confers, cost to file the moving and reply papers and argue at the hearing [on the motion for sanctions], follow up activities of hearing (identifying relevant [*17] documents, responding to Plaintiffs' submission at October 17th hearing and drafting statement of incurred costs." These expenses encompass work done from April through November 2008.

After the August 5, 2008 hearing on Defendants' Motion to Compel Hard Drive, the Court ordered Plaintiffs to provide an explanation regarding the disposition of the documents identified by Defendants as missing from production. Plaintiffs produced Attorney David Albagli's certification in response to the Court's order. Defendants argue that a considerable amount of time was spent analyzing the Albagli certification, which Defendants argued contained several deficient explanations, some of which were noted by Defendants in their motion for sanctions. Plaintiffs argue that given the limited prejudice found by the Court relating to the late production, a request for the entire fees and costs for bringing the motion is not justified. Plaintiffs also note that Defendants could have cured any prejudice caused by the late production of documents by deposing Kevin Keithley, Sheldon Parker, Scott Tatro, Peter Bennett and Ron Keithley, and in fact Defendants did re-depose Kevin Keithley, Ron Keithley and Sheldon [*18] Parker after these documents were produced in 2008. Plaintiffs point out, however, that by the time the motion for sanctions was filed, discovery had closed and Defendants had therefore decided not to pursue depositions of third parties identified in the late production. Plaintiffs argue that Defendants should not be compensated for the prejudicial loss of opportunity, which Defendants chose to forego.

On November 6, 2008, the Court granted in part Defendants' motion for sanctions, holding that Plaintiffs' failure to timely produce documents and the loss of some documents had resulted in some prejudice to Defendants that warranted limited monetary sanctions, but did not justify evidentiary or terminating sanctions. Plaintiffs' failure to timely produce documents and to supplement discovery requests pursuant to Rule 26(e) caused

Defendants to incur expenses in bringing the motion for sanctions. As described above and in the Court's November 6, 2008 Order granting in part Defendants' motion for sanctions, however, even though Plaintiffs have not shown any substantial justification for the failure, the prejudice to Defendants was somewhat limited and Defendants only partially prevailed. [*19] See Nov. 6, 2008 Order at 5 (". . .some relevant documents were produced late, causing some prejudice, but far less than Defendants contend."); at 6 ("The resulting production of this electronic material, at least some of which is relevant, prejudices Defendants insofar as they were rushed to complete discovery.").

Accordingly, an award of sanctions for the entire amount of fees and costs incurred in bringing the motion for sanctions would be excessive. Defendants are, however, entitled to recover some of the fees and costs for bringing the motion for sanctions. According to Defendants' detailed summary of incurred fees and costs, Defendants incurred approximately $ 120,000 in fees and costs from August through November 2008 associated with the core functions of drafting, analyzing or preparing the motion for sanctions, rather than with more removed activities such as reviewing document production that took place from April through August 2008. The Court does not award this amount in full but reduces it to $ 90,000 because Defendants' Motion for Sanctions was only partially successful.

## 2. Costs incurred in examining and trying to make use of late produced documents

### A. $ 94,702.16

Defendants [*20] seek fees and costs relating to "witness fees, subpoenaing, preparing for, and retaking depositions" of Kevin Keithley, Ron Keithley and Sheldon Parker, and attempting to depose Scott Tatro, Don Levy, Joe Novosel and Peter Bennett. The expenses were incurred as follows: (1) $ 11,606.00 for fees and costs associated with preparing documents for use at deposition, updating deposition indexes, configuring documents for use while attorneys travel, and other tasks related to organizing materials for deposition; (2) $ 72,281.71 for fees and costs associated with preparing for and taking the depositions of Kevin Keithley ($ 33,014.20), Ron Keithley ($ 31,925.91) and Sheldon Parker ($ 7,341.60); (3) $ 6,964.60 for fees and costs associated with coordinating, preparing and attempting to take Mr. Tatro's deposition; (4) $ 3,200.00 for costs

associated with travel to attend depositions of Kevin Keithley, Ron Keithley, Sheldon Parker and Scott Tatro; and (5) $ 428.83 for costs associated with serving a subpoena on Sheldon Parker.

Specifically, Defendants re-deposed Kevin Keithley, Ron Keithley and Sheldon Parker to obtain testimony regarding the late produced documents. Defendants argue that they [*21] are entitled to all fees and costs associated with these depositions because the further depositions would not have been required had Plaintiffs timely produced the documents. Further, Defendants argue that their desire to minimize the travel burden by grouping depositions should not result in a reduced sanctions award. The Court agrees with Defendants that the bulk of the expenses comes from preparing for the depositions, which required rushed review of the late produced documents, and that the earlier depositions would likely have been different had all the documents been produced in a timely fashion.

Plaintiffs concede that some of the fees and costs associated with these depositions were incurred as a result of the late production, and that they stipulated to the additional depositions. Plaintiffs argue that the fees and costs for the depositions themselves should not be awarded, and that if those costs are awarded, they should be limited to 25% of the expenses sought to reflect the actual time spent at the depositions on the new documents. Plaintiffs have provided no support for this arbitrary percentage reduction. However, Plaintiffs argue, and the Court agrees, that Defendants' [*22] reimbursable expenses should be limited to the costs of a few nights' lodging. For example, Ron Keithley and Kevin Keithley were deposed on April 18 and 19, 2007, respectively, and again on May 8 and 9, 2008 and July 21 and 24, 2008, respectively, after further documents were produced. Plaintiffs note that in May, one of Defendants' counsel who conducted the depositions was already in California to attend a May 13, 2008 court hearing in this case. See Albagli Decl. P 7. Plaintiffs also note that in July, both attorneys who attended the Keithley depositions already had travel arrangements to be in California that week because a number of other depositions were being taken in this case. See Albagli Decl. P 8. Therefore, travel costs for these attorneys were not necessitated by the deposition, and only a few nights' hotel lodging is appropriately reimbursable. With respect to Sheldon Parker, Plaintiffs state that he was deposed on May 22, 2007, and then again after the late produced

documents on August 7, 2008 in Virginia for about two and one-half hours. See Albagli Decl. P 10. Plaintiffs note that there was another deposition in this case the next day in Washington, D.C. (see Albagli [*23] Decl. P 11), so the travel costs should be limited to one night's lodging in Virginia.

In the November 6, 2008 Order, the Court found little prejudice resulting from the inability to depose other third parties, including Scott Tatro, Don Levy and Peter Bennett. Specifically, the Court stated:

> Indeed, the primary prejudice claimed by Defendants is that they were unable to take important depositions from third parties such as Don Levy, Scott Tatro, Mark Holmes, Michael Starkweather and Peter Bennett as a result of the belated production. However, other factors led to some of these depositions not being taken. Moreover, the testimony that the witnesses could offer appears to be of such limited relevance that even if the documents had been produced earlier, Defendants might well have chosen to forego them under a rational cost/benefit approach to discovery.

> For example, the evidence shows that Defendants were unable to serve Mr. Levy with a deposition subpoena in July 2008 despite several attempts due to the facts that Mr. Levy was no longer at the address Defendants had for him, and that when Defendants obtained a business address, they discovered that Mr. Levy was out of town with his ill [*24] father during that time. See Second Supp. Taylor Decl. PP 4-11; Ex. 4-7. Defendants did not pursue his deposition after discovery closed on August 8, 2008, either through stipulation with Plaintiffs or through an extension of time from the Court.

> As to Mr. Tatro, Defendants argue that he has highly relevant information based on an October 2006 e-mail that he sent to Plaintiff Keithley stating that Plaintiff's '025 patent may be invalid in light of two earlier patents. See Malik

Decl. Ex. 14. Yet Defendants' inability to depose Mr. Tatro flows from Mr. Tatro's hostility toward Defendants due to Defendants having filed a declaratory judgment action against him in 2007 relating to patents that are not at issue in this case. See Foxhall Decl. P 10. Ex. 9. Defendants' argument that he would have been less hostile had he been subpoenaed earlier in this case before he was actually sued by Defendants is not very persuasive as it assumes, inter alia, that he had no reason to expect to be sued. Moreover, Defendants did not refute Plaintiffs' point that one of the patents mentioned by Mr. Tatro was cited as prior art in Plaintiffs' '025 patent (see Oct. 17, 2008 Tr. at 16:17-19), rendering its [*25] importance to the validity analysis questionable. Moreover, Mr. Tatro's opinion about prior art would constitute extrinsic evidence, which is of limited value under Federal Circuit authority (see Phillips v. AWH Corp., 415 F. 3d 1303, 1318-19 (Fed. Cir. 2005)), and even less important than expert testimony. When questioned by the Court at the hearing, Defendants' counsel could not say whether they even wanted to proceed with Mr. Tatro's deposition. See Oct. 17, 2008 Tr. at 7:4-24 ("The Court: Do you even want to redepose [Tatro]? Mr. Orton: "I don't know, Your Honor. . . . The Court: So I would think as of today coming here to address me you would know whether you want to do it or not. Mr. Orton: "I don't, Your Honor.").

\*\*\*

Finally, as to Mr. Bennett, Defendants argue that he possessed highly relevant information based on a February 2005 e-mail exchange between Mr. Bennett and Plaintiff Keithley in which Mr. Bennett states that he has reviewed Plaintiffs' project and concluded that Plaintiffs should "refocus your design, the technologies and documentation," and that he was disengaging from the bidding process with Plaintiff Keithley. See Malik

Decl. Ex. 15. Again, to the extent that [*26] Mr. Bennett has an opinion regarding the validity of Plaintiffs' patent, any opinion would be merely extrinsic evidence, and even less useful extrinsic evidence than an expert's opinion. Moreover, the evidence shows that Defendants subpoenaed him in May 2008, before the discovery cutoff. See Second Supp. Taylor Decl. Ex. 8; Oct. 17, 2008 Tr. at 20:4-14. Further, the evidence shows that his unexpected personal problems, rather than anything that Plaintiffs did, derailed his deposition. See Taylor Decl. PP 12-20.

Nov. 6, 2008 Order at 6-8.

With respect to Scott Tatro, Defendants argue that had they known about Mr. Tatro four years earlier, before he became involved in litigation against Defendants, Defendants would have been able to depose him. However, it is not at all clear to the Court that Mr. Tatro would have cooperated had Defendants contacted him earlier in this case. Defendants only argue that they have been deprived of the ability to find out how willing Mr. Tatro would have been to cooperate with Defendants before he had a reason not to. Also, Plaintiffs point out that Defendants did not seek to enforce the deposition subpoena against Mr. Tatro, showing that Mr. Tatro's deposition [*27] was not very important. Further, it appears that Mr. Tatro would have been able to provide only extrinsic, nonexpert testimony, which would have been of limited value in this patent infringement matter. Accordingly, expenses related to Defendants' attempts to depose Mr. Tatro are denied pursuant to Rule 37(c)(1) because the inability to depose him was harmless.

Defendants also seek fees and costs associated with attempting to depose third parties such as Don Levy, Jose Novosel and Peter Bennett. With respect to Mr. Novosel, the Court has previously ruled that communications between Mr. Novosel and Kevin Keithley were privileged, so any deposition would not have yielded much discoverable information. See Aug. 4, 2008 Order Regarding In Camera Review of Documents from Plaintiffs' Privilege Log. With respect to Mr. Bennett, Defendants did not seek to enforce the subpoena against him. Moreover, as described above, the Court has already found that these witnesses would have limited, if any, relevant evidence, and that the failures to depose them did not necessarily arise from Plaintiffs' late production. Therefore, the inability to depose Mr. Bennett and Mr. Levy was harmless. To the extent [*28] that Defendants also seek costs associated with attempting to depose Michael Starkweather and Mark Holmes, the inability to do so was also harmless. Defendants unilaterally cancelled Mr. Starkweather's deposition when Defendants' counsel was informed while at the airport that Plaintiffs' counsel would not attend, apparently agreeing with Plaintiffs as to the insignificance of his deposition. In addition, Mr. Holmes was cooperating with Defendants and therefore could have been deposed, but Defendants chose not to do so.

Accordingly, the Court awards the expenses attributable to the Kevin and Ron Keithley and Sheldon Parker depositions ($ 72,281.71), the costs of preparing the documents for deposition ($ 11,606.00), and the subpoena costs for Mr. Parker ($ 428.83). Defendants are also entitled to the costs of the additional nights' lodging for the re-depositions of Kevin Keithley, Ron Keithley and Sheldon Parker as discussed above. Defendants shall provide evidence of their expenses for this lodging to Plaintiffs, which Plaintiffs shall also pay.

**Conclusion**

Accordingly, the Court awards monetary sanctions as stated in this Order in the amount of $ 205,507.53 plus the expenses of the additional [*29] nights' lodging as described above.

**IT IS SO ORDERED**.

Dated: January 7, 2009

/s/ Elizabeth D. Laporte

ELIZABETH D. LAPORTE

United States Magistrate Judge

TAB 5

LEXSEE

**SAMUEL LEWIS, Petitioner, v. J. SOLIS, Respondent.**

**No. C 04-2 152 JF (PR)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2005 U.S. Dist. LEXIS 39828**

**December 8, 2005, Decided**
**December 14, 2005, Filed**

**CORE TERMS:** parole, prisoner, liberty interest, habeas petition, plea agreement, federal law, parole release, convicted, sentence, habeas corpus, parole date, suitability, inmate, indicia of reliability, incarceration, supplemental, mootness, prison term, evidence presented, disproportionate, unsuitable, traverse, gravity, parole date, record reflects, objectively unreasonable, mandatory language, degree murder, guilty plea, years-to-life

**COUNSEL:** [*1] For Samuel Lewis, Petitioner, Pro se, Soledad, CA.

For J. Solis, Respondent: Julia Je, Department of Justice, Office of the Attorney General, San Francisco, CA; Virginia I. Papan, California Attorney General's Office, San Francisco, CA.

**JUDGES:** JEREMY FOGEL, United States District Judge.

**OPINION BY:** JEREMY FOGEL

**OPINION**

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, a state prisoner proceeding *pro se*, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the denial of parole by the Board of Prison Terms (hereinafter "Board") on April 30, 2002. In its December 14, 2004 Order to Show Cause, this Court found that Petitioner raised two cognizable claims: (1) the Board's denial of parole was arbitrary and capricious and its findings were unsubstantiated; and (2) the Board failed

to provide Petitioner with the benefits and consideration set forth in his plea agreement, resulting in a disproportionate sentence. Respondent filed an answer addressing the merits of the petition and Petitioner filed a traverse. Respondent thereafter filed a supplemental answer, and Petitioner filed a supplemental traverse. After reviewing the papers and relevant [*2] portions of the record, the Court concludes that Petitioner is not entitled to habeas corpus relief based on the claims presented and will deny the petition.

**I. BACKGROUND**

1

> 1    The underlying facts are set forth and incorporated from the Los Angeles Superior Court's January 9, 2004 order denying Petitioner's state habeas petition. *In Re Samuel Lewis*, BH 002512 (January 9, 2004), Resp't Exh. C.

On February 18, 1988, Petitioner who then was eighteen years old, was driving through his neighborhood when he and a pedestrian, Marcus Venegas, got into a staring contest. Petitioner got out of the car and challenged Venegas to a fight. Venegas' brother intervened, and petitioner left and came back with some gang members. No fight broke out at that time. Instead, that evening Petitioner, along with two "Bloods" gang members, went to the home where Venegas was present. Petitioner was given a shotgun and told to "handle this." Petitioner walked up onto the porch and began shooting. April Parcell and Lavelle Bullard [*3] were shot but survived. Seventeen year-old Chevon Perry was shot in the back and died from her injuries.

On November 21, 1988, Petitioner was convicted of second-degree murder in violation of California Penal Code § 187 after entering a "no contest" plea. Petitioner was sentenced to a prison term of fifteen years-to-life. His minimum eligible parole date was February 19, 1998. In 1997, Petitioner received a three-year denial at his initial parole suitability hearing. On April 30, 2002, after having served over thirteen years, Petitioner appeared before the Board for his second parole suitability hearing. The Board found Petitioner unsuitable for parole and issued a two-year denial. Since the filing of the instant petition, Petitioner again was found unsuitable for parole at a hearing on October 28, 2004.

Following the April 20, 2002 denial of parole, Petitioner filed a state habeas petition in the Los Angeles Superior Court, which was denied January 9, 2004. Petitioner then filed habeas petitions in both the California Court of Appeal and California Supreme Court, which were summarily denied on February 24, 2004 and May 12, 2004, respectively. Petitioner filed [*4] the instant federal habeas petition on June 1, 2004.

## II. DISCUSSION

### A. *Standard of Review*

The court will entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court may not grant a petition with respect to any claim adjudicated on the merits in state court proceedings unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

For purposes of 28 U.S.C. § 2254(d)(1), "clearly established federal law" refers to the holdings of the United States Supreme Court as of the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). [*5] In other words, it is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1172, 155 L. Ed. 2d 144 (2003).

A state court decision may be "contrary to" clearly established federal law if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-413.

"Under the unreasonable application' clause, a federal habeas court may grant the writ if the state court identified the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The relevant inquiry is not whether the state court applied the law erroneously or incorrectly, but "[r]ather that application must be objectively unreasonable." Lockyer, 123 S. Ct. at 1175. A federal habeas court making the "unreasonable application" inquiry should ask whether the [*6] state court's application of clearly established federal law was "objectively unreasonable." Williams, 529 U.S. at 409. The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer, 123 S. Ct. at 1175.

On a petition for habeas corpus, a federal court looks to the decision of the highest state court to determine whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. LaJoie v. Thompson, 217 F.3d 663, 669, n.7 (9th Cir. 2000); see, e.g., Avila v. Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002) (treating state court referee's report as the last reasoned state court decision, where report was summarily adopted by the court of appeal and petition for review to California Supreme Court was denied without comment); Packer v. Hill, 291 F.3d 569, 578-79 (9th Cir. 2002) (where state supreme court denied habeas petition without [*7] comment, looking to last reasoned decision of a state court as the basis of the state court's judgment), rev'd on other grounds, 537 U.S. 3, 123 S.Ct. 362, 154 L. Ed. 2d 263 (2002). It also looks to any lower court decision examined or adopted by the highest state court to address the merits. See Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004) (because state appellate court examined and adopted some of the trial court's reasoning, the trial court's ruling is also relevant); Collins v. Rice, 348 F.3d 1082, 1087 (9th Cir. 2003) (where state appellate court

2005 U.S. Dist. LEXIS 39828, *7
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

adopted reasons cited by trial court, federal review necessarily includes discussion of trial court decision as well).

Under U.S.C. § 2254(d)(2), a federal court may grant the habeas writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless petitioner rebuts the presumption of correctness by clear [*8] and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Justiciability**

Respondent first argues that this action is moot because a "favorable decision in this action cannot provide redress for the alleged constitutional violations at the April 30, 2002 hearing because the decision at that hearing . . . was superceded [sic] by the decision at the subsequent hearing on October 28, 2004, which also found Petitioner unsuitable for parole." Resp't Mem. of P. & A. at 5-6. The instant petition is not moot simply because Petitioner has received subsequent parole suitability hearings. See Hubbart v. Knapp, 379 F.3d 773, 778-779 (9th Cir. 2004), cert. denied, 543 U.S. 1071, 125 S. Ct. 913, 160 L. Ed. 2d 807 (2005) (habeas petition challenging a civil commitment under California's Sexually Violent Predators Act was not moot because it fit within the capable-of-repetition-yet-evading review exception to the mootness doctrine). [2] Because Petitioner's claims fall within an exception to the mootness doctrine, the Court reaches the merits of the claims.

2    The mootness doctrine is based on the requirement in Article III, § 2, of the Constitution, that there exist a case or controversy through all stages of federal judicial proceedings. This means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Lewis v. Continental Bank Corp., 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990). An exception to the mootness doctrine exists where a claim is capable of repetition yet evading review. This exception is limited to extraordinary circumstances where two elements combine: (1)

the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again. See Hubbart v. Knapp, 379 F.3d 773, 777 (9th Cir. 2004), cert. denied, 125 S. Ct. 913 (2005). Parole suitability hearings fall under both exceptions to mootness.

[*9]  Next, in its supplemental answer, Respondent contends that this Court lacks subject matter jurisdiction because state parole matters do not constitute a federal question, relying on Sass v. California Bd. of Prison Terms, 376 F. Supp. 2d 975 (E.D. Cal. 2005) and In re Dannenberg, 34 Cal. 4th 1061, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005). [3] Resp't. Supp. Ans. at 6. Although it concludes that the instant petition should be denied on the merits, the Court does not find Sass persuasive.

3    The Sass court makes express reference to Dannenberg, stating that "1) the language of § 3041 is not mandatory, 2) there is no right to parole in California, 3) the Board of Prison Terms has extremely broad discretion and is not required to fix a parole date, 4) the statutory scheme of § 3041 indicates that § 3041(b) extinguishes any expectancy an inmate may have in parole found in § 3041 (a)." Sass v. California Bd. of Prison Terms, 376 F. Supp. 2d 975, 981 (E.D. Cal. 2005) citing to Dannenberg, 34 Cal. 4th at 1084, 1087-88, 1097-98.

[*10]  While there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1, 7, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979), a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and thereby give rise to a constitutionally protected liberty interest. See Board of Pardons v. Allen, 482 U.S. 369, 376-78, 107 S. Ct. 2415, 96 L. Ed. 2d 303 (1987) (Montana parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates due process liberty interest in release on parole); Greenholtz, 442 U.S. at 11-12 (Nebraska parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates due process liberty interest in release on parole). In such a case, a prisoner gains a

Page 3

legitimate expectation in parole that cannot be denied without adequate procedural due process protections. *Allen*, 482 U.S. at 373-81; *Greenholtz*, 442 U.S. at 11-16.

California's parole [*11] scheme uses mandatory language and is largely parallel to the parole schemes in *Allen* and *Greenholtz* giving rise to a protected liberty interest in release on parole. California Penal Code § 3041(b) provides that: "[t]he panel or board . . . shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." The Ninth Circuit has held explicitly that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002); *see also Biggs v. Terhune*, 334 F.3d 910, 914 (2003). The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made. *Id.* This is true regardless of whether a parole release date has ever been set for the inmate, because "[t]he liberty interest is created, [*12] not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d at 915-16 (9th Cir. 2003) (finding initial refusal to set parole date for prisoner with 15-to-life sentence implicated prisoner's liberty interest); *cf. McQuillion*, 306 F.3d at 903 (finding decision to rescind previously-granted parole release date implicated prisoner's liberty interest).

## C. Due Process Violation

Petitioner asserts that the Board's denial of parole was arbitrary and capricious, and that the Board's findings were unsubstantiated, thus violating his right to due process. Pet. at 5. In his supplemental traverse, Petitioner further contends that the Board's denial of parole implicated his federally protected liberty interest in parole. Supplemental Traverse at 3-10.

The Board is the administrative agency authorized to conduct hearings to determine whether an inmate is suitable for parole. California Penal Code §§ 3041(a),(b) authorize the Board to "establish criteria for the setting of parole release dates" and uses mandatory language to express California's parole scheme:

The [*13] panel or board shall set a

release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041(b).

California's parole scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made. *McQuillion*, 306 F.3d at 902. Thus, this presumption creates a legitimate expectation in parole that cannot be denied without adequate procedural due process protections. *Allen*, 482 U.S. at 373-81; *Greenholtz*, 442 U.S. at 12. A prisoner's presumption and expectation in parole is legitimate regardless of whether or not a parole release date has ever been set because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003). However, [*14] "the requirements of due process are satisfied if some evidence' supports the decision" of the parole board and " the evidence underlying the board's decision [has] some indicia of reliability." *Id.* at 915 (quoting *McQuillion*, 306 F.3d at 904 (citations omitted); *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987)).

In determining whether the Board's decision was based on "some evidence" and had some "indicia of reliability," the Court may consider whether Petitioner was afforded an opportunity to appear before, and present evidence to, the Board. *See Pedro v. Oregon Parole Board*, 825 F.2d 1396, 1399 (9th Cir. 1987), *cert. denied*, 484 U.S. 1017, 108 S. Ct. 726, 98 L. Ed. 2d 675 (1988). The Court also may consider the Board's decision-making process over time. *See Biggs*, 334 F.3d at 916-17 (upholding the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but noting that "[o]ver time . . . should [the Petitioner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply [*15] because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole"). However, the "some evidence" standard may be met even

when some of the Board's findings are unsupported. *See id. at 916* (stating that "in spite of the fact that several of the Board's findings were unsupported," the Board's denial was affirmed).

At the April 30, 2002 hearing the Board denied parole, finding that: "The inmate needs additional time in order to fully understand and deal with the causation factors that led to the commitment of the life crime . . . The prisoner committed the offense in an exceptionally cruel, callous, violent, brutal, and cold-blooded manner." Resp't Exh. E (April 30, 2002 Parole Consideration Hearing Transcript) at 62. After reviewing the record, the superior court found that the Board's findings were supported by "some evidence" and denied Petitioner's state habeas petition. Resp't Exh. C at 4. This Court concludes that the state court's decision was not contrary to, or an unreasonable application of clearly established federal law, nor a decision based on an unreasonable determination of the facts in light [*16] of the evidence presented. 28 U.S.C. § 2254(d)(1),(2).

The record reflects that Petitioner was present and presented testimony at his parole hearing. Resp't Exh. E. Evidence was submitted to the Board providing information on Petitioner's instant offense, history prior to conviction, and history while incarcerated. *Id.* Among the evidence received and reviewed by the Board were many letters of support and a favorable psychological report, as well as recommendations from the Deputy District Attorney for denial of parole. *Id.* Although the record reflects evidence that Petitioner has worked to improve himself while incarcerated, pursuing a higher education, attending self-help workshops, and receiving excellent work reviews, the record also reflects evidence supporting the Board's denial, including consideration of the nature of the offense committed and Petitioner's seven "115's" (Cal. Dept. of Correction's Rule Violation Report). *See id.* at 22-55. The Board's decision that Petitioner has made " great progress' but . . . needs to demonstrate an ability to maintain gains over an extended period of time'" is supported by "some evidence" and has some [*17] "indicia of reliability." Resp't Exh. C at 4; *Biggs, 334 F.3d at 915*.

Petitioner also contends that the Board erroneously "used first degree elements as a basis for finding [him], who was convicted of second degree murder, unsuitable for parole." Pet. at 8. However, the description of Petitioner's offense as "cruel, callous, violent, brutal, and

cold-blooded" does not indicate that the Board "used" elements of first degree murder to deny Petitioner's parole. Rather, these adjectives express the circumstances of the crime, as set forth in the guidelines pursuant to California Code Regs. tit. 15, § 2402(c). [4] The Board reviewed the events surrounding the offense with Petitioner and provided Petitioner an opportunity to present relevant testimony. Resp't Exh. E at 1-17. Referring to the facts surrounding Petitioner's offense, the Board deferred to the regulation guidelines and found that Petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society." Resp't Exh. E at 60. Hence the record reflects that the Board did not erroneously "use" elements of first degree murder to deny Petitioner's parole, but rather, came to its decision [*18] based on "some evidence" with an "indicia of reliability." *Biggs, 334 F.3d at 915*.

> 4    California Code Regs. Tit. 15, § 2402(c) provide the circumstances tending to indicate unsuitability for release. Such circumstances include that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner," defined by factors such as: (A) multiple victims in the same or separate incidents; (B) offense was carried out in a dispassionate and calculated manner; (C) the victim was abused, defined or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E).

Accordingly, the Court concludes that Petitioner's due process rights were not violated as there is "some evidence" to support the Board's decision denying parole, and the evidence underlying the [*19] Board's decision has some "indicia of reliability." *Biggs, 334 F.3d at 915*. Therefore, the state court's decision was not contrary to, or an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(b)(1),(2).

**D. *Plea Agreement Violation*** [5]

> 5    The Court notes that in denying Petitioner's state habeas petition, the Los Angeles Superior

Court did not address this issue. However, as this claim was presented in Petitioner's habeas petition to the California Supreme Court, which was summarily denied, this Court will address the merits of the claim.

Next, Petitioner contends that the Board's denial of parole violated his plea agreement resulting in a disproportionate sentence to his offense. Pet. at 8-9. Petitioner asserts that his reasonable understanding "at the time of his plea was that he would serve approximately seven-and-a-half to eight years," based [*20] on the representations of his trial counsel and the case law at the time. Pet. at 9. Petitioner argues that his term has "become disproportionate to his offense based on the fact that the conviction stems from a plea contract." *Id.* Respondent contends that Petitioner received the benefit of his plea agreement by the earlier consideration of his parole suitability and his plea did not assure him of release on parole by a given date. Resp't Mem. of P. & A. at 13.

Due process requires that a guilty plea be both knowingly and voluntarily made. *See Boykin v. Alabama, 395 U.S. 238, 242-43, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969).* The clearly established test for determining the validity of a guilty plea, is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).* A habeas petitioner claiming a due process violation based on his plea agreement, bears the burden of establishing that his guilty plea was not knowing and voluntary. *See Parke v. Raley, 506 U.S. 20, 29-30, 113 S. Ct. 517, 121 L. Ed. 2d 391 (1992).*

Here, Petitioner does not allege that his plea was involuntary. Petitioner [*21] states that on "November 21, 1988, [he] . . . was convicted by plea agreement of second degree murder, California Penal Code 187 and 190, and sentenced to a term of fifteen years-to-life." 6 Pet. at 5. Although he does not state the exact terms of his plea agreement, Petitioner contends that he "pled no contest with the reasonable understanding that in return for providing the State with benefit (consideration) in the form of exposure to, and his serving a lengthy prison term, he would receive the court mandated reciprocal benefit of lessened punishment." Pet. at 9. Petitioner further claims that he was under the reasonable belief that he would serve no more than eight years in prison. *See id.*

However, the record does not indicate, nor does Petitioner claim, that the prosecution promised any specific terms of relief which have been violated. There is no evidence at all that the parties to the plea agreement intended or promised that Petitioner would serve no more than eight years in prison. Without evidence of such a term in the plea agreement, it follows that there could be no breach of the agreement itself.

6   As noted above, Petitioner was sentenced on January 4, 1989 to fifteen years-to-life with a minimum eligible parole date of February 19, 1998. Resp't Exh. E at 1.

[*22] Since his 1988 sentence, Petitioner has received three parole suitability hearings: one in 1997, the second on April 20, 2002, and most recently on October 28, 2004. Resp't Exh. C at 1, Resp't Mem. P. & A. at 2. There is no evidence that the prosecution promised Petitioner that he would be released once eligible for parole. On the contrary, Petitioner asserts his claim based on a "reasonable understanding at the time [which] came from his trial counsel, and case law of that period." Pet. at 9. The fact that Petitioner has served more than eight years is not a new obligation or contrary to any term of his plea bargain. Petitioner has the same 15-to-life sentence today that he received in 1988.

The Court concludes that Petitioner has failed to demonstrate that the Board's denial of parole violated his plea agreement, that his sentence is disproportionate to his offense, or that his plea was not knowing and voluntary. Therefore, the state court's summary denial of Petitioner's state habeas petition was not contrary to, or an unreasonable application of clearly established federal law. *28 U.S.C. § 2254(d)(1).*

## III. CONCLUSION

The Court concludes that [*23] Petitioner has failed to show any violation of his federal constitutional rights in the underlying state parole hearing. Accordingly, the petition for writ of habeas corpus is denied.

IT IS SO ORDERED.

DATED: *December 8, 2005*

JEREMY FOGEL

United States District Judge

2005 U.S. Dist. LEXIS 39828, *23
66 L. Ed. 2d 431, ***445; 1980 U.S. LEXIS 161

JUDGMENT

The Court has denied the instant *pro* se petition for writ of habeas corpus on the merits. Therefore, judgment is entered in favor of Respondent. Petitioner shall take nothing by way of his petition. The Clerk shall close the file.

IT IS SO ORDERED.

DATED: *December 8, 2005*

JEREMY FOGEL

United States District Judge