1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   CARLOS CASTRO,

11              Plaintiff,                              No. C 98-4877 WHA

12        v.

13   CAL TERHUNE, Director, CALIFORNIA
     DEPARTMENT OF CORRECTIONS, G. BONNIE        **FINDINGS OF FACT AND**
14   GARIBAY, J. BATCHELOR, S. C. WOLHWEND,      **CONCLUSIONS OF LAW**
     A. SCRIBNER, J. STOKES, M. YARBOROUGH,      **AFTER BENCH TRIAL**
15   L. HOOD, C. CAMPBELL, A. M. GONZALEZ,
     M. AYALA, E. DERUSHA, c/o ROBERT L. L.
16   AYERS, Warden, and J. MARTINEZ,

17              Defendants.

18   _____/

19

20                              **INTRODUCTION**

         This prisoner civil-rights action challenges the adequacy of due process afforded Carlos

22   Castro during his gang validation in 1997.  Following a bench trial, this order is the decision of

     the Court.

23                          **PROCEDURAL HISTORY**

24        Plaintiff Carlos Castro, a state prisoner, was validated as an associate of the Mexican

25   Mafia, also known as La Eme ("EME"), on April 24, 1997, at California State Prison-Lancaster.

26   He has been in continuous administrative segregation since February 26, 1997.  Based on that

27   determination, plaintiff was moved to the Security Housing Unit ("SHU") at Pelican Bay State

28   Prison.  It is a prison within the prison and is highly restrictive.  He remains there today.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Plaintiff commenced this action in December 1998 to challenge his validation as an

2    EME associate, asserting that the 1997 gang validation violated his right to due process.

3    Defendants filed a motion for summary judgment which was granted in 1999.   Plaintiff appealed.

4    In 2002, the Ninth Circuit affirmed the district court's decision that plaintiff received sufficient

5    notice of the charges against him to satisfy due process and that the evidence supporting his gang

6    validation was factually sufficient.  The Ninth Circuit, however, remanded on the due process

7    issue for a determination of:  (1) which official(s) actually made the decision to confine prisoners

8    to administrative segregation, and (2) whether plaintiff in fact received a meaningful opportunity

9    to present his views to them on the issue of validation.

10    On remand, defendants again filed a motion for summary judgment.  It was granted in

11    2006.  Based on declarations and the record, the order found that Assistant Institutional Gang

12    Investigator Michael Ayala was the critical decisionmaker and that plaintiff had had an

13    opportunity to express his views to Investigator Ayala.  Plaintiff again appealed.  The Ninth

14    Circuit again remanded, holding that there were triable issues of fact regarding both of these

15    findings.

16    On remand, the district court appointed Attorney James E. Burns and the firm of Orrick,

17    Herrington & Sutcliffe, LLP, as plaintiff's counsel and additional discovery was then conducted.

18    Both sides filed motions for summary judgment.  Plaintiff also moved for reconsideration of the

19    previous December 1999 summary adjudication on the ground that new facts showed the

20    evidence used to validate him as a gang associate in 1997 was insufficient.  The motion also

21    sought sanctions against defendants for the alleged spoilation of evidence and to compel

22    production of documents.

23    For their part, defendants filed a motion to dismiss two grounds:  (1) that a new validation

24    hearing in 2009 rendered the action moot, and (2) that plaintiff failed to exhaust administrative

25    remedies.

26    The Court denied both sides' motions for summary judgment and bifurcated the trial, the

27    first to address the two issues remanded from the Ninth Circuit, and the second to address the new

28    validation hearing.  At the final pretrial conference on October 26, the first trial was postponed

1   for a few weeks to allow additional discovery in light of newly discovered prison documents said

2   earlier to have been lost or destroyed.  During supplemental discovery, important evidence was

3   unearthed.  The instant order follows a four-day trial, closing arguments, and consideration of the

4   parties' proposed findings and conclusions.

5                    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

6          Although both sides submitted findings of fact and conclusions of law in proposed form,

7   this order has found its own way and made its own findings rather than picking and choosing

8   between competing versions.  Any proposal that has been expressly agreed to by the opposing

9   side, however, shall be deemed adopted, but only to the extent so agreed.  That a proposed finding

10  has not been expressly adopted does not necessarily mean it has been rejected; rather, it means

11  that this order has found it unnecessary to adopt it or reject it *per se*.  It is unnecessary for this

12  order to cite the record.  It will do so only as to particulars that may assist the court of appeals.

13  Additionally, this order will commingle the conclusions of law with the factual findings since

14  many of them are interwoven.  Unless the content indicates otherwise, all factual statements

15  herein are intended to be fact findings though the words "findings" or "find" may not be used.

16      **1.      FREQUENTLY USED TERMS.**

17         The Administrative Segregation Isolation Logbook ("logbook") was a record of all

18  persons who entered and exited the Lancaster Prison administrative segregation building.  All

19  movements by inmates into and out of the building were recorded in the logbook.  All prison

20  officials were required to sign in and sign out of the logbook when entering and exiting the

21  building.

22         CDC refers to the California Department of Corrections.

23         CDC 114-A was a log called the "Inmate Segregation Record."  It was used to record

24  individual inmates' minute daily activities while housed in administrative segregation, such as

25  cell inspections, showers, exercise, meals, and attendance at meetings *within* the administrative

26  segregation building at Lancaster.  This internal log was a separate and distinct document from

27  the logbook, which was used to track movements *into* and *out of* the building.

28

*United States District Court*
For the Northern District of California

3

CDC 114-D was a form called "Order and Hearing for Placement in Segregated Housing." It was utilized to document an inmate's placement in segregated housing.

CDC 128-B was a general form/chrono used to document miscellaneous information regarding inmates.

CDC 128-G was a form called the "Classification Chrono." It was used to document Institutional Classification Committee meetings.

CDC 602 was a form called the "Inmate/Parolee Appeal Form." It was given to inmates to appeal any policy, action, or decision.

CDC 1030 was a form called the "Confidential Information Disclosure Form." It was utilized to record and disclose to inmates that confidential information was used against them as evidence in a disciplinary proceeding or to place them in administrative segregation.

A gang "member" refers to an inmate accepted into membership by a prison gang. A gang "associate" refers to non-gang members involved periodically or regularly with members or associates of a prison gang.

**2.    THE CONVICTION.**

In 1982, when plaintiff Carlos Castro was 17 years old, he pled guilty to second-degree murder and accepted a sentence of fifteen years to life. He is now 45. Initially, he was classified within the prison system as A1A. This allowed him a degree of freedom and privileges in the prison system. He participated in educational and vocations programs when available, earning his GED and working his way towards a college degree. In administrative segregation, however, these privileges are unavailable.

**3.    THE CONFIDENTIAL MEMORANDA.**

This case is festooned with so-called "confidential memoranda." These were used to document interviews with confidential informants in prison. Interviews with confidential informants needed to remain private because "snitches," if known as such to other inmates, would face a risk of violent reprisal. When information in a confidential memorandum was used against an inmate in a disciplinary proceeding or used to place him in administrative segregation, prison officials disclosed the fact that secret information was used against him in a CDC 1030, briefly

4

describing the nature of the information used.  Debriefing was a process where a validated gang member or associate voluntarily disassociated himself from a prison gang, self-incriminated himself in criminal activity, and provided information about the gang structure, operational methods, codes, and criminal activity done at the gang's behest.

### 4.    THE STABBING INCIDENT.

In April 1991, while plaintiff was incarcerated at California Correctional Institution in Tehachapi, he was accused of stabbing another inmate in November 1990.  The accusations were derived from two confidential memoranda dated April 22, 1991 (TX 13), and April 29, 1991 (TX 14), which identified plaintiff as an EME associate and accused him of participating in the allegedly EME-sanctioned assault on the victim.  After he had been charged and placed in administrative segregation pending hearing, two more confidential memoranda dated May 6, 1991 (TX 15), and May 15, 1991 (TX 16), also accused plaintiff of being involved in the stabbing and were used against him as evidence.

In May 1991, however, plaintiff was exonerated by his work supervisor, who testified that plaintiff could *not* have been involved in the stabbing because he was working in the hobby shop, another part of the prison altogether, at the time of the stabbing.  As a result of being found not guilty of the stabbing, plaintiff's gang-affiliation investigation was also discontinued in July 1991.

### 5.    THE 1991 VALIDATION AT TEHACHAPI.

Six months later, however, plaintiff was validated as an EME associate based on three confidential memoranda dated March 17, 1989, April 22, 1991, June 26, 1991, and a non-confidential incident report from 1989.  The confidential informant who had wrongly accused plaintiff of being involved in the stabbing and had identified plaintiff as an EME associate in the confidential memorandum dated April 29, 1991, again identified plaintiff as an EME associate in the confidential memorandum dated June 26, 1991.

Because the latter document is a central document in this case and will be referred to over and again, it will be referred to for convenience as the "June 1991 CM."  It summarized information from an informant identifying numerous inmates as members, associates, or defectors

of EME, all based on the informant's "opinion."  The memorandum also specifically implicated

plaintiff again as being involved in the stabbing, but this information was not based on personal

knowledge but only on what he had heard.  Although it is a central document in the case, the trial

record includes only a highly redacted version of it (TX 18).

### 6.   THE DELETION AT PELICAN BAY.

As a consequence of being validated, plaintiff was then transferred to Pelican Bay and

given an indeterminate term in the SHU.  Plaintiff appealed the validation, challenging the

reliability of all confidential memoranda used to validate him.  In 1992, Correctional Counselor

T. Kosloske interviewed plaintiff as part of the investigation into the reliability of the confidential

sources and recorded the interview in an investigative report (TX 28).  At the interview, plaintiff

raised the reliability of the confidential memorandum dated April 22, 1991, and whether it

wrongly accused plaintiff of being involved in the stabbing.  He also raised the same issue as to

the June 1991 CM, since the same confidential source had previously been wrong about the

stabbing.  Addressing the reliability of these memoranda, Correctional Counselor Kosloske noted

in the report that the confidential source for the June 1991 CM was also the same confidential

source behind the confidential memorandum dated April 29, 1991, which had already been

discounted as evidence due to plaintiff having being exonerated from the stabbing.

After receiving this report from Correctional Counselor Kosloske, the Pelican Bay ICC

decided to review plaintiff's gang status and referred his case to Institutional Gang Investigator

J. Briddle at Pelican Bay.  IGI Briddle, however, determined that confidential memoranda were

sufficient evidence to uphold the validation in 1993 (TX 30), and again in 1994 (TX 34).

But plaintiff persisted and succeeded.  In 1995, Lieutenant L. Anderson at Pelican Bay deleted

plaintiff's gang status, holding that there had been insufficient evidence to support the validation

after all.  Specifically, Lieutenant Anderson found that:  (1) the confidential memorandum dated

March 17, 1989, did "not meet the current criteria for reliability . . . with respects to the validation

process," and (2) "no direct link between [Castro], the confidential sources and/or any validated

members of the EME has been established," by any of the evidence (TX 39).  This latter finding

included consideration of the June 1991 CM.

To validate a gang associate, three original, independent sources were required.  At least one source had to show a *direct link* to a validated gang member or a validated gang associate who had a documented direct link to a gang member (TX 43).  As none of the evidence indicated a *direct link* and two sources were deemed to be unsuitable for validation purposes, Pelican Bay deleted plaintiff's gang-status in 1995 and forwarded its gang deletion to the Special Services Unit ("SSU") in Sacramento.  In June 1995, SSU agreed with Pelican Bay that the confidential memorandum dated March 17, 1989, did not meet the validation requirement, and found that the confidential memorandum dated April 22, 1991, also did not meet the validation requirement (TX 40).  SSU determined that the only evidence that could be used as evidence was the June 1991 CM.  SSU did not reach whether the June 1991 CM, or whether any evidence at all, had shown a "direct link" in 1991.

Subsequently, plaintiff was released from the SHU at Pelican Bay and was transferred in 1995 to the general population in Lancaster.

### 7.     THE 1997 GANG VALIDATION AT LANCASTER.

The Institutional Gang Investigation office at Lancaster had only two officers. IGI Alexander Gonzales was the chief.  Assistant IGI Ayala was his assistant.  On February 26, 1997, Investigator Ayala received a phone call from Lieutenant M. Johnson, the A yard lieutenant at the time, who asked him to investigate plaintiff's gang affiliation.  Investigator Ayala found that plaintiff was listed in the CDC electronic gang database as a validated EME associate. This information, however, was incorrect since plaintiff's gang status had been deleted in 1995, but Investigator Ayala was unaware at the time that plaintiff's listed gang status in the database was erroneous.  Investigator Ayala relayed the information to Lieutenant Johnson who decided to place plaintiff in administrative segregation pending an investigation.  They then informed plaintiff that Investigator Ayala would be investigating plaintiff's gang affiliation. Lieutenant Johnson issued plaintiff a CDC 114-D, which stated that plaintiff was being placed in administrative segregation as a suspected EME member.  Investigator Ayala went into plaintiff's cell and gathered personal property and for several days sifted through it for evidence of gang affiliation.

United States District Court

For the Northern District of California

On March 6, the Lancaster Institutional Classification Committee met in the administrative segregation building. The purpose of ICC meetings was to set appropriate levels of inmate housing, based on several factors, including gang affiliation. ICC meetings were not, however, a forum to determine gang validation. At the March 6 meeting, the ICC determined that plaintiff should stay in administrative segregation pending his gang investigation. IGI Gonzales did not attend the March 6 ICC meeting, but Investigator Ayala did sign into the logbook, and this order finds he attended that meeting.

On March 10, Investigator Ayala found a postcard from a validated EME dropout among the property taken from the cell. Both IGI Gonzales and Ayala signed a CDC 128-B documenting the discovery of the postcard (TX 54 ). On March 11, IGI Gonzales and Investigator Ayala completed a second CDC 128-B documenting the discovery of a letter addressed to Raul Mendoza, a validated EME associate (TX 55). The front of the envelope had plaintiff's nickname "Huero" written on it. On March 13, they completed two more CDC 128-Bs documenting the discovery of another letter written by Antonio Hernandez, a validated EME associate, addressed to Joann (TX 56, 57), and a card written by Ray Bracamonte, another validated EME associate, addressed to "Huerito" that IGI Gonzales and Investigator determined was another of plaintiff's nickname (TX 58, 59). All of these items were found among the items taken from plaintiff's cell.

On April 1, IGI Gonzales and Investigator Ayala completed a CDC 128-B, documenting the result of their investigation into plaintiff's gang affiliation. They identified the postcard, the Mendoza letter, the Hernandez letter, the Bracamonte card, and the June 1991 CM as five items of evidence to support plaintiff's validation. IGI Gonzales and Investigator Ayala then prepared a validation package to be forwarded to SSU in Sacramento.

The validation package provided to SSU was not marked as a trial exhibit. Instead, a validation folder — a larger file from which the validation package to SSU was prepared, was marked as Trial Exhibit 64. The validation folder contained copies of evidence, corresponding chronos, photos of plaintiff, and other relevant documentation. Significantly, the validation folder contained *no* notes taken during any alleged meetings between plaintiff and IGI Gonzales and

8

United States District Court

For the Northern District of California

Investigator Ayala.  The validation folder also did not describe the tortured history behind the June 1991 CM or the earlier gang validation and the subsequent deletion.  The only reference in the validation folder to the June 1991 CM or its history was a notation in the comments section of "Subject Profile."  The notation stated that his validation was deleted in 1995, and that the June 1991 CM — a debriefing report of an inmate who "mentioned Castro attempted to stab [another] inmate"— met departmental requirements (TX 64).

On April 3, another ICC meeting was held, during which it was again determined that plaintiff should remain in administrative segregation pending the completion of plaintiff's gang-validation process.

On April 24, SSU rejected the postcard and the Mendoza letter as evidence, holding they were unreliable.  Nonetheless, it agreed with the validation, relying only on the Hernandez letter, the Bracamonte card, and the June 1991 CM as evidence (TX 63).[1]

Significantly, plaintiff was not told of the cards and letters allegedly found in his property until *after* April 24.  He was neither given nor shown the CDC 128-Bs summarizing or identifying evidence used to validate him as a gang associate until after April 24.  He was not shown the evidence itself nor copies thereof in 1997.  On April 30, plaintiff first received a CDC 1030 form that disclosed the fact that the June 1991 CM had been used to validate him as a gang associate.  The CDC 1030, however, did not disclose any other information about the CM, such as the non-confidential parts of the memorandum or any other information that could have been disclosed without revealing the source of the CM.

**8.    THE JUNE 1991 CONFIDENTIAL MEMORANDUM.**

To validate an inmate as a gang associate, the CDC regulations in 1997 required at least three independent items of evidence, at least one of which had to show a direct link. The undersigned finds that the third item relied upon for validation, the June 1991 CM, was

---

[1] Plaintiff testified at trial that the items used to validate him as a gang associate did not belong to him. During discovery, plaintiff requested the original Hernandez letter and the Bracamonte card to conduct fingerprint tests to prove that these items were never in his possession, but the original evidence could not be located by defendants.  Although Investigator Ayala's trial testimony was less than credible regarding whether he and IGI Gonzales had actually interviewed plaintiff, his testimony regarding finding the letters and the postcard in the cell will be accepted, at least for purposes of argument.

United States District Court

For the Northern District of California

of doubtful reliability.  *First*, the June 1991 CM *incorrectly* implicated plaintiff in the stabbing from which he was exonerated in May 1991.  *Second*, the source behind the June 1991 CM was also the source behind the discounted confidential memorandum dated April 29, 1991. In July 1991, Lieutenant J. Negrete found that because plaintiff had been exonerated, all of the confidential memoranda which accused him of participating in the stabbing and being an EME associate were "tabled" or discounted, including the confidential memorandum dated April 29, 1991 (TX 19).  In support of discontinuing plaintiff's gang investigation, Lieutenant Negrete found that "the distinction between facts and hypothesis has been obfuscated and pure speculation has been commingled with what is truly known about CASTRO" (TX 19).

IGI Gonzales testified at trial that had he been aware in 1997 that plaintiff had been found not guilty of the stabbing that was alleged in the June 1991 CM, he probably would not have relied upon it as evidence (Tr. 254).

> Q.    Mr. Gonzales, had you known Mr. Castro had been found not guilty, you probably wouldn't have used that confidential memorandum as a source item in his associate validation, would you?
>
> A.    No.

In 1997, IGI Gonzales was unaware that the accusations regarding plaintiff contained in the June 1991 CM had already been proven wrong and that the confidential source behind the memorandum was also the source behind another discredited 1991 memorandum.  The validation package, consequently, did not reveal the questionable reliability of the June 1991 CM.  SSU in 1997 was not provided with the full history behind the memorandum.

**9.    THE DIRECT-LINK REQUIREMENT**.

The June 1991 CM also lacked the crucial "direct link" required to validate plaintiff as a gang associate.  In 1997, according to the California Department of Corrections, Operations Manual section 55070.19.3,

> [Gang associate] identification requires at least three (3) original, independent source items of documentation indicative of association with VALIDATED gang members and/or associates. *At least one (1) of the sources shall be a direct link to a validated member*, such as:  a validated member or former member identifying the inmate/parolee as an associate; correspondence with a validated member; photographed with a validated member;

10

United States District Court

For the Northern District of California

staff or informant observations of being in company with a
validated member; identified as an associate by a validated
associate who has a documented direct link; etc.

(emphasis added).  In May 1995, Lieutenant Anderson at Pelican Bay deleted plaintiff's gang

status because there was insufficient evidence to support the validation.  Crucially, Lieutenant

Anderson found that "no direct link between [Castro], the confidential sources and/or any

validated members of the EME has been established," from *any* of the evidence (TX 39).  As the

Court reads Lieutenant Anderson's memo, this statement comprehended the June 1991 CM.

Lieutenant Anderson's determination to delete plaintiff's gang status was confirmed by SSU in

June 1995, although SSU did not reach whether it agreed with Lieutenant Anderson's assessment

regarding "direct link" (TX 40).

IGI Gonzales testified at trial that the Hernandez letter and the Bracamonte card did not

contain the necessary direct link to a validated gang member, and that the June 1991 CM was the

only evidence that allegedly provided the crucial and necessary direct link to a validated gang

member in the 1997 investigation (Tr. 496).  If the June 1991 CM did *not* establish a direct link

between plaintiff and a validated gang member, it should not have been relied upon for the

direct-link requirement.  This order need not determine if the June 1991 CM was sufficient to

establish a direct link.

### 10.   NOTICE AND MEANINGFUL OPPORTUNITY TO BE HEARD.

Plaintiff argues that in order to satisfy due process, he should have been informed of the

factual basis of evidence before he was validated.  Defendants argue that this issue has already

been affirmed by the Ninth Circuit and should not be revisited.  Furthermore, they argue that

due process for administrative segregation only required that plaintiff be told that he was being

suspected of having gang affiliation and no more.  They assert that plaintiff was not entitled to

be informed of the factual basis before he was validated.  In closing arguments, defendants argued

that plaintiff should have anticipated that the cards and letters would be found and made his

defense accordingly, and that he should have addressed the reliability of the June 1991 CM as

soon as he had been accused of being a gang affiliate (Tr. 631, 639–41).  For the sake of

completeness, this order will make findings on the matter inasmuch as it is interwoven with the questions sent back for trial.

As mentioned earlier, the SHU is a prison within a prison.  An inmate in administrative segregation is isolated in a windowless cell at all times except for ten hours of exercise time a week.  Even then, the inmate is not allowed to interact with others.  He is denied educational, vocational, or rehabilitative programs available to the general inmate prison.  It is hard time, as hard as it gets.  Whereas disciplinary segregation carries a definite term, administrative segregation can be indefinite and can last for years.  Plaintiff, for example, has remained in administrative segregation for the past 12 years.

The Supreme Court has held that the level of due process afforded to inmates before being transferred to administrative segregation includes *some notice* of the charges against the inmate.  *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), *abrogated on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995).  The Ninth Circuit has held that due process in the administrative segregation context does *not* require *detailed written notice* of charges, or *a written description of the reasons* for placing the prisoner in administrative segregation.  *Toussaint v. McCarthy*, 801 F.2d 1080, 1100–01 (9th Cir. 1986).  While not precedential, the Second Circuit's reasoning in *Taylor v. Rodriguez* regarding notice requirement in administrative segregation context is persuasive.  238 F.3d 188, 193 (2d Cir. 2001).  It held that the constitutional requirements for notice in administrative segregation should be similar to the notice requirement in disciplinary segregation, and should contain *specific* allegations of conduct of involvement with a prison gang, not merely vague, unspecific charges of being involved.

Defendants argue that plaintiff was not entitled to the level of due process afforded an inmate for *disciplinary* segregation — namely, 24 hours's advance written notice, a limited right to call witnesses and present documentary evidence in defense, an impartial tribunal, and a written statement of reasons relied on by the tribunal — as required under the Constitution.  *Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974).  Since both lead to the same harsh "prison within a prison" punishment, however, it is hard to see why the due process standard should be so different.  This order finds that plaintiff was at least entitled to know that the discredited

June 1991 CM was being resurrected against him.  And since the postcard and the letter allegedly came from *his* cell, there was no security reason not to let him know they were being used against him as well, and to give him his say on the matter.

Defendants also invoke *Hewitt.*  There, an inmate who was involved in a prison riot was charged with assaulting prison officials.  He was given a written report briefly describing the factual basis for the disciplinary charge.  The inmate was placed in administrative segregation pending investigation into his role in the prison riot.  The level of notice provided to the inmate in *Hewitt*, however, was more than provided here to plaintiff.  The inmate in *Hewitt* was informed of the factual basis, and he was actually on notice as to the conduct that formed the factual basis of evidence for the administrative segregation.  In the instant action, plaintiff was not put on notice as to the conduct forming the factual basis of evidence for the gang affiliation and subsequent segregation.

The problem is better viewed as to whether or not there was a meaningful opportunity to be heard.  *Matthew v. Eldridge*, 424 U.S. 319, 333 (1976) (holding that a "fundamental requirement of due process is the opportunity to be heard . . . in a meaningful manner").  While the Ninth Circuit has not defined what a meaningful opportunity entails, the Second Circuit has found that "[a] hearing is not meaningful if a prisoner is given inadequate information about the basis of the charges against him.  A prisoner should not . . . have to guess what conduct forms the basis for the charges against him."  *Taylor v. Rodriguez*, 238 F.3d at 193.

At least on the facts of this case, a meaningful opportunity to be heard required that plaintiff be told that the June 1991 CM was once again being used against him.  Had this been done, he could have immediately pointed out, as he had done before, that it was unreliable — based as it was on a mere opinion by the same source who had wrongly accused him in the stabbing.  This should have been done *before* the decision to validate plaintiff was made.

Due process also required that plaintiff be notified of all relied-on letters and postcards allegedly found in his belongings before he was validated.  Plaintiff testified at trial that he would have pointed out that neither the Hernandez letter nor the Bracamonte card was addressed to him nor were they addressed from him.  Because he was not informed of the letters and cards

United States District Court

For the Northern District of California

allegedly found in his belongings, he was not able to make this point.  Plaintiff did not receive sufficient notice to adequately prepare and gather facts in his defense.  He did not have a meaningful opportunity to explain his side of the matter.

In the process of drafting these findings, it occurred to the Court that SSU was well positioned to evaluate for itself the June 1991 CM and to determine its evidentiary worth under its own regulations.  The Court requested supplemental briefing on this point.

Having considered the problem in many lights, however, this order still finds that plaintiff should have been given a meaningful opportunity to point out to the critical decisionmaker that the confidential source behind the June 1991 CM was unreliable, having also been the source of the untrue accusations about plaintiff's complicity in the 1990 stabbing incident.  There is no evidence in the trial record that SSU was aware of this, namely, that the source behind the June 1991 CM had been discredited.

Fast forwarding to 1997, had plaintiff been seasonably informed that the June 1991 CM was being resurrected against him, he surely would have raised the same question in 1997 that he had raised in 1992.  That question, as memorialized in 1992 by Counselor Kosloske, asked (TX 28):

> Regarding confidential memo dated 6/26/91, the source in this memo is the same source who previously provided information about the stabbing assault . . . that was proven not true.  How could this inmate be reliable?

That was a fair question.  No prison officer has ever really answered it.  IGI Gonzales testified at trial that had he known that plaintiff had been exonerated on the stabbing incident, he probably would not have relied upon the June 1991 CM as evidence for validation, given that the same source was involved (Tr. 254).  There is a reasonable likelihood that SSU would have concurred.

Turning to whether had he known of the resurrection of the June 1991 CM, plaintiff would have raised the "direct-link" issue, the record is not so clear.  The record does not show that plaintiff even knew in 1997 that Pelican Bay officials had earlier found that there was no direct link shown by the June 1991 CM.  In 1995, Pelican Bay authorities found that "[n]o direct link between [Castro], the confidential sources and/or any validated members of the EME" was

**United States District Court**
For the Northern District of California

1   established by the June 1991 CM or by the two other confidential memoranda of earlier dates

2   (TX 39).  This determination was forwarded to SSU.  SSU did not expressly rule on the

3   "direct-link" question.  Instead, it ruled only that two out of the three confidential memoranda

4   did not meet validation requirements for reliability under California Code of Regulations,

5   Title 15, Section 3321.  It is true that SSU stated that the June 1991 CM *was* admissible, but as

6   the undersigned reads the SSU document (TX 40), it found only that the June 1991 CM was

7   usable without reaching the separate "direct-link" requirement.  It was unnecessary to reach the

8   point since three admissible sources were required by regulations and two of the three were

9   already held to be inadmissible.

10       The 1995 deletion memo was not copied to plaintiff (TX 39).  This order finds that in

11   1997, plaintiff was unaware of Pelican Bay's finding of "no direct link" in 1995.  Morever, since

12   no one has ever known the full content of the June 1991 CM (other than prison officials), it would

13   have been impossible for plaintiff to have known the full content of the June 1991 CM and to

14   have thus been in a position to evaluate whether a direct link was shown therein.  Therefore, it is

15   unclear whether plaintiff would have raised the direct-link issue even if he had known that the

16   June 1991 CM was again in play.  And, SSU surely could evaluate for itself whether the

17   June 1991 CM satisfied its own regulations as to a direct link.

18       The fact remains, however, that plaintiff certainly would have raised the unreliability

19   of the source had he known that the June 1991 CM was being used against him.  For this reason

20   alone, it was unfair to "convict" plaintiff without giving him an opportunity to explain the

21   pedigree of the June 1991 CM and to have that explanation considered by the critical

22   decisionmaker (as well as by SSU).

23       **11.   CRITICAL DECISIONMAKER.**

24       A prior summary judgment order herein found Investigator Ayala to be the critical 1997

25   decisionmaker.  That finding was based on declarations in connection with the motion for

26   summary judgment.  The Ninth Circuit remanded the case for a trial on this question as to

27   whether it was Investigator Ayala or IGI Gonzales who had the critical decisionmaking authority

28   to validate plaintiff.  Now there is a full record, tested by cross-examination.

**United States District Court**
For the Northern District of California

As previously mentioned, the IGI office in Lancaster was composed of only two officers in 1997:  IGI Gonzales and Investigator Ayala.  After plaintiff was placed in administrative segregation, Investigator Ayala gathered plaintiff's personal belonging and searched through them for evidence of gang affiliation.  Four items of correspondence were found and discussed with IGI Gonzales.  Both officers signed the CDC 128-B forms documenting the evidence found on March 10, 11, and 13.  Both officers worked with each other and discussed the ongoing investigation with each other.  IGI Gonzales testified that he always considered Investigator Ayala's opinion, but that he had the "ultimate authority" and the final "say-so" in forwarding the validation package to SSU in Sacramento.

Based on expanded evidentiary record, the Court now finds that the critical decisionmaker in validating plaintiff as a gang associate was IGI Gonzales.  He was the person who could actually make the decision to forward a validation package to SSU.  Note, however, that this finding of fact is not crucial because plaintiff never had a meaningful opportunity before either Investigator Ayala or IGI Gonzales to present his views and defend himself.

**12.   AN OPPORTUNITY TO BE HEARD BY THE CRITICAL DECISIONMAKER.**

The parties offer vastly conflicting stories as to whether plaintiff ever had an interview with IGI Gonzales, *i.e.*, an opportunity to have his say in opposition to the evidence against him.  After mature deliberation over all testimony of all witnesses, this order finds that *no* interview took place between plaintiff and any IGI officer.  This is true regardless of who is deemed (within IGI) to have been the critical decisionmaker.

Since the beginning of this action, plaintiff has maintained that he was never given an opportunity to present his case before either Investigator Ayala or IGI Gonzales.  Plaintiff concedes that Investigator Ayala introduced himself when plaintiff was being placed in administrative segregation on February 26, but asserts that he never had an opportunity to meet with either Investigator Ayala or IGI Gonzales for the specific purpose of presenting his defense.

Defendants reply that plaintiff had several opportunities to meet with:

- Investigator Ayala on February 26 when he introduced himself to plaintiff as the investigator;

16

United States District Court
For the Northern District of California

- Investigator Ayala at the March 6 ICC meeting;

- IGI Gonzales and Investigator Ayala during two interviews in the IGI building;

- IGI Gonzales and Investigator Ayala on April 1 in the administrative segregation building when they allegedly took photos of plaintiff for the validation package;

- The gang investigator (either IGI Gonzales or Investigator Ayala) who attended the April 3 ICC meeting.

IGI Gonzales testified that he cannot recall any meetings with plaintiff in 1997.  Thus, the Court must rely on other testimony and the documentary evidence to determine whether plaintiff was ever afforded an opportunity before the critical decisionmaker.

### A.    February 26 Meeting.

The only meeting that both sides agree to having occurred was on February 26, when Investigator Ayala introduced himself to plaintiff and told him that he would investigate plaintiff's gang affiliations.  The erroneous listing of plaintiff in the CDC computer database as a validated EME associate was the only evidence against plaintiff at that time.  The substantive evidence against plaintiff had not yet been gathered.  Clearly, the February 26 meeting with Investigator Ayala did not afford plaintiff a meaningful opportunity since there was not yet any evidence to which he could object.

### B.    ICC Meeting on March 6.

Plaintiff testified that neither Investigator Ayala nor IGI Gonzales attended the March 6 ICC meeting.  The logbook has an entry showing Investigator Ayala signing into the administrative segregation building on March 6 for the ICC meetings but not IGI Gonzales.  This factual dispute is not material in determining whether plaintiff had a meaningful opportunity as the Court finds that:  (1) the purpose of ICC meeting was to classify inmate's housing status, not to provide a forum for plaintiff to present his views to the gang investigator; and (2) Investigator Ayala had not yet even gathered any evidence against plaintiff by March 6.

### C.    Two Supposed Interviews in the IGI Building.

Now this order turns to Investigator Ayala's ever-changing story about interviews in the IGI building.  This was a *separate* facility from the administrative segregation unit.  Plaintiff has

17

1  consistently denied that any such interview took place.  Investigator Ayala testified that he and

2  Investigator Gonzales *did* interview plaintiff in the IGI building before the validation.

3        The IGI building at Lancaster was a completely separate facility from the administrative

4  segregation building, where plaintiff was being held.  The Court finds that Investigator Ayala's

5  testimony that any interview, much less two interviews, took place in the IGI building is not

6  credible.  Investigator Ayala's sworn story has reversed course several times in this action, as one

7  after another was shot down by subsequent evidence.  Here is a synopsis of the ever-changing

8  chronicle:

9      •    In 2002, Investigator Ayala asserted in his sworn interrogatory
10        responses and in his sworn declaration to the Court that plaintiff had
       had an opportunity to present his views to him at the ICC meetings
11        held on March 6, and on April 3, 1997 (TX 86, ¶ 4; Tr. 302–05).
       *Investigator Ayala did not mention any interviews in the IGI building*
12        *at this time.*

13     •    In 2005, *after* the Ninth Circuit had remanded this case to determine
       whether plaintiff had been afforded a meaningful opportunity to be
14        heard before the critical decisionmaker, Investigator Ayala
       embellished his account and stated in a sworn declaration (in
15        connection with defendants' motion for summary judgment) that, in
       addition to the two ICC meetings, plaintiff had had a chance to
16        present his views to him and to IGI Gonzales during an interview at
       an unspecified date at an unspecified location  (Tr. 305–06; Dkt
17        No. 63, ¶ 6).

18     •    After the second remand, Investigator Ayala asserted in 2009 that he
       and IGI Gonzales interviewed plaintiff *twice in the IGI building*
19        *before* validating him  (Tr. 301–02).  Investigator Ayala also
       maintained in deposition testimony read in at trial that the logbooks
20        would confirm that plaintiff had been escorted from the
       administrative segregation building for interviews in the IGI building
21        (Tr. 310–11, 556).

22     •    The logbooks were miraculously located just a few weeks before trial,
       evidently because defendants needed them for yet another civil
23        action.  The logbooks showed plaintiff being placed on administrative
       segregation on February 26, *but conspicuously omitted any record of*
24        *plaintiff leaving the building at all until May 24, a month after he had*
       *already been validated as a gang associate*.  This order finds that any
25        movement of any inmate in or out of the administrative segregation
       building, such as to go to the separate IGI building, would have and
26        was supposed to have been recorded in the logbook.  *The logbooks*
       *flatly contradict Investigator Ayala's claims that plaintiff was*
       *escorted from the administrative segregation building sometime*

27

28

United States District Court

For the Northern District of California

*between February 26 and April 24 for any interviews with him and IGI Gonzales in the IGI building.*[2]

• To recap, since 2005, Investigator Ayala has asserted that he always conducted inmate interviews in the IGI building. At trial, the logbooks indicated that no such interview took place.

• At trial, Investigator Ayala added a new twist. For the first time ever, Investigator Ayala testified that inmate movement would not necessarily be recorded in the logbook if the "back door" was used. Specifically, Investigator Ayala testified at trial that there was a "back door" to the administrative segregation building and that inmates were sometimes escorted out of the back door and that such movement would not be recorded in the logbook, which was kept by the front door of the building (Tr. 529-30). In direct contrast, IGI Gonzales testified that inmate movement would be logged at all times (Tr. 257–58).

Q.   Okay. I would like to take you to the logbooks briefly. In 1997, the Lancaster Administrative Segregation Unit kept a logbook to monitor people entering and leaving that unit. Isn't that right?

A.   Yes.

Q.   And because this is a heightened-security area, the prison wanted to know where all those inmates were at any given time. Isn't that right?

A.   Yes.

Q.   And the — the goings into and out of the Ad. Seg. building at Lancaster in 1997 were monitored by what we call the "Ad. Seg. isolation log."

A.   Yes.

Q.   And that's the big green books (indicating) that are stacked over there on that table, right?

A.   Yes.

---

[2] Plaintiff requested sanctions against defendants for alleged spoliation of evidence. The Court denied plaintiff's request at the time, but reserved the right to reconsider the issue at trial. Since then, some of the sought-after documents were located just before the trial and produced to plaintiff. It is troubling that the key evidentiary documents had not been properly preserved, considering how long defendants have been on notice of this case, dating back to at least 1998. This issue will be considered after the next trial concerning the 2009 validation.

Q.    And if one were to leave — if an inmate were to leave the Ad. Seg. Unit at Lancaster in 1997 and go to the IGI office — the Institutional Gang Investigator's office — for an interview, you would have to leave the Administrative Segregation Unit itself, wouldn't you?

A.    Yes.

Q.    And if an inmate did that, he would be logged out, wouldn't he?

A.    Yes.

                    *                    *                    *

Q.    And if there were such a meeting, the log would show Mr. Castro leaving.  The log would show Mr. Castro leaving the Ad. Seg. Unit and going to the IGI office.

A.    It would show Mr. Castro leaving the unit.

•    Expert witness Daniel Vasquez, a former CDC official testified that all inmate movement in and out of the administrative segregation building would be recorded in the logbook (Tr. 349–50).

•    Investigator Ayala testified at trial that he sometimes interviewed inmates in the administrative segregation building itself, suggesting that maybe the interview occurred in the administrative segregation building.  But CDC 114-A, the internal log used to keep track of inmate movement *within* the administrative segregation building, documented no such meeting between plaintiff and Investigator Ayala in the administrative segregation building (TX 50).

•    More broadly, no documentation shows any interview between plaintiff and Investigators Gonzales and/or Ayala — ever or anywhere.  The validation folder, which should have contained any notes taken during any meetings with plaintiff, contained no notes from any alleged interview with plaintiff.  This order finds that plaintiff was never interviewed anywhere or any place by either Investigator Ayala or by IGI Gonzales.

**D.    April 1 Meeting.**

Defendants speculate that there were other opportunities for Investigator Ayala and IGI Gonzales to have interviewed plaintiff *in the administrative segregation building itself* when they entered the building on March 11, March 24, and on April 1.  They argue that photos of plaintiff which were submitted in the validation package to SSU "could have only" been taken by Investigator Ayala or IGI Gonzales on April 1 and that they "could have" interviewed plaintiff at the same time.  While the logbook shows that Investigators Ayala and Gonzales did sign into the administrative segregation building on March 11, March 24, and on April 1, plaintiff's inmate

United States District Court
For the Northern District of California

1  segregation record, CDC 114-A, does *not* show that plaintiff met with either investigator on any

2  of those dates (TX 50) — CDC 114-A is used to record inmates' minute daily activities while

3  housed in administrative segregation, such as cell inspections, showers, exercise, meals, and

4  attendance at meetings, all strictly *within* the building.  There were over 200 inmates in

5  administrative segregation at the time in question.  Since plaintiff's validation folder contained

6  no such interview notes from the alleged interview with plaintiff on April 1, this order finds that

7  Investigator Ayala and IGI Gonzales were in the building for other purposes on those dates.

8        Defendants argue that plaintiff's CDC 114-A forms for March and April 1997 do not

9  indicate when plaintiff's photos for the validation packages were taken; hence, they argue that

10  plaintiff's forms are incomplete and plaintiff's alleged interview within the administrative

11  segregation building may not have been properly indicated in the forms.  Plaintiff testified that the

12  photos were taken by an administrative segregation officer in his cell sometime in April 1997.

13  Plaintiff argues that because the photos were taken in his cell, it would not be noted in his CDC

14  114-A form.

15        While it is conceivable that prison records may be incomplete, defendants' bare assertions

16  without evidentiary support cannot be given much credibility in such a speculative context.

17  IGI Gonzales recalls almost nothing from 1997.  Investigator Ayala's memory, as explained

18  above, is unreliable.  Defendants' assertion that an omission in the records *may* prove that an

19  interview took place when all other evidence indicates otherwise, is rejected.

20              **E.    ICC Meeting on April 3.**

21        Finally, defendants argue that plaintiff had an opportunity at the second ICC meeting on

22  April 3.  Plaintiff testified that neither IGI Gonzales nor Investigator Ayala attended the April 3

23  ICC meeting.  Although Warden Yarborough, who used to chair ICC meetings at Lancaster in

24  1997, testified that it was his custom to require the presence of a gang investigator from the IGI

25  office at all ICC meetings chaired by him, Warden Yarborough did *not* chair the ICC meetings on

26  April 3 and could not confirm the presence of either IGI Gonzales or Ayala.  Counsel argue that

27  one of the gang investigators "must have" attended plaintiff's ICC meeting on April 3 because it

28  was customary to have the presence of either Investigator Ayala or IGI Gonzales at ICC meetings

in 1997, but their assertion is contradicted by the logbook.  It omits IGI Gonzales or Investigator Ayala as signing into the administrative segregation building to attend ICC meetings on April 3. Investigator Ayala testified that he sometimes forewent signing in the logbook if he were in a hurry, but his testimony, as explained above, is not credible.  There is no other documentation of either gang investigator's presence on the CDC 128-D for the April 3 ICC meeting.

To repeat, the purpose of an ICC meeting was not to provide a forum for plaintiff to respond to evidence against him for validation purpose.  The purpose of an ICC meeting was to place inmates in the appropriate levels of housing, based on several factors, including gang affiliation.  The ICC meeting was not a forum to decide validation.  Warden Yarborough testified that ICC meetings had little to do with validation process  (Tr. 165):

> Q.    And you had no role in the validation process at all, did you?
>
> A.    ICC's role would be to — once an inmate has been validated, the ICC's roll [sic] would be to refer the inmate for appropriate housing consistent with that validation.

The Court finds that plaintiff did not have an opportunity on April 3 to present his views to the critical decisionmaker.

### F.    Inmate Appeal.

Defendants argue that because plaintiff did not specifically ask for an opportunity to meet with a gang investigator in his CDC 602 inmate appeal dated March 10, he implicitly acknowledged that he already had such a meeting.  This is frivolous.  Plaintiff stated in his CDC 602 that he was "denied an opportunity to dispute the allegations" and was denied "a fair hearing and due process" (TX 53).  It could not have been clearer that plaintiff was asking for due process, which included a meeting with the gang investigator.  More importantly, responses to plaintiff's inmate appeal actually stated that plaintiff was "allowed an opportunity to voice . . . rebuttal before the Institutional Committee on March 6, 1997, April 3, 1997, May 1, 1997, and June 26, 1997" (TX 70).  The responses do not contain any mention of any alleged interviews between plaintiff and IGI Gonzales and/or Investigator Ayala apart from the ICC meetings.

United States District Court

For the Northern District of California

In summary, this order finds that plaintiff was never afforded a meaningful opportunity to present his views before the critical decisionmaker prior to his validation.[3]

**CONCLUSION**

For the foregoing reasons, this order holds that plaintiff did not receive all the due process to which he was entitled when he was validated as a gang associate in 1997.  The Court finds that the critical decisionmaker in 1997 was IGI Gonzales, and that whether or not he was given sufficient notice of the charges, plaintiff did not have a meaningful opportunity to present his response before either IGI Gonzales or Investigator Ayala.  The second trial will address the new validation hearing.

**IT IS SO ORDERED.**

Dated:  January 14, 2010.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[3]  This order finds that the current version of California Code of Regulations Title 15, section 3378 is properly the subject of judicial notice for the limited purpose of proving feasibility of providing interviews to inmates during the gang-validation process.  Fed. R. Evid. 201(b)(2); Fed. R. Evid. 407.