1 JAMES E. BURNS, JR. (STATE BAR NO. 53250)
jburns@orrick.com
2 JAMES E. THOMPSON (STATE BAR NO. 240979)
jthompson@orrick.com
3 JENNIFER N. NEJAD (STATE BAR NO. 267109)
jnejad@orrick.com
4 ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
5 405 Howard Street
San Francisco, CA  94105-2669
6 Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759
7
8 Attorneys for Plaintiff
CARLOS CASTRO
9

10

11                     UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
12                       SAN FRANCISCO DIVISION

13

14 CARLOS CASTRO,                          Case No.  3:98-CV-04877-WHA

15               Plaintiff,               **PLAINTIFF'S OPPOSITION TO**
                                          **DEFENDANTS' MOTION FOR**
16       v.                               **SUMMARY JUDGMENT**

17 CAL TERHUNE, DIRECTOR,                  Date:        September 2, 2010
   CALIFORNIA DEPARTMENT OF               Time:        8:00 a.m.
18 CORRECTIONS; BONNIE G. GARIBAY;        Judge:       William Alsup
   J. BATCHELOR; S. C. WOLHWEND;
19 A. SCRIBNER; J. STOKES;
   M. YARBOROUGH; L. HOOD;
20 C. CAMPBELL; A. M. GONZALEZ;
   M. AYALA; E. DERUSHA, c/o ROBERT L.
21 AYERS, WARDEN; J. MARTINEZ,

22               Defendants.

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 2

III.   THIS COURT HAS ALREADY DENIED THIS MOTION ........................................... 6

IV.   LEGAL STANDARD ON SUMMARY JUDGMENT ................................................. 7

V.    THERE IS A TRIABLE ISSUE OF FACT WHETHER CASTRO WAS AFFORDED SUFFICIENT DUE PROCESS IN HIS 2009 REVALIDATION (HE WAS NOT) ................................................................................................ 7

       A.    There Is A Triable Issue Of Fact Whether Castro Received A Meaningful Opportunity To Be Heard Or Adequate Notice In The 2009 Revalidation (He Did Not) ..................................................... 7

            1.    The Outcome of Castro's Revalidation was Predetermined and Resulted from Improper Motivation ......................................... 8

            2.    Defendants Deliberately Withheld Information from Castro Because They Knew He Would Challenge It ........................................... 10

            3.    Castro Did Not Have an Opportunity to Meet with the Critical Decision Maker ...................................................................... 11

            4.    Castro Could Not Respond to Impermissibly Vague Allegations of Being a "Prison Gang Associate" ................................................ 13

            5.    Castro Was Provided Inaccurate and Incomplete Information Regarding the Charges Levied Against Him ............................................. 14

       B.    There Is A Triable Issue Of Fact Whether The Evidence Used In The 2009 Revalidation Was Sufficient To Revalidate Castro (It Was Not) ...................... 15

            1.    This Court Can and Should Reassess the Sufficiency of the Evidence in Light of New Facts ....................................................... 15

            2.    None of the Evidence Used in Castro's 2009 Revalidation is Reliable nor Does It Demonstrate Association with a Prison Gang ......... 16

VI.   TO THE EXTENT DEFENDANTS ARGUE THAT A HEARING IN 2009 CAN REMEDY DEFENDANTS FAILURE TO PROVIDE DUE PROCESS IN 1997 AND UNDO THE RESULT OF THE PREVIOUS TRIAL, THIS ARGUMENT IS COMPLETELY WITHOUT MERIT .................................................................. 21

VII.  THERE IS A TRIABLE ISSUE OF FACT WHETHER THE 2003 AND 2006 ACTIVE/INACTIVE REVIEWS PROVIDE AN INDEPENDENT BASIS FOR CASTRO'S CONTINUED RETENTION (THEY DO NOT) ....................................... 23

VIII. DEFENDANTS IMPROPERLY RAISE SETTLEMENT DISCUSSIONS IN DIRECT CONTRAVENTION OF FEDERAL RULE OF EVIDENCE 408 AND MISSTATES THOSE DISCUSSIONS ........................................................ 24

Page

IX.    REVALIDATION BY THE CDCR IS NOT AN APPROPRIATE REMEDY BECAUSE THE CDCR IS INCAPABLE OF PROVIDING DUE PROCESS ............... 24

X.    CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..................................................................................... 7

*Battle v. Schaefer,*
229 F.3d 1156 (9th Cir. 2000) .................................................................... 21

*Bruce v. Ylst,*
351 F.3d 1283 (9th Cir. 2003) .................................................................... 16

*Castro v. Horel,*
CV 09-4902, October 14, 2009 .................................................................... 4

*Castro v. Terhune,*
2010 U.S. Dist. LEXIS 3366 ...................................................................... 16

*Castro v. Terhune,*
2010 U.S. Dist. LEXIS 3366 (Jan. 14, 2010) ............................................. 12

*Castro v. Terhune,*
2010 US Dist LEXIS 3366 ............................................................................ 3

*Castro v. Terhune,*
29 Fed. Appx. 463 (9th Cir. 2002) .............................................................. 15

*Cato v. Rushen,*
824 F.2d 703 (9th Cir. 1987) ...................................................................... 16

*Elster v. Wong,*
2009 WL 1604695 (N.D. Cal. 2009) ........................................................... 21

*Garcia v. Stewart,*
2009 WL 688887 (N.D. Cal. March 2009) .................................................. 22

*Hewitt v. Helms,*
459 U.S. 460 (1983)........................................................................... 7, 10, 12

*Hubbart v. Knapp,*
379 F.3d 773 (9th Cir. 2004) ...................................................................... 23

*Jones v. Smalls,*
2002 WL 31618539 (N.D. Cal. Nov. 2002)................................................. 22

*Madrid v. Gomez,*
889 F. Supp. 1146 (N.D. Cal. 1995) ........................................................... 11

*Madrid v. Gomez,*
889 F. Supp. 1146 (N.D. Cal., 1995) ..........................................12, 16, 17, 21

*Mathews v. Eldridge,*
424 U.S. 319 (1976).................................................................................... 22

*Mathews v. Elridge,*
424 U.S. 319 (1976)...................................................................................... 7

*Mortimer v. Leroy D. Baca,*
549 F.3d 714 (9th Cir. 2009) ...................................................................... 15

**Page(s)**

*Pryer v. Evans,*
   2008 WL 131604 (N.D. Cal. Jan. 2008) ................................................................ 22

*Raditch v. United States,*
   929 F.2d 478 (9th Cir. 1991) ........................................................................... 21

*Toussaint v. McCarthy,*
   801 F.2d 1080 (9th Cir. 1986) ......................................................................... 10

*Toussaint v. Rowland,*
   711 F. Supp. 536 (N.D. Cal. 1989) .................................................................. 14

*Wilkinson v. Austin,*
   545 U.S. 209 (2005) ........................................................................................ 21

*Wolff v. O McDonnell,*
   418 U.S. 539 (1974) ........................................................................................ 21

**STATUTES**

15 C.C.R. 3378(f), 3378(c)(4) ............................................................................ 23

Title 15 §§ 3378(c)(6)(B) and (D) ..................................................................... 12

Title 15, § 3378(f) .................................................................................................. 3

**RULES**

Civ. L.R. 7-9(a) ........................................................................................................ 6

Fed. R. Evid. 408 ................................................................................................... 24

## I.    INTRODUCTION

On September 3, 2009, Defendants filed a motion for summary judgment claiming that the "revalidation" they conducted in August 2009 mooted Plaintiff's case. The Court denied this "eleventh hour" attempt to moot the case, and ruled that, if the Court found that Defendants had violated Plaintiff's due process rights in 1997, it would hold a second trial on whether Defendants afforded Plaintiff due process in 2009. Defendants have now re-filed the same motion, making the same arguments the Court rejected last year, apparently believing Defendants are entitled to summary judgment even though Plaintiff disputes just about every fact material to their motion.

The key differences between Defendants' 2009 motion and the present motion are: (1) this time, apparently in an attempt to bias the Court, Defendants violated Federal Rule of Evidence 408 and introduced an inaccurate and incomplete discussion of settlement negotiations in a effort to defeat Plaintiff's claim;[1] and (2) Plaintiff, having now conducted discovery, has evidence proving that the 2009 revalidation did not comply with due process because: (i) the outcome was litigation driven, orchestrated by trial counsel, and predetermined; (ii) it was performed by individuals who harbored a personal bias against Plaintiff and this fact was intentionally withheld from Castro; (iii) Plaintiff was not given an opportunity to present his views to the critical decisionmaker; (iv) it is not supported by evidence of prison gang association; and (v) the term prison gang "associate" is so vague that prison gang investigators do not share a consistent understanding, rendering the term unconstitutionally vague and preventing any prison inmate from receiving due process because the process is inherently subject to the arbitrary whims of the prison gang investigators.

The number of material facts omitted from Defendants' motion is astonishing. For example, Defendants failed to inform the Court that, at his deposition, the IGI changed his mind regarding the validity of the source items used in the 2009 revalidation, and testified that several

---

[1] After the Defendants' Motion for Summary Judgment was filed, Plaintiff's counsel advised the Attorney General that his detailed discussion of settlement negotiations violated Federal Rule of Evidence 408 and must be withdrawn. Plaintiff's counsel further advised that if the offending arguments were not withdrawn, Plaintiff would advise the Court of the truth of such negotiations. The Attorney General refused. The letters of Plaintiff's counsel and the Attorney General are attached to the Declaration of James Burns ("Burns Decl.") as Exhibits A and B.

- 1 -

1  of them were in fact invalid. Defendants' own experts similarly opined that some of the source

2  items used in the 2009 revalidation were invalid.

3       Defendants' motion suffers from another fatal flaw; even if everything the motion claims

4  were true, it would still not moot Plaintiff's 1998 complaint. The new "procedure" Defendants

5  afforded Plaintiff did not evaluate whether he was correctly validated in 1997, but rather whether,

6  in 2009, he was a prison gang associate. Defendants thus did not and could not remedy the 1997

7  violation.

8       The real purpose of Defendants' 2009 revalidation and this motion, as demonstrated

9  conclusively by their own e-mail correspondence, was and is to defeat Plaintiff's counsel's right

10 to attorney fees and moot the 2009 trial. Whether or not Plaintiff received due process in 2009

11 (he did not) and thus must remain in the SHU is irrelevant to this issue; the Court already held

12 that Plaintiff did not receive due process in 1997. At least some injunctive relief remains

13 important and available (for example, clearing Castro's prison record for the 1997-2009 time

14 period). He has thus prevailed on his complaint, which cannot be dismissed as moot without

15 considering remedies, and is entitled to attorney fees.[2]

16       None of the facts here suggest that the Court should not hold a trial on what happened in

17 2009. Such a trial is essential to determine the right remedy for the Court to provide Plaintiff. As

18 Plaintiff will demonstrate below, and will prove at trial, the evidence shows that Defendants are

19 institutionally incapable of providing him due process of law, and that the Court must therefore

20 provide injunctive relief that goes beyond simply ordering them to, once again, go through the

21 motions of "revalidating" Castro. The record and trial papers are replete with triable issues of

22 fact. The Defendants' clumsy attempt to moot this case should once again be rejected.

23 **II.     STATEMENT OF FACTS**

24       On April 24, 1997, the Office of Correctional Safety validated Castro as an associate of

25 the EME. *See* Docket No. 1. Ex. D at 1. This Court later found that the 1997 validation was

26

27 _____

   [2] The Court should know that Plaintiff's attorneys gladly waived their right to attorneys' fees in the settlement
28 discussions provided that Plaintiff was provided a timely, fair, and objective process. Defendants rejected the
   proposal. *See* Burns Decl. ¶2.

constitutionally deficient because Castro was "never afforded a meaningful opportunity to present his views before the critical decisionmaker [IGI Gonzales] prior to his validation." *Castro v. Terhune*, 2010 US Dist LEXIS 3366, *43.

In 2003, Castro received an active/inactive status review. Active/inactive status reviews are conducted at least every six years for validated prison gang associates or members. *See* Title 15, § 3378(f). Unlike an initial validation, which requires at least three pieces of evidence, an inmate can be found as an "active" associate based upon only one. *Id.* Based upon his 2003 review of Castro's central file, among other things, Assistant IGI Lujan recommended that Castro be assigned inactive status. Declaration of Ken Roost ISO Defendants' Motion for Summary Judgment ("Roost Decl."), Ex. G at 125:14-126:18. OCS subsequently rejected IGI Lujan's recommendation based upon purported "new" evidence of Castro's involvement with the EME: a 2000 letter authored by Anthony Sisneros. *Id.* At 145:19-146:6, 157:16-158:4. This letter no longer exists and no evidence of the letter's contents remains. Thompson Decl. ¶ 2. As a result, there is no way of confirming whether the letter contained any sort of gang-related information, whether the letter ever reached Castro, or whether Castro even knew Sisneros or communicated with him at any point in time. In fact, IGI McMillan testified that the Sisneros letter was not a valid source item and should not have been used as a source item against Castro. Thompson Decl. Ex 1 at 224:12-225:6. The alarming conclusion one must reach is that Plaintiff should have been released from solitary confinement no later than 2003. He was kept in the SHU only because of a lost letter that Defendants now agree was improper evidence. *Id.*

In 2006, Castro received another active/inactive status review because the most recent piece of evidence used against him, the missing Sisneros letter, was six years old. Roost Decl. Ex. C at CF 2142-2143. In conjunction with Castro's 2006 review, Assistant IGI Mount purportedly searched Castro's cell and allegedly found two drawings containing EME symbols. Roost Decl. Ex. C at CF 2142-2143, 2125-2126, 2128. Based upon these drawings, IGI McKinney, and later the OCS, determined that Castro was an active EME associate. Roost Decl. Ex. C at CF 2143, 0006. As with Castro's 2003 active/inactive status review, his 2006 review was predicated on his procedurally deficient 1997 validation. Castro is currently challenging the

1  2006 active/inactive review for failure to provide him adequate procedural and substantive due

2  process protections. *See Castro v. Horel*, CV 09-4902, October 14, 2009.

3         As early as April 2007, the CDCR was contemplating revalidating Castro. Thompson

4  Decl. Ex. 2 at AGO 03442. At this time, the CDCR had already acknowledged that "Castro

5  would certainly be re-validated." *Id.* In April 2009, Defendants joined in a court-sponsored

6  mediation with Plaintiff before the Honorable Nandor Vadas. During the mediation session, the

7  PBSP litigation coordinator instructed the IGI unit to conduct a search of Castro's cell.

8  Thompson Decl. Ex. 3 at 121:13-21. In response to this request, Assistant IGIs Short and Burris

9  ransacked Castro's cell, destroying his property, removing his legal papers, and "finding"

10  evidence that would later be used in conjunction with Castro's 2009 "revalidation." *See* Docket

11  No. 118, Castro Decl. ¶ 16. Plaintiff's counsel vociferously complained about Defendants'

12  conduct. Burns Decl. ¶ 3. Only Judge Vadas can relate his reaction to this ransacking during the

13  mediation, but he did express to Plaintiff's counsel his understanding of why we would be so

14  exercised. *Id.*

15         Following the April 2009 cell search, the CDCR continued to discuss internally whether

16  to revalidate Castro. Thompson Decl. Ex. 4; Ex. 5 at AGO 03431; Ex. 6 at AGO 03376. Mr.

17  Roost reiterated "the clear inevitability that [Castro] will be validated once more, regardless of

18  any procedural safeguards" and recommend Castro be revalidated for a host of reasons.

19  Thompson Decl. Ex. 4. Specifically, Roost indicated that by revalidating Castro the CDCR could

20  avoid having to pay attorneys' fees, avoid adverse precedent, and avoid the cost and risks of

21  going to trial. *See, e.g.*, Thompson Decl. Exs. 5, 7-9. The CDCR specifically requested "more

22  assurance on the unlikelihood of an award of attorney's fees if CDCR takes the recommended

23  course" prior to making their decision to revalidate Castro. Thompson Decl. Ex. 8.

24         In July 2009, the CDCR began the formal revalidation process. In August 2009, Assistant

25  IGI Pieren provided Castro the source items upon which Defendants relied and Castro submitted

26  a written rebuttal. Thompson Decl. Ex. 10 at 04611-13. However, Castro did not meet with the

27  Lieutenant IGI, IGI McMillan, who had final authority in deciding whether to recommend

28  Castro's revalidation and was the only one who could forward the validation package to the OCS.

1   *See* Thompson Decl. Ex.1 at 40:9-21, 46:16-22, 54:15-17; Ex. 11 at 86:25-87:3.  IGI McMillan

2   was not involved in the investigation of Castro's gang validation and did not prepare the written

3   response to Castro's written rebuttal.  *See* Thompson Decl. Ex. 12 at 46:14-21.

4       "[B]ecause Castro alleged that the [April 2009] search was retaliatory and improperly

5   done," Mr. Roost specifically instructed that Assistant IGIs Short and Burris, who ransacked

6   Castro's cell during the court-sponsored settlement conference in April 2009, should not be

7   involved in the revalidation process.  Thompson Decl. Ex. 13 at SSU02210.  Nevertheless,

8   Assistant IGI Short played an active role in Castro's revalidation.  *See Id.*; Thompson Decl Ex.

9   14; Ex. 15 at 13:13-21.  Among other things, Short prepared the IGI Chrono submitted in

10  connection with the validation package, and drafted responses to Castro's written rebuttal,

11  including the response to Castro's allegations that Short engaged in inappropriate conduct.  *See*

12  Thompson Decl. Ex. 14; *compare* Thompson Decl. Ex. 1 at 53:11-54:8; *see also* Thompson Decl.

13  Ex. 15 at 100:12-14.  Defendants then deliberately withheld Short's involvement from Castro:

14  "[Short] will not be involved *any [sic] fashion which Castro will be made aware.*"  Thompson

15  Decl. Ex. 13 at SSU02209 (emphasis added).

16      Throughout Castro's revalidation, the Attorney General provided input not only as to who

17  should be involved in the revalidation hearing, but also regarding the items of evidence to be used

18  against Castro, the timeline in which the revalidation was to take place, and the details of various

19  revalidation paperwork.  *See Id.*; Thompson Decl. Exs. 14, 16.  For example, the Attorney

20  General explicitly requested the inclusion of the 1997 source items in Castro's 2009 revalidation

21  package in order to bolster the mootness argument Defendants' put before this Court. Thompson

22  Decl. Ex. 16 ("In particular, to moot Castro's claim that the 1997 validation did not provide an

23  opportunity to be heard, it is vital to include at minimum the source items from the 1997

24  validation.").  When shown these e-mails to and from the Attorney General, IGI McMillan, who

25  was the presiding IGI in the revalidation, testified that the Attorney General's involvement was

26  "improper," that he would probably have recused himself had he known about the

27  communications at the time of the revalidation, and that he was "embarrassed" by them.

28  Thompson Decl. Ex. 11 at 73:8-22, 77:17-24; 78:18-79:1, 86:5-9; 88:8-13; 88:25-89:6; 92:16-

93:8; 84:23-25.

In revalidating Castro, Defendants relied upon 12 source items. Thompson Decl. Ex. 10 at AGO 04604. Most, if not all of these source items have been called into question by Defendants' own witnesses and experts. For example, the IGI, Mr. McMillan, testified that the following source items are unreliable and therefore should not be submitted: the July 21, 2008 Confidential Memorandum, the Sisneros letter, the February 7, 1997 Confidential Memorandum, and the Mendoza letter. Thompson Decl. Ex. 11 at 52:21-54:6; Ex. 1 at 224:12-225:6, 193:1-16. Similarly, Mr. Marquez, Defendants' own expert, testified that the Bracamonte card and Hernandez card (both items used in 1997) were insufficient. Thompson Decl. Ex. 17, p. 19-20. Other witnesses also rejected and/or called into question various source items.[3] *See, e.g.,* Thompson Decl. Ex. 18, p. 15.

On September 3, 2009, Castro was revalidated as a Mexican Mafia associate. Thompson Decl. Ex. 10 at AGO04602. On the same day, the Defendants filed their 2009 Motion for Summary Judgment on mootness grounds. *See* Docket No. 123.

## III. THIS COURT HAS ALREADY DENIED THIS MOTION

In its October 5, 2009 order, this Court denied Defendants' Motion for Summary Judgment filed September 3, 2009. *See* Docket No. 144. Defendants have now re-filed this motion, raising the same issues that the Court already considered and rejected last year: that the failure to provide Castro with a meaningful opportunity to be heard in 1997 could be remedied by providing him this opportunity 12 years later in the 2009 revalidation, and that the 2009 revalidation provided an independent basis upon which to retain Castro in the SHU. *See* Docket No. 123, pp. 8-10; Ds' 2010 MSJ, pp. 13-18, 20-21. Defendants' Motion made little sense in 2009, but is now completely illogical given that we already had a trial regarding the 1997 validation in which this Court found it invalid. To the extent Defendants are seeking a motion for reconsideration, they have failed to first obtain leave of the Court as required by Civ. L.R. 7-9(a). Accordingly, Defendants' motion must fail from the onset.

---

[3] A list of the 12 source items and their defects appears in Section IV.C.2., *infra.*

1   As discussed below, even if the Court were to consider Defendants' arguments yet again,

2   denial must again follow because Defendants' arguments demonstrate a number of triable issues

3   of fact.

4   **IV.   LEGAL STANDARD ON SUMMARY JUDGMENT.**

5        To grant summary judgment, the moving party must demonstrate that there is no "genuine

6   issue as to any material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact

7   is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at

8   248.  Here, there is a genuine issue as to almost every material fact, as demonstrated below, and

9   accordingly, Defendants Motion must fail.

10  **V.   THERE IS A TRIABLE ISSUE OF FACT WHETHER CASTRO WAS
         AFFORDED SUFFICIENT DUE PROCESS IN HIS 2009 REVALIDATION (HE
11       WAS NOT)[4]**

12       Plaintiff's counsel confess to a disagreement among themselves as to exactly what

13  Defendants are arguing in this motion.  They appear to argue that the 1997 defects were washed

14  away by a new 2009 validation.  They may also be arguing that because the 2009 revalidation

15  allegedly included a chance to be heard by the critical decisionmaker (it did not), the 1997 defect

16  was cured 12 years later regardless of what else happened in the 2009 procedure.  To be sure, we

17  will address each possibility, starting with the more likely argument that the 2009 revalidation

18  washes away the 1997 defects.

19       **A.   There Is A Triable Issue Of Fact Whether Castro Received A Meaningful
              Opportunity To Be Heard Or Adequate Notice In The 2009 Revalidation (He
20            Did Not)**

21       Due process required that Castro be afforded (1) notice of the charges against him, and (2)

22  an "opportunity to be heard at a meaningful time and in a meaningful manner." *Hewitt v. Helms*,

23  459 U.S. 460, 476 (1983); *Mathews v. Elridge*, 424 U.S. 319, 333 (1976).  Here, for the reasons

---

[4] Defendants' assertion that Castro did not want procedural due process concerning his 2009 revalidation is absurd,
false, and borne of desperation.  Ds' 2010 MSJ, p. 19.  Through this litigation and the inmate grievance system,
Castro has repeatedly sought, and continues to seek such process.  Defendants, however, somehow illogically equate
Castro's desire to be housed in the general population with his not wanting to receive procedural due process.
Obviously, Castro wants to be released from the SHU – he should not be there in the first place – but, to the extent
that the CDCR was going to revalidate him, Castro clearly sought, and is actively litigating to receive, the full scope
of procedural and substantive due process protections to which he was entitled.

below, it is clear that triable issues exist as to whether Castro was provided either.

### 1. The Outcome of Castro's Revalidation was Predetermined and Resulted from Improper Motivation

The outcome of Castro's 2009 revalidation was a foregone conclusion. The reason it was performed was to moot this case, prevent the December 2009 trial, and to avoid the payment of attorneys' fees. The only way the CDCR could avoid paying attorneys' fees was to revalidate Castro as an active EME associate. This improper motivation[5] deprived Castro of any meaningful opportunity to be heard (or at least raises a triable issue of fact) as the CDCR had already made up its mind and did not care what Castro had to say.

The evidence is unequivocal that the CDCR's motivation to revalidate Castro was to avoid the payment of attorneys' fees. For example, in a July 20, 2009 memorandum to CDCR counsel Jeff Hook ("Hook"), Deputy Attorney General Ken Roost ("Roost") writes: "CDCR can avoid exposure of up to $350,000 in attorney's fees, plus other significant expenses, if it either moots this case by giving Castro a new validation procedure or settles it by providing a new validation." Thompson Decl. Ex. 7 at AGO 03381; *see also* Thompson Decl. Ex. 8 at AGO 03398 ("In sum, by promptly revalidating Castro, CDCR should be able to moot the case and avoid the chance of attorney's fees and further litigation expenses through a trial."). Before agreeing to revalidate Castro, the CDCR specifically requested "more assurance on the unlikelihood of an award of attorney's fees if CDCR takes the recommended course," therefore confirming that the attorneys' fees were the driving factor. Thompson Decl. Ex. 8 at AGO 03397.

The only way to avoid payment of attorneys' fees was to revalidate Castro as an EME associate,[6] but this was of no concern to the CDCR because they had already determined that Castro would be revalidated as early as 2007. Thompson Decl. Ex. 2 at AGO 03442 (*April 2, 2007* memorandum to OCS Agent Fischer from Mr. Roost stating: "But you affirmed that, having

---

[5] Thompson Decl. Ex. 11 at 73:8-22, 77:17-24; 78:18-79:1, 86:5-9; 88:8-13; 88:25-89:6; *see also* Thompson Decl. Ex. 19 at p. 2 ("There should only be one purpose to a gang investigation – to determine whether an inmate is or is not a member or associate of a prison gang.")

[6] It is clear that if Castro were not revalidated, Plaintiff would be the prevailing party. In fact, even if Plaintiff were properly revalidated, Plaintiff would still prevail, however, Defendants do not share this belief.

reviewed Castro's file, Castro would certainly be re-validated."). The CDCR would not have

engaged in the validation process if they didn't already know the outcome, leaving Castro no

chance of having a meaningful opportunity to be heard in what was essentially a show trial. Any

argument by Defendants to the contrary is belied by the evidence. For example:

- In an April 30, 2009 email from Roost to Hook, Roost confirms the preordained outcome of Castro's revalidation, referencing "the clear inevitability that [Castro] will be validated once more, regardless of any procedural safeguards." Thompson Decl. Ex. 4.

- In an April 1, 2008 letter, Roost writes to Hook stating, "Mr Fisher also affirmed that…Castro would certainly be re-validated." Thompson Decl. Ex. 5 at AGO 03430.

- In a July 28, 2009 letter, Hook writes to Anthony Chaus (Assistant Secretary of OCS), stating "Based on discussions with the OAG, OCS, and PBSP, it is highly unlikely plaintiff will not be revalidated.". Thompson Decl. Ex. 6 at AGO 03376.

The predetermined nature of the Castro's revalidation is further confirmed by the timing

of Defendants' previous Motion for Summary Judgment (a motion which raised the same

arguments as raised here and which this Court already denied). On the <u>same day</u> that Defendants

validated Castro, they filed a well-researched, 14-page Motion to Dismiss and for Summary

Judgment, with substantial supporting documentation, based on the new validation. *See* Docket

No. 123. The timing clearly shows that Defendants drafted the motion *before* SSU made its

decision, and therefore already knew the outcome.

Finally, the Attorney General's orchestration of the entire revalidation process highlights

the results-oriented approach and lack of regard for Castro's due process. The Attorney General's

office, which recommended Castro's revalidation to moot the case and obviate payment of

attorneys' fees, determined, among other things, who was to be involved in the revalidation

process,[7] the timing of the process,[8] which source items to use,[9] and how the revalidation was to

---

[7] E-mail from Roost to Hook stating "I am glad that CDCR will proceed with the revalidation, and additionally advise that the staff involved in the revalidation procedure *not* include IGIs Short or Burris, who executed the April

be documented.[10] This level of involvement is not only striking, but clearly improper. The Attorney General is not an expert in gang validation, but undertook this role because they needed to ensure that the "right" outcome was reached. IGI McMillan, who was the presiding IGI in the revalidation but not a party to these communications, recently expressed his opinion that the Attorney General's involvement was "improper," that he would probably have recused himself had he known about the communications at the time of the revalidation, and that he was "embarrassed" by the letters and the e-mails. Thompson Decl. Ex. 11 at 73:8-22, 77:17-24; 78:18-79:1, 86:5-9; 88:8-13; 88:25-89:6; 92:16-93:8; 84:23-25.

At bottom, due process requires more than "meaningless gestures," but that is all Castro received. *Hewitt*, 459 U.S. 460, 476; *Toussaint v. McCarthy*, 801 F.2d 1080, 1101-1102 (9th Cir. 1986). There can be no real opportunity to be heard where the outcome has already been determined. The CDCR knew Castro would be revalidated before they even began the process and was highly motivated to obtain this outcome in order to obviate the attorneys' fees.

## 2. Defendants Deliberately Withheld Information from Castro Because They Knew He Would Challenge It

There is a triable issue of fact whether Castro could have received a meaningful opportunity to be heard regarding his 2009 revalidation because Defendants deliberately withheld key information from him to thwart any potential challenge. This conduct raises a triable issue of fact that goes to the heart of Castro's "revalidation." On April 27, 2009, during a court-sponsored mediation before Judge Vadas at Pelican Bay, Assistant IGI Short (along with Assistant IGI Burris) ransacked Castro's cell and destroyed his property. See Docket No. 118, Castro Decl. ¶ 16. This was not merely a random search, but was specifically ordered to take place while the

---

28, 2009 search of Plaintiff's cell during our settlement conference with Judge Vadas." Thompson Decl. Ex. 13 at SSU002209.
[8] Roost e-mail to Fischer: "[b]ecause the dispositive-motion deadline in this case is September 3, we recommend again that CDR move quickly to complete the new revalidation before the end of this month." Thompson Decl. Ex. 16 at SSU 002208.
[9] Roost e-mail to Fischer: "In particular, to moot Castro's claim that the 1997 validation did not provide an opportunity to be heard, it is vital to include at minimum the source items from the 1997 validation." Thompson Decl. Ex. 16 at SSU 002208.
[10] E-mail from Short to Roost regarding the 2009 IGI chrono, stating "let me know if you want more changed. Hell, change it yourself if you want. I'll do what is most convenient for you." Thompson Decl. Ex. 14 at AGO 03348.

mediation before Judge Vadas was occurring.  Thompson Decl. Ex. 3 at 121:13-122:2.

Recognizing the retaliatory nature of and animus demonstrated by the search, the Attorney

General did not want Short to be involved in Castro's revalidation.  *See, e.g.*, Thompson Decl. Ex.

13 at SSU002209 ("I am glad that CDCR will proceed with the revalidation, and additionally

advise that the staff involved in the revalidation procedure *not* include IGIs Short or Burris, who

executed the April 28, 2009 search of Plaintiff's cell during our settlement conference with Judge

Vadas.  Because Castro alleged that the search was retaliatory and improperly done, it would be

prudent to avoid any unnecessary complications in the revalidation.") (emphasis in original).

Incredibly, however, despite the clear prejudice and bias demonstrated by Short

ransacking Castro's cell, the CDCR, with full acquiescence of the Attorney General, instructed

Short to take a central role in Castro's 2009 validation.  *See, e.g.*, Thompson Decl. Ex. 13 at

SSU002209 ("Short was/is the staff assigned to conduct the review"); Thompson Decl. Ex. 14 at

AGO 00348 (Short prepares the IGI "Chrono" detailing the investigation, source items, and

recommendation to revalidate Castro and sends to the Attorney General).  They made sure to

intentionally conceal Short's involvement from Castro, however, to prevent him from properly

challenging it.  "[Short] will not be involved *any [sic] fashion which Castro will be made aware*."

Thompson Decl. Ex. 13 at SSU002209 (emphasis added).  Surely an inmate cannot have a

meaningful opportunity to be heard where the truth is withheld, particularly where this is done

knowingly to avoid an inmate challenge and to prevent him from informing the Court.

### 3. Castro Did Not Have an Opportunity to Meet with the Critical Decision Maker

The Constitution requires that Castro have been provided an opportunity to meet with the

"critical decisionmaker" before the decision to validate was made.  Here, the critical

decisionmaker was the Lieutenant IGI, Mr. McMillan.  *Madrid v. Gomez*, 889 F. Supp. 1146,

1276 (N.D. Cal. 1995); *see also Castro v. Terhune*, 2010 U.S. Dist. Lexis 3366, *30.  Only

McMillan, as opposed to an Assistant IGI, had authority to recommend that Castro be revalidated

and "actually make the decision to forward a validation package to SSU." *Id.*; see also Thompson

Decl. Ex. 1 at 46:16-22.  However, it is undisputed that Castro did <u>not</u> meet with McMillan

1    regarding his 2009 revalidation and therefore there is a triable issue of fact whether Castro

2    received a meaningful opportunity to be heard.  Ds' 2010 MSJ, pp. 17-18.

3         Defendants' attempts to end-run around this fatal flaw are unavailing.  First, Defendants

4    incorrectly argue that Assistant IGI Pieren afforded Castro a meaningful opportunity to be heard.

5    *Id.* at 11.  Not only does this ignore the case law cited above, but even if an Assistant IGI could

6    provide a meaningful opportunity to be heard, which they cannot, here Pieren failed to do so

7    because he failed to provide an "interview."  Among other things, Pieren did not inform Castro

8    that he was being provided his opportunity to address the evidence, nor did he ask Castro if he

9    had any questions regarding the revalidation or source items used therein.  Thompson Decl. Ex.

10   10 at AGO 04604-05.  Without providing these procedural safeguards, there is a triable issue as to

11   whether Castro could meaningfully respond, and therefore whether he was afforded a meaningful

12   opportunity to be heard.  Thompson Decl. Ex. 19, p. 7.

13        Second, Defendants try to place the onus of requesting an interview with the IGI on

14   Castro.  *See* Ds' 2010 MSJ, p. 11.  This is preposterous.  The CDCR is required to affirmatively

15   provide inmates with the procedural protections provided by the Constitution.  *Madrid v. Gomez*,

16   889 F. Supp. 1146 (N.D. Cal. 1995).  To suggest otherwise is simply wrong.

17        Third, Defendants argue that Castro's submission of written responses satisfies the

18   "interview" requirement.  It does not.  *Hewitt v. Helms*, on which Defendants rely, is clear that an

19   inmate may present his views via written statement *or by oral presentation if prison officials*

20   *believe a written statement would not be effective*.  459 U.S. 460, 476 (emphasis added). Here,

21   CDCR regulations make clear that a written statement is not effective in providing inmates with a

22   meaningful opportunity to be heard.  Title 15 specifically requires that the inmate be provided an

23   "in-person interview" and courts have agreed.  *See* Title 15 §§ 3378(c)(6)(B) and (D); Thompson

24   Decl. Ex. 20 at SSU 002247; *Madrid v. Gomez*, 889 F. Supp. 1146, 1242 (N.D. Cal., 1995);

25   *Castro v. Terhune*, 2010 U.S. Dist. LEXIS 3366 at *14 (Jan. 14, 2010).  This is not surprising

26   given that a dialogue provides a much more meaningful conduit in which to discuss the evidence,

27   the validation process, and other critical items.  Accordingly, a triable issue of fact exists as to

28   whether Castro was denied a meaningful opportunity to be heard, which he certainly was.

### 4. Castro Could Not Respond to Impermissibly Vague Allegations of Being a "Prison Gang Associate"

Without a clear definition of the term "prison gang associate" there can be no meaningful opportunity to be heard. Thompson Decl Ex. 21, p. 13. By definition, a hearing cannot be "meaningful" if those responsible for providing the hearing cannot clearly and uniformly define what they are looking for or seek to establish. A fundamental triable issue of fact exists as to this basic definition used to revalidate inmates.

As outlined in the chart below, there is no uniform definition of the term "associate." To the contrary, the term is defined in a multitude of ways, no two of which are the same. In fact, IGI personnel admit that two gang investigators could reach opposite conclusions regarding the same source item. Thompson Decl. Ex. 1 at 103:24-104:1. Moreover, the degree of variation is stark. Take, for example, Defendants' own experts – one suggests that being a "Mexican National" constitutes association with the Mexican Mafia, whereas the other requires evidence of "planning, organizing, threatening, financing, soliciting or committing unlawful acts or acts of serious misconduct" to reach this same conclusion. Thompson Decl. Ex. 18, p. 18; Ex. 22, p. 2. Clearly, these two definitions are irreconcilable and make it impossible for an inmate to receive a meaningful opportunity to be heard.

| Source | Definition of "Associate" |
|---|---|
| DOM § 52070.1.9.3 (Thompson Decl. Ex. 23); Title 15 § 3378(c)(4) | Someone involved periodically or regularly with members or associates of a gang |
| Barneburg Deposition, April 30, 2010, at 167:20-22 (Thompson Decl. Ex. 24) | Someone who is a Sureno (Latinos from Southern California) |
| Marquez Rebuttal Report, June 25, 2010, p. 2 (Thompson Decl. Ex. 22) | Someone who is a Mexican National |
| Sean Burris Deposition, April 29, 2010 , at 67:3-68:15 (Thompson Decl. Ex. 3) | Someone who has adopted the prison gang's ideology |
| Everett Fischer Deposition, April 23, 2010, at 47:20-48:24 (Thompson Decl. Ex. 25) | Someone who is closely aligned with the gang and fulfills the gang's motives, needs or conducts activities. |
| David Tristan, June 28, 2010 rebuttal report, p. | Someone who engages in activities which |

| 18 (referring to DOM 52070.16 and CDCR regulations) (Thompson Decl. Ex. 18) | include planning, organizing, threatening, financing, soliciting or committing unlawful acts or acts of serious misconduct. |
| --- | --- |

If the CDC personnel making the decisions cannot consistently articulate a defensible and clear definition of "associate," an inmate cannot know what conduct, thoughts, speech or relationships will put him in danger of being sentenced to solitary confinement for life. This triable issue of fact, and perhaps law, goes to the heart of the constitutionality of the whole validation process.

### 5. Castro Was Provided Inaccurate and Incomplete Information Regarding the Charges Levied Against Him

There is a triable issue of fact whether Castro received proper notice and an opportunity to be heard given that he was not provided complete and accurate information regarding the charges against him. In particular, Castro was not provided sufficient information regarding the confidential materials, which prison officials are required to "inform the inmate of as much of the relevant content of that information as possible consistent with the nondisclosure of the source of the information." *Toussaint v. Rowland*, 711 F. Supp. 536, 542 (N.D. Cal. 1989).

Here, all of the 1030s (forms used to disclose confidential materials to inmates) provided to Castro in his 2009 revalidation were riddled with inaccuracies and incomplete information. Several fail to disclose necessary information, such as the hearsay nature of the information, thereby preventing Castro from properly challenging the source items on these grounds. *See* Thompson Decl. Ex. 10 at AGO 04660. McMillan and Tristan agree that the 1030 regarding the July 21, 2008 confidential memorandum failed to disclose necessary information and as a result that the memorandum should not have been used as a source item. Thompson Decl. Ex. 11 at 52:21-54:6; Ex. 18, p. 15. Other 1030s mischaracterize, or provide blatantly false information *See* AGO 04660. For example, the 1030 for the February 7, 1997 confidential memo states that Castro was identified as an EME associate in April of 1997 - two months in the future. Similarly, the 1030 for the November 5, 2005 confidential memo states that Castro conducted EME activities for the informant, whereas the memo itself states: "Subject does not recall any significant activities occurring." *Id.* Clearly, these 1030 disclosures were insufficient to provide

1  Castro with notice of the factual basis for his validation and prevented him from meaningfully
2  responding.

3      **B.**  **There Is A Triable Issue Of Fact Whether The Evidence Used In The 2009**
       **Revalidation Was Sufficient To Revalidate Castro  (It Was Not)**
4
5          **1.**  **This Court Can and Should Reassess the Sufficiency of the Evidence in**
               **Light of New Facts**

6          Defendants relied upon two source items from Castro's 1997 validation in the 2009

7  revalidation: the Bracamonte card and the Hernandez letter.[11]  Defendants argue that this Court

8  may not reconsider the sufficiency of these two source items because it is bound by its prior

9  ruling (and the Ninth Circuit's ruling based thereupon) that these source items satisfied the

10 constitutional "some evidence" standard.  *See Castro v. C.A. Terhune* December 13, 1999 Order;

11 *Castro v. Terhune*, 29 Fed. Appx. 463, 465 (9th Cir. 2002).  Defendants are wrong.  The "law of

12 the case" doctrine upon which Defendants rely is not an absolute bar to reconsidering matters

13 previously decided.  *Mortimer v. Leroy D. Baca*, 594 F.3d 714, 721 (9th Cir. 2009).  A court can,

14 and should, reconsider a previously resolved question if new evidence comes to light, such as it

15 has here.  *Id.* (finding reconsideration proper because there was "considerably more and different

16 evidence" before the district court when it considered a motion for summary judgment in 2007, as

17 compared to the record before the court in 2002).

18         Numerous "new" facts have come to light since this Court first ruled in 1999 that there

19 was "some evidence" supporting Castro's 1997 validation.  For example, Defendants' own

20 expert, Mr. Marquez, now opines that both the Bracamonte card and Hernandez letter are

21 insufficient.  As to the Bracamonte card, he opines: "there is insufficient evidence to support the

22 acceptance of this document for validation purposes.  There is no articulable basis in the

23 document for determining that Raymond Bracamonte, C61713, the validated EME associate, is

24 the one who authored the card."  Thompson Decl. Ex. 17, p. 19.  Similarly, Marquez opines that

25 the Hernandez letter is insufficient because "there is no apparent gang activity noted in the

26 document" nor is there an "articulation as to why and how it was determined that Antonio

27 ───────────────────

[11] In addition to the two source items accepted in the 1997 validation, in 2009 Defendants used ten additional pieces
28 of evidence that were not used in connection with his 1997 validation.

Hernandez, D87215, the validated EME associate is the one and same who authored and or gave the letter to Castro." *Id.* at 20 (Marquez opening report). As this Court found that new evidence demonstrated the "doubtful reliability" of the 1991 confidential memo during the Phase I trial, the Court should similarly revisit its previous findings regarding the Bracamonte card and Hernandez letter. *Castro v. Terhune,* 2010 U.S. Dist. LEXIS 3366, *17. And perhaps more basically, when a court is misled, the resulting ruling can and should be revisited. Arguments which are made and opposed only by a *pro se* opponent will not support a ruling if those same arguments, when thoroughly examined, turn out to be false.

This Court has never ruled on the sufficiency of any other source item used in the 2009 revalidation. Accordingly, the Court can and should assess the sufficiency of all evidence used in Castro's 2009 revalidation.

### 2. None of the Evidence Used in Castro's 2009 Revalidation is Reliable nor Does It Demonstrate Association with a Prison Gang

Due Process requires prison officials to have an evidentiary basis for their decision to confine an inmate in the SHU based on alleged gang affiliation. *See Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003). Their decision must be supported by at least "some evidence" evincing the requisite "indicia of reliability." *Id.* at 1287-88; *Madrid*, 889 F. Supp. at 1273-74; *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987) (evidence relied upon by prison disciplinary board must have "some indicia of reliability"). Thus, if an inmate is validated based upon unreliable evidence, as Castro was here, due process is violated.

Certain types of evidence have been categorically held <u>not</u> to meet the minimum constitutional standard of reliability. For example, hearsay has been deemed unreliable. *See Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir. 1987) (finding that an "inmate's statement that was related to prison officials through a confidential informant who had no first hand knowledge of any relevant statements or actions by [the plaintiff]" did not meet the some evidence standard). In fact, the CDCR has expressly recognized the unreliability of hearsay evidence and adopted regulations to disallow the use of source items relying solely upon hearsay. Thompson Decl. Ex. 12 at 300-302; Cal. Code Regs. tit. 15 § 3378(c)(8)(H) ("Title 15 § 3378").

Uncorroborated evidence similarly does not meet the constitutionally-mandated "some evidence" standard. Thompson Decl. Ex. 26, p. 43. For example, in *Lira*, the Court found multiple confidential debriefing reports insufficient because the alleged gang involvement and/or events described therein were not independently corroborated. *Id.* at 47. The same holds true for evidence that is "equivocal and marked with inconsistencies." *Id.* at 43. In evaluating a drawing found in an inmates' cell allegedly containing gang symbols and the inmate's nickname, the *Lira* court determined that the drawing did not meet the "some evidence" standard because plaintiff himself had not created the drawing (though he possessed it), because the symbols were not obvious to highly trained experts, and because the symbols were subject to multiple interpretations. *Id.* at 44-45. Finally, where the activity described in the source item is "too inconsequential to have any prison gang significance," the source item does not meet the "some evidence" standard. *Id.* at 45. This is parroted by CDCR regulations requiring that source items show "evidence of prison gang activity" for it to be used in connection with an inmate's validation.[12] Title 15 § 3378(c)(8)(M), (C).

Moreover, courts should be particularly vigilant in considering the reliability of confidential memoranda. The "clear incentive to fabricate or exaggerate information" attendant in debriefings – whereby inmates seek to gain release from the SHU by divulging information regarding gang membership or activity – significantly heightens the risk that false information will be relied upon." *See Madrid*, 899 F. Supp. at 1274.

As outlined in the chart below, there is a triable issue of fact whether any of the items of evidence used in Castro's 2009 revalidation is sufficiently reliable.

| Source Item No. | Description of Source Item | Unreliable because: |
|---|---|---|
| 1 | Drawing of "Shield of the | • IGI McMillan confirmed that the source item should not have been submitted in connection with Castro's 2009 revalidation. |

---

[12] Courts look to CDCR regulations in assessing what constitutes reliability. *See, e.g.*, Thompson Decl. Ex. 26, p. 46, fn. 31 (stating "the inherent unreliability of laundry list identifications is reflected by the fact that CDCR changed its regulations on acceptable validation evidence items in January 2006 pursuant to its settlement of *Castillo v. Alameida*, No. C 94-2847 (N.D. Cal. 1994)").

| | | Eternal Warrior"<br><br>[Thompson Decl. Ex. 10 at AGO 04620] | Cite Depo.<br>• The drawing does not evidence any activity in furtherance of the prison gang. Thompson Decl. Ex. 26.<br>• Defendant did not create this drawing. Cite Lira.<br>• The Aztec shield is not a prolific or universal symbol of the EME. Thompson Decl. Ex. 26, p. 44; Thompson Decl. Ex. 21, p. 7.<br>• The drawing was allegedly found while Assistant IGIs Short and Burris ransacked Castro's cell during his court-sponsored mediation.<br>• This drawing bears a shield that is different than what the CDCR training materials describe as an EME symbol. Compare drawing with Thompson Decl. Ex. 27. |
|---|---|---|---|
| 2 | Confidential Memorandum dated February 16, 2009<br><br>[Roost Decl. Ex. H at AGO 03288-03326] | • All information regarding Castro is hearsay. *Cato* and Title 15 § 3378(c)(8)(H).<br>• The memo does not explain how the source knew Castro was a "Blockero" nor is this allegation corroborated. *See* AGO03289-<br>• The memo does not specify any gang-related act or conduct involving Castro. Thompson Decl. Ex. 26; Title 15 § 3378(c)(8)(M). |
| 3 | Confidential Memorandum dated July 21, 2008<br><br>[Roost Decl. Ex. H; AGO 03281-03287] | • McMillan and Tristan both confirmed that the source item should not have been submitted in connection with Castro's 2009 revalidation. Thompson Decl. Ex. 18, p. 15; Ex. 11 at 52:21-54:6.<br>• All information regarding Castro is hearsay. *Cato* and Title 15 § 3378(c)(8)(H).<br>• The source's claims were never substantiated. Source said he had been given orders to assault staff by another inmate (Inmate X) and stated that he "later learned" that the instructions had come from Huero (Castro) and the source alleged (again without identifying the source of his information), that Huero (Castro) was a "person of influence" in the EME.<br>• The debriefer was identified as a "validated Sureno," but this classification does not exist. |
| 4 | Birthday Card<br><br>[Thompson Decl. Ex. 10 at AGO 04668] | • The card does not evidence gang activity. Thompson Decl. Ex. 26.<br>• There is no such thing as a "non-validated" EME associate, yet one of the other signatories on the birthday card was deemed by CDC as such. The fact that the CDC invented a designation for purposes of this source item indicates a blatantly results-oriented analysis. |
| 5 | Drawings of "Aztec Chief" and "Aztec Ruins with Mactlactomei" | • OCS determined that these drawings did not independently constitute a valid source item, and therefore used them as support for another source. *See* Thompson Decl. Ex. 10 at AGO 04602. Ultimately 11, not 12 source items were accepted by OCS. *Id.* |

| | | |
|---|---|---|
| | [Thompson Decl. Ex. 10 at AGO 04670-04671] | • The purported gang symbols are impossible to see. The drawing needed to be enlarged for investigators to allegedly find symbols and there is no indication that Castro was even aware of any purported symbols, to the extent they exist. |
| | | • Castro did not create these drawings. Thompson Decl. Ex. 26. |
| | | • The Mactactomei is not unique to the EME. Thompson Decl. Ex. 26. Surenos (Southern Hispanics) also use Mactactomei as symbol. *See* Thompson Decl. Ex. 21, p.9. |
| | | • The drawings do not demonstrate activity in furtherance of the prison gang. Thompson Decl. Ex. 26. |
| 6 | Confidential Memorandum dated November 15, 2005<br><br>[Roost Decl. Ex. H at AGO 03269-03280] | • All information regarding Castro is hearsay. *Cato* and Title 15 § 3378(c)(8)(H). |
| | | • Memo doesn't indicate that Castro was involved in any gang activity or conduct. Thompson Decl. Ex. 26; Title 15 § 3378(M). In fact, the source indicated that "he did not recall any significant prison gang activities occurring" that involved Castro. |
| 7 | Confidential Memorandum dated March 4, 2004<br><br>[Roost Decl. Ex. H at AGO 03258-03268] | • All information regarding Castro is hearsay. *Cato* and Title 15 § 3378(c)(8)(H). |
| | | • The information concerning Castro is not corroborated. Memo states the source was directed by another inmate (Inmate B) to stab another inmate but to give the "other razor knife" to Castro, but nothing indicates verification thereof. |
| | | • No gang related activity. Thompson Decl. Ex. 26. Nothing indicates that Castro was actually given the "other" razor knife as indicated in the memo, nor does the memo state that the purported activities related to any prison gang. |
| 8 | Memorandum dated December 22, 2000 authored by Evanilla<br><br>[Thompson Decl. Ex. 10 at AGO 04696-04698] | • McMillan testified that this was a "very weak source," that he probably wouldn't submit to OCS today." Thompson Decl. Ex. 1 at 225:5. |
| | | • There is no indication that any investigation was done by the CDC to determine whether this communication came from or evidenced a gang-related "mail drop box" as required by department regulations. Thompson Decl. Ex. 28. |
| | | • The original correspondence does not exist. Anyone conducting a proper gang investigation would need to see the actual correspondence to determine whether it contained any evidence of gang activity before this source item could be used for validation. |
| | | • Memo does not state how it is possible that the events occurred. Thompson Decl. Ex. 26. |
| 9 | Confidential Memorandum dated February 7, 1997 | • IGI McMillan confirmed that this source item should not have been submitted in connection with Castro's 2009 revalidation. |
| | | • There is no gang-related activity or conduct described in the memo. Thompson Decl. Ex. 26. The only portion of the memo referencing Castro is a laundry list, which is |

| | | [Roost Decl. Ex. H at AGO 03248-03257] | specifically disallowed as a source item by Title 15. Title 15 § 3378(c)(8)(M). |
|---|---|---|---|
| | 10 | Mendoza Letter<br><br>[Thompson Decl. Ex. 10 at AGO 04710-12] | • IGI McMillan confirmed that the source item should not have been submitted in connection with Castro's 2009 revalidation. Thompson Decl. Ex. 1 at 230:21-231:10.<br>• This was rejected as a source item by OCS/SSU in 1997. Docket No. 1, Ex. D at 1.<br>• Letter contains no evidence of prison gang activity. *Lira.* Defendants' expert, Mr. Marquez, speculated at trial that the letter might be evidence of a "mail drop." Trial Tr. 574-575. However, there is no evidence supporting this contention. There is no documentation of an investigation into whether the Mendoza letter address or addressee was a known mail drop, as required by departmental regulations. Thompson Decl. Ex. 28.<br>• Defendants could not produce the original letter, thereby calling into question its reliability. |
| | 11 | Hernandez Letter<br><br>[Thompson Decl. Ex. 10 at AGO 04714-15] | • Defendants' expert, Mr. Marquez, opines that this source item is insufficient because "there is no apparent gang activity noted in the document" nor is there an "articulation as to why and how it was determined that Antonio Hernandez, D87215, the validated EME associate is the one and same who authored and or gave the letter to Castro." Thompson Decl. Ex. 17, p. 20.<br>• There is no evidence showing that Castro had any contact with Antonio G. Hernandez or Joann, or that there had been any investigation of these individuals in 1997 or in 2009.<br>• Defendants could not produce the original letter, thereby calling into question its reliability. |
| | 12 | Bracamonte Card<br><br>[Thompson Decl. Ex. 10 at AGO 04717] | • Defendants' expert, Mr. Marquez, opines that this source item is insufficient because "[t]here is no articulable basis in the document for determining that Raymond Bracamonte, C61713, the validated EME associate, is the one who authored the card." Thompson Decl. Ex. 17 p. 19.<br>• Defendants could not produce the original card, thereby calling into question its reliability.<br>• There is no evidence of prison gang activity. See Thompson Decl. Ex. 26.<br>• There is no evidence showing that Castro had any contact with Ray Bracamonte, or that there had been any investigation of the identity or whereabouts of Bracamonte in 2009. |

Thus, because none of the 12 pieces of evidence that formed the basis of Castro's 2009 revalidation meets the requisite quantum of reliability, Defendants' motion for summary

1  judgment must be denied.[13] "The 'touchstone of due process is protection of the individual

2  against arbitrary action of government.'" *Wolff v. O McDonnell*, 418 U.S. 539, 558 (1974).

3  Allowing prisons to consign an inmate to the SHU for an indeterminate term, in essence for *life*,

4  without ascertaining whether the information relied upon has 'some indicia of reliability,' fails to

5  protect against such arbitrary action." *Madrid*, 899 F. Supp. at 1274.[14]

6  **VI.  TO THE EXTENT DEFENDANTS ARGUE THAT A HEARING IN 2009 CAN
    REMEDY DEFENDANTS FAILURE TO PROVIDE DUE PROCESS IN 1997 AND

7  UNDO THE RESULT OF THE PREVIOUS TRIAL, THIS ARGUMENT IS
    COMPLETELY WITHOUT MERIT**

8

9  Defendants may argue that Castro's 1997 due process violation is moot because they

10  provided him the process he was due in 1997 12 years later in 2009.  Defendants appear to cite to

11  *Raditch v. United States* in support of such a contention, however, this reliance is misplaced.  929

12  F.2d 478 (9th Cir. 1991).  Ninth Circuit precedent and *Raditch* itself make clear that the ruling

13  applies in the context of <u>property</u> interests, not a liberty interest, such as Castro's interest at stake

14  here.[15]  *Raditch v. United States*, 929 F.2d 478, 482 (9th Cir. 1991) ("This postdeprivation

15  procedure would have compensated Mr. Raditch for any loss of *property* to which he was

16  entitled.") (emphasis added); s*ee, e.g., Battle v. Schaefer*, 229 F.3d 1156, **1 (9th Cir. 2000)

17  (citing *Raditch* as "concluding that no deprivation of *property* by a state governmental official

18  can violate procedural requirements of the Due Process Clause if a meaningful postdeprivation

19  remedy for the loss is available.") (emphasis added);

20  In fact, in *Elster v. Wong*, this Court explicitly recognized *Raditch's* limitations.  2009

21  WL 1604695, *4 (N.D. Cal. 2009) (Alsup, J.). The Court stated:

22  At best, *Raditch* stands for the narrow proposition that 'an intentional deprivation
    of a *property* right by a government official, in violation of established

23

24
  ----
  [13] Even if one or more of the source items met Constitutional requirements, which they do not, Defendants have not

25  shown that the source item meets the "direct link" requirement of Title 15, and on this basis their Motion must also
    fail.  Title 15 § 3378(c)(A).

26  [14] Throughout their motion, Defendants repeatedly refer to Castro's purported possession of a razor knife in a blatant
    and misguided attempt to prejudice him.  *See, e.g.,* Ds' MSJ, p. 9, 19-20.  In fact, Castro has repeatedly denied

27  possessing any razor, and more importantly this has nothing to do with Castro's 2009 revalidation.  No razor was
    used as a source item.  *See* Thompson Decl. Ex. 10 at AGO 04602.

28  [15] Specifically, Castro's liberty interest in remaining free from confinement in the SHU is at stake.  The U.S.
    Supreme Court has recognized that this is a valid liberty interest.  *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

procedures...[,] does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for that loss is available.

*Id.* (emphasis added). *Elster* distinguished *Raditch* because: (1) Elster sought "constitutional freedom from imprisonment, not property rights" and (2) Elster had no meaningful postdeprivation remedy because he was "no longer serving the first sentence in the series which he challenges." Similarly, here Castro is seeking freedom from solitary confinement as opposed to a property right, and is no longer in the SHU as a result of his 1997 validation, but instead remains there because of his 2009 revalidation. *Id.* Accordingly, *Elster* makes clear that Castro's 2009 revalidation cannot moot the constitutional violation that occurred in 1997.

The cases Defendants cite are inapposite for two reasons: (1) they improperly suggest that *any* procedural due process violation requires only a procedural correction, which was specifically rejected in *Elster*, and (2) the post-deprivation hearings in these cases were provided on the heels of the due process violations, not 12 years after the fact as with Castro's revalidation. *Se, e.g., Garcia v. Stewart*, 2009 WL 688887, *8 (N.D. Cal. March 2009) (post-deprivation hearing provided within one year and three months); *Pryer v. Evans*, 2008 WL 131604, PIN (N.D. Cal. Jan. 2008) (post-deprivation hearing provided within four months); *Jones v. Smalls*, 2002 WL 31618539 (N.D. Cal. Nov. 2002) (post-deprivation hearing provided within slightly over two months). This second reason is particularly important because "[t]he fundamental requirement of due process is the opportunity to be heard *at a meaningful time* and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added). Castro's 2009 revalidation could not have provided due process for his 1997 validation at a "meaningful time" – Castro remained housed in the SHU, a prison within a prison, for 12 years based upon the unconstitutional initial validation.

Moreover, Defendants' attempt to justify Castro's 12 years of solitary confinement by providing him with a "hearing" over a decade later fails not only because it defies common sense, but because it undermines any notions of fairness. If such a position were allowed, it would effectively authorize the CDCR to violate the Constitution, and provide due process only if there

1    were a risk that an inmate might successfully challenge this at trial. This clearly cannot be

2    allowed, and accordingly, the 2009 revalidation cannot moot Castro's claim.[16]

3    **VII.   THERE IS A TRIABLE ISSUE OF FACT WHETHER THE 2003 AND 2006**
     **ACTIVE/INACTIVE REVIEWS PROVIDE AN INDEPENDENT BASIS FOR**
4    **CASTRO'S CONTINUED RETENTION (THEY DO NOT)**

5            Defendants may be arguing that Castro's 2003 and 2006 active/inactive reviews provide

6    independent bases for Castro's continued retention in addition to his procedurally deficient 1997

7    and 2009 revalidations. Because the 2003 and 2006 active/inactive reviews were predicated on

8    his procedurally deficient 1997 validation, however, they cannot provide such a basis. Simply

9    put, but for the 1997 validation, which this Court has found invalid, the active/inactive review

10   would not and could not have resulted in Castro's retention in the SHU. The idea that the an

11   active/inactive review can somehow moot the previous due process violation is tantamount to

12   arguing that someone who is convicted of a crime, but later exonerated, should be retained in

13   prison if the parole board found that they were unsuitable to re-enter society. Clearly, this

14   position defies logic.

15           Further, even if the 2003 or 2006 active/inactive reviews could form an independent basis

16   to retain Castro, which they cannot, they would fail to do so here because, among other things,

17   neither afforded Castro with the requisite due process. As discussed above, the evidence used in

18   the 2003 active/inactive review (Source item 8) suffered from numerous fatal flaws, and as a

19   result was found insufficient by IGI Lieutenant McMillan. Similarly, the evidence used in the

20   2006 revalidation was insufficient (Source item 5). Moreover, both active/inactive reviews relied

21   upon only one source item, whereas to validate an inmate, CDCR regulations require at least

22   three. *See* 15 C.C.R. 3378(f), 3378(c)(4).

23

24   _____

25   [16] A case also cannot be mooted where "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *See Hubbart v. Knapp,* 379 F.3d 773, 777-78 (9th Cir. 2004). Here, Mr. Castro has been, and will continue to be, subject to gang validation hearings before a court can rule on its propriety. Thus, Castro will likely be subject to the same action again. Moreover, the CDCR's actions evade review. Were Defendants permitted to moot a 12-year-old civil rights case by providing a new hearing each time we are on the eve of trial, Mr. Castro would file suit each time challenging the new hearing, and, each time his case neared trial, Defendants could simply provide a new "hearing" and again moot the case. Equity does not permit such an unjust result.

26

27

28

## VIII. DEFENDANTS IMPROPERLY RAISE SETTLEMENT DISCUSSIONS IN DIRECT CONTRAVENTION OF FEDERAL RULE OF EVIDENCE 408 AND MISSTATES THOSE DISCUSSIONS

In their Motion for Summary Judgment, Defendants describe, albeit incorrectly, numerous confidential settlement communications that have taken place between the parties over the course of this litigation. Defendants rely upon these settlement discussions in an attempt to invalidate Plaintiff's claim in blatant violation of Fed. R. Evid. 408. *See* Burns Decl. Exs. A, B. Because these settlement discussions are inadmissible, this Court should not only ignore them, but deny Defendants' motion which relies thereupon.

However, to the extent this Court chooses to consider these inadmissible settlement discussions, Plaintiff must respond in order to provide the Court with a complete and accurate depiction of these discussions and rectify Defendants' gross mischaracterizations and omissions. Burns Decl. Exs. A, B. For example, Defendants omit that during the court-sponsored mediation in April 2009, the CDCR instructed Assistant IGIs Short and Burris to ransack Castro's cell, and that this ransacking magically elicited new evidence that was later used in Castro's 2009 "revalidation." *See* Docket No. 118, Castro Decl. ¶ 16. Prior to the ransacking of Castro's cell, Castro sought a revalidation procedure under then current CDCR regulations. After the ransacking, Castro decided that a fair proceeding before the CDCR was not possible and proposed that such a proceeding be before a neutral party. Plaintiff's attorneys agreed to waive their attorneys fees if a fair hearing could be had. Defendants rejected these overtures. All Castro ever sought was a fair hearing.

## IX. REVALIDATION BY THE CDCR IS NOT AN APPROPRIATE REMEDY BECAUSE THE CDCR IS INCAPABLE OF PROVIDING DUE PROCESS

It has become clear that the CDCR is unwilling to or incapable of providing Castro due process. They have failed to do so with each chance they have had – in Castro's 1997 validation, his 2003 and 2006 active/inactive reviews, and again in his 2009 revalidation.

This unwillingness to provide due process is confirmed by the CDCR's actions during settlement discussions. Castro has repeatedly suggested having a hearing before a neutral party, but the CDCR has refused because they want to maintain power over the process to ensure that

the "right" outcome is reached. Castro, on the other hand, simply wants a fair hearing from a neutral party that has no motivation to decide one way or the other.

Finally, it is evident that the CDCR is already working on the next revalidation of Castro. Mr. Marquez specifically opines regarding the validity of a potential source item that was not discovered until <u>after</u> the 2009 revalidation was completed. Thompson Decl. Ex. 17. Plaintiff fully expects that if he is successful in Phase II of this litigation, he will be back before the Court again litigating another sham revalidation. Unfortunately, the CDCR will always be one step ahead. Unless this Court stops them from doing so, or mandates adequate procedural safeguards, the CDCR will continue to revalidate Castro each and every time he is successful in his litigation. Accordingly, Plaintiff requests that the Court provide injunctive relief that goes beyond simply ordering the CDCR to, once again, "revalidate" Plaintiff, and instead that this Court maintain jurisdiction over this action and require that any subsequent validation proceeding take place before either this Court, Judge Vadas, or some other neutral party. The CDCR has demonstrated that it cannot and will not provide Castro with a fair hearing.

## X.    CONCLUSION

As demonstrated above, there is a triable issue regarding most, if not all material facts Defendants proffer. Accordingly, Defendants' Motion for Summary Judgment should be denied.


Dated: August 12, 2010                    JAMES E. BURNS, JR.
                                          JAMES E. THOMPSON
                                          JENNIFER NEJAD
                                          ORRICK, HERRINGTON & SUTCLIFFE LLP


                                          */s/ James E. Burns, Jr.*
                                          _____
                                          JAMES E. BURNS, JR.
                                          Attorneys for Plaintiff
                                          CARLOS CASTRO